UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
(WESTERN DIVISION)

| | | |
|---|---|---|
| ALAN BROSZ, derivatively on behalf of BIG LOTS, INC., | : | Civil Action No. 1:13-cv-753 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| STEVEN S. FISHMAN , JOE R. COOPER, CHARLES W. HAUBIEL II, TIMOTHY A. JOHNSON, ROBERT CRAIG CLAXTON, JOHN CHARLES MARTIN, NORMAN J. RANKIN, PAUL ALAN SCHROEDER, ROBERT SAMUEL SEGAL, STEVEN RAY SMART, JEFFREY PAUL BERGER, DAVID T. KOLLAT, BRENDA LAUDERBACK, PHILIP E. MALLOT, RUSSELL SOLT and  DENNIS B. TISHKOFF, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| BIG LOTS, INC., | : | |
| | : | |
| Nominal Defendant. | : | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.     Plaintiff Alan Brosz ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Big Lots, Inc. ("Big Lots" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2012 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Big Lots is North America's largest broadline closeout retailer.  The Company operates over 1,400 Big Lots Stores in the 48 contiguous United States.  Big Lots' stores contain an assortment of merchandise, including consumables, seasonal products, furniture, housewares, toys and gifts.

3.      During the Relevant Period, several of the Company's officers and directors engaged in illicit sales of Big Lots stock based on their possession of material, adverse, non-public information.  The relevant sales, which total **_over $37 million_**, began only days after defendants' March 2, 2012 announcement of positive guidance for fiscal 2012, and would last until March 28, 2012.

4.      Beginning on April 23, 2012, the truth about the Company's financial prospects began to be revealed.  That day, defendants announced that comparable same stores sales would be slightly negative for the first quarter of 2012, as opposed to the positive guidance for these stores that was announced on March 2, 2012.

5.      On this news, Big Lots stock collapsed $11.00 per share to close at $34.71 per share on April 24, 2012, a one-day decline of 24%.

6.      On May 23, 2012, defendants confirmed that comparable stores sales were in fact negative for the first quarter of 2012.  Defendants also reversed the Company's prior positive guidance for the remainder of 2012.  At the same time, defendants (at the direction of the Board) announced that Big Lots spent $99 million to repurchase its shares during the first quarter of 2012, propping up the Company's share price at the same time that defendants engaged in their illicit insider selling.

7.      Accordingly, the Company has been damaged.

2

8. In light of the events described herein, on January 28, 2013, Plaintiff issued a demand (the "Demand") pursuant to Ohio law on the Board to undertake an independent internal investigation into defendants' violations of Ohio and/or federal law, and to commence a civil action against each of the defendants to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties. A true and correct copy of the Demand is attached hereto at Exhibit "A."

9. Thereafter, on September 9, 2013, Plaintiff's counsel received a letter from Patrick D. Cornelius ("Cornelius") of Squire Sanders (US) LLP ("Squire Sanders"). This letter, hereinafter referred to as the "Refusal," stated that a purported special committee (an "SC") of the Board had determined that none of the officers or directors named in the Demand breached their fiduciary duties, and that the Board had determined to reject the Demand in its entirety. A true and correct copy of the Refusal is attached hereto at Exhibit "B."

10. The Refusal was most notable for what it lacked, rather than its scant contents. Specifically, the Refusal contained absolutely no information whatsoever concerning the kind of "investigation" the SC and/or the Board engaged in, or what the substantive findings were regarding the merits of any of Plaintiff's claims as set forth in the Demand. The Refusal merely contained a blanket refusal of the specific claims set forth in the Demand, with nothing more.

11. Clearly, the Board's complete disregard of the actual merits of the claims set forth in the Demand is improper and demonstrates the Board's lack of diligence and good faith.

12. Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds

$75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

### THE PARTIES

15.     Plaintiff is a current shareholder of Big Lots and has continuously held Big Lots stock since December 2011.  Plaintiff is a citizen of Vermont.

16.     Nominal defendant Big Lots is an Ohio corporation, with its principal executive offices at 300 Phillipi Road, Columbus, Ohio 43228.  According to its public filings, Big Lots is North America's largest broadline closeout retailer.  The Company operates over 1,400 Big Lots Stores in the 48 contiguous United States.  Big Lots' stores contain an assortment of merchandise, including consumables, seasonal products, furniture, housewares, toys and gifts.

17.     Defendant Steven S. Fishman ("Fishman") served as the Company's Chairman of the Board, President and Chief Executive Officer ("CEO") from July 2005 until his "retirement" on May 6, 2013.  Upon information and belief, defendant Fishman is a citizen of Ohio.

18.     Defendant Joe R. Cooper ("Cooper") serves as the Company's Executive Vice President ("EVP") and President, Big Lots Canada, Inc.  Cooper previously served as the Company's EVP and Chief Financial Officer ("CFO") from March 2010 until August 2012, and

as Senior Vice President ("SVP") and CFO from February 2004 until March 2010.  Previously, Cooper served as the Company's Vice President of Strategic Planning and Investor Relations, Treasurer.  Upon information and belief, defendant Cooper is a citizen of Ohio.

19.     Defendant Charles W. Haubiel II ("Haubiel") served as the Company's Chief Administrative Officer from August 2012 to June 17, 2013 and served as EVP from March 2010 to June 17, 2013.  Haubiel served as the Company's General Counsel and Corporate Secretary from July 2000 to June 17, 2013.  Previously, Haubiel served as SVP of Legal and Real Estate from January 2008 to March 2010, and as SVP from November 22, 2004.  Haubiel served as Vice President of Big Lots from July 2000 to November 2004. Haubiel joined Big Lots in 1997 as Senior Staff Counsel and later served as its Director of Corporate Counsel and Assistant Secretary in 1999.  Upon information and belief, defendant Haubiel is a citizen of Ohio.

20.     Defendant Timothy A. Johnson ("Johnson") has served as the Company's SVP, CFO since August 2012.  Previously, Johnson served as SVP of Finance, SVP of Strategic Planning and Investor Relations and Director of Strategic Planning.  Upon information and belief, defendant Johnson is a citizen of Ohio.

21.     Defendant Robert Craig Claxton ("Claxton") served as the Company's SVP of Marketing from 2005 until June 2013.  Upon information and belief, defendant Claxton is a citizen of Ohio.

22.     Defendant John Charles Martin ("Martin") has served as the Company's EVP, Chief Marketing Officer since August 2012.  On July 16, 2013, Martin announced his intention to retire from that position.  Upon information and belief, defendant Martin has not yet actually retired.  Previously, Martin had served as the Company's EVP of Administration and EVP of Merchandising.  Upon information and belief, defendant Martin is a citizen of Ohio.

23.     Defendant Norman J. Rankin ("Rankin") has served as SVP of Big Lots Capital & Wholesale since January 2008.  Rankin has served as SVP of Big Lots since 1999 and as General Merchandise Manager.  Upon information and belief, Rankin is a citizen of Ohio.

24.     Defendant Paul Alan Schroeder ("Schroeder") has served as Vice President and Controller of Big Lots since September 2005.  Upon information and belief, Schroeder is a citizen of Ohio.

25.     Defendant Robert Samuel Segal ("Segal") has served as SVP and General Merchandise Manager of Big Lots since January 2008.  Upon information and belief, Segal is a citizen of Ohio.

26.     Defendant Steven Ray Smart ("Smart") has served as the Company's SVP and General Merchandise Manager since March 2010.  Upon information and belief, Smart is a citizen of Ohio.

27.     Defendant Jeffrey Paul Berger ("Berger") has served as a director of the Company since 2006.  Upon information and belief, defendant Berger is a citizen of Florida.

28.     Defendant David T. Kollat ("Kollat") served as a director of the Company from 2005 until May 2012.  Upon information and belief, defendant Kollat is a citizen of Ohio.

29.     Defendant Brenda Lauderback ("Lauderback") has served as a director of the Company since 1997.  Upon information and belief, defendant Lauderback is a citizen of Texas.

30.     Defendant Philip E. Mallot ("Mallot") has served as a director of the Company since 2003.  Upon information and belief, defendant Mallot is a citizen of Ohio.

31.     Defendant Russell Solt  ("Solt") has served as a director of the Company since 2003.  Upon information and belief, defendant Solt is a citizen of Oregon.

6

32.     Defendant Dennis B. Tishkoff ("Tishkoff") has served as a director of the Company since 1991.  Upon information and belief, defendant Tishkoff is a citizen of Ohio.

33.     Collectively, defendants Fishman, Cooper, Haubiel, Johnson, Claxton, Martin, Rankin, Schroeder, Segal, Smart, Berger, Kollat, Lauderback, Mallot, Solt and Tishkoff shall be referred to herein as "Defendants."

## DEFENDANTS' DUTIES

34.     By reason of their positions as officers, directors, and/or fiduciaries of Big Lots and because of their ability to control the business and corporate affairs of Big Lots, Defendants owed Big Lots and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Big Lots in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Big Lots and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Big Lots and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     Defendants, because of their positions of control and authority as directors and/or officers of Big Lots, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Big Lots, each of the Defendants had knowledge of material non-public information regarding the Company.

36.     To discharge their duties, the officers and directors of Big Lots were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company.  By virtue of such duties, the officers and directors of Big Lots were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37.    All of the Defendants were required to comply with Big Lots' Code of Business Conduct and Ethics.  According to the Big Lots' Code of Business Conduct and Ethics:

> *This Code of Business Conduct and Ethics covers a wide range of business principles to guide all directors, officers and associates of the Company.* All of our directors, officers and associates must conduct themselves accordingly and seek to avoid even the appearance of improper behavior.
>
>     *      *      *
>
> **1. Compliance with Laws, Rules and Regulations**
> *Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built.* All associates must respect and obey the laws of the cities, states and countries in which we operate. Although not all associates are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers or other appropriate personnel. **The Company holds information and training sessions to promote compliance with laws, rules and regulations, including insider-trading laws.**
>
>     *      *      *
>
> **3. Insider Trading**
> *Associates, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. [Emphasis added.]*

8

38.    Defendants Fishman, Johnson and Cooper were required to comply with Big Lots' Code of Ethics for Financial Professionals. Among other things, this code mandates that these defendants "[e]ngage in and promote honest and ethical conduct" and "[c]omply with applicable governmental laws, rules and regulations."

39.    Moreover, Big Lots' Corporate Governance Guidelines, when referencing "Expectations of Directors" in Section 2.4.3, sets forth that the "Board believes that significant ownership of the Company's common shares by directors further aligns their interests with the interests of the Company's shareholders." Additionally, Section 4.3 states that the "Board believes that significant ownership of the Company's common shares by members of senior management further aligns their interests with the interests of the Company's shareholders."

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

40.    According to its public filings, the Company is North America's largest broadline closeout retailer. The Company operates over 1,400 Big Lots Stores in the 48 contiguous United States. Big Lots' stores contain an assortment of merchandise, including consumables, seasonal products, furniture, housewares, toys and gifts.

### B.    Defendants' False and Misleading Statements

41.    On February 2, 2012, Defendants caused the Company to issue a press release reporting certain financial results for the fourth quarter 2011 and fiscal year 2011. In addition to reporting sales and earnings, Defendants made statements concerning the Company's shift to more electronic merchandise while downsizing toy products. In particular, Defendants revised the Company's U.S. fourth quarter earnings guidance to $1.71-$1.74 diluted earnings per share ("EPS"), up from prior guidance of $1.59-$1.66 diluted EPS. Defendants additionally reported

Case: 1:13-cv-00753-SSB-KLL Doc #: 1 Filed: 10/18/13 Page: 10 of 32  PAGEID #: 10

that Big Lots' fiscal year 2011 retail sales from U.S. operations totaled $5,093.4 million (or about $5.093 billion), and forecast 2011 diluted EPS of $2.94-$2.97, a 4% to 5% improvement over fiscal 2010 earnings. In the release, defendant Fishman stated, in part:

> I'm pleased with our fourth quarter sales results and the improving trends we have experienced throughout the year. For the all-important holiday selling season, we believe our strategy was very well executed and our decision to be aggressive in certain key categories was successful. From a merchandise perspective, seasonal and furniture each comped up low double digits and consumables comped up mid single digits. Additionally, our planned shift to more electronics merchandise while downsizing toys was well received by our customers.

42.    Based on these statements, Big Lots' stock price increased $3.27 per share to close at $42.82 per share on February 2, 2012, a one-day increase of nearly 8%.

43.    On March 2, 2012, Defendants caused Big Lots to issue a press release announcing the Company's financial results for its fourth quarter and fiscal year ended January 28, 2012.  Defendants reported fourth quarter 2011 net income of $114.7 million, or $1.75 diluted EPS, and a comparable store sales increase of 3.4% for U.S. stores. Defendants further reported fiscal year 2011 net income of $207.1 million, or $2.98 diluted EPS, and "record" total sales of $5.2 billion for the year. Moreover, Defendants issued the Company's 2012 guidance, estimating a comparable store sales increase in the range of 2%-3% for U.S. stores and income from continuing operations projected to be $3.40-$3.50 diluted EPS. In the release, defendant Fishman stated, in part:

> We are very pleased to deliver our fifth consecutive year of record operating profit in the U.S. and record EPS for the overall Company. We were aggressive this year in certain key merchandise initiatives and our strategies accelerated sales trends as the year progressed. We successfully opened 92 new stores in the U.S. and expanded our footprint into Canada with the acquisition of Liquidation World. We operated as good stewards of our cash and shareholders' capital as we invested in long-term growth opportunities, both in the U.S. and Canada, while returning $359 million of cash back to shareholders through our share repurchase efforts.

10

44.    By mid-March 2012, Big Lots stock was trading above $45 per share.  On March 20, 2012, defendant Fishman sold 227,500 shares of his Big Lots stock at $45.23 per share, for proceeds of $10.289 million.  On March 27, 2012, Big Lots stock closed at $46.81 per share.  On this day, defendant Cooper sold 25,000 shares of his Big Lots stock, for proceeds of $1.165 million.  These sales, as well as other sales by Defendants, are set forth in greater detail, *infra*.

45.    It has been alleged[1] that defendants Cooper, Fishman, Haubiel and Johnson were continuously apprised of ongoing sales trends and the performance of the Company's critical merchandising operations through Big Lots' extensive reporting and information delivery systems.   These defendants received daily "Flash Reports" via Big Lots' "Lotus Notes" narrowcast messaging system – an internal Company communication and information-sharing interface – at approximately 3 a.m. every morning.   The Flash Reports broke down the Company's sales by region, sales to plan, and comparable store sales.

46.    In addition, these defendants received a "Weekly Summary" of sales results every Monday morning between 10:30 and 11:00 a.m. The sales data in the Weekly Summary came from a Company data warehouse known as "Donald" and was approved by defendant Johnson. The Weekly Summary showed the prior week's sales by state, by region, and by merchandise category and included comparable store sales.  Every Monday, from noon to 2:30 p.m., these defendants attended an executive meeting in the Company's Executive Board Room during which managers relayed the content of weekly BPA divisional meetings, including sales trends and issues throughout the Company's merchandising operations.  At these executive meetings, defendants Cooper, Fishman, Haubiel and Johnson discussed Big Lots' business performance for

---

[1] Some of the facts alleged herein have been alleged in an amended complaint for a securities class action (amended complaint filed on April 4, 2013) pending in the Southern District of Ohio against Big Lots and certain of its executive officers.  *See Willis v. Big Lots, Inc. et al*,. No. 12cv00604 (S.D. Ohio).

the previous week and business prospects in detail, with top priority given to any downward sales trends or problems identified within the Company's merchandising operations.  Moreover, certain individuals, including defendant Fishman, received special "micro-strategy reporting" which allowed these executives to view sales performance every hour, by region, by district, by store, and by merchandise category.  Because of these extensive information delivery and reporting systems, Defendants knew of declines within the Company's key merchandising categories and problems within the Company's critical merchandising operations as they occurred.

47.    These defendants have admitted and repeatedly affirmed their intense, constant focus on the Company's merchandising operations and sales prospects, in particular on the Company's key merchandising categories.  Defendants "challenge[d] [themselves] every day about [sales growth]" and "work[ed] really, really hard . . . to understand how to grow the business and have more consistency."  Indeed, "[Big Lots'] [m]erchant terms [were] intensely focused on [sales consistency]," such that it was the "top priority" in "everything [Big Lots would] do."  In addition, defendant Fishman has stated that he and Johnson would "constantly monitor" store sales trends and discuss, on a "week to week basis," "where the action needs to be taken."  Defendant Fishman has further stated that he was "always concerned" with the performance of the Company's key merchandising categories, and would even "lose sleep" over sales performance.

48.    These defendants' job responsibilities, certifications, actions, statements and participation in Big Lots' extensive reporting and information distribution network confirm that these defendants were on notice of and/or turned a blind eye to the impairment to the Company's

merchandising operations and slowdown in the Company's sales performance and the surrounding circumstances.

### C.   The Insider Trading

49.   Between March 6, 2012 and March 28, 2012, while in possession of material, adverse, non-public information, Defendants sold 817,874 shares of their personally held or controlled Big Lots stock, reaping illicit proceeds of over $37 million.  This occurred at a time when the Company, at the Board's direction, was buying back $99 million of Big Lots stock, artificially propping up the Company's stock price.

50.   The following chart details the illicit insider sales during a twenty-two day period encompassing only seventeen trading days in March 2012, shortly after Defendants' March 2, 2012 disclosures touting purportedly record results.  These sales were made while Big Lots stock was artificially inflated due to Defendants' false and misleading statements about the Company (as set forth above), and while Defendants were in possession of material, adverse non-public information about the Company:

| Insider Seller | Date | Number of Shares | Price | Total Price |
|---|---|---|---|---|
| Brenda J. Lauderback | March 6, 2012 | 30,000 | $44.04 | $1,321,200.00 |
| Charles W. Haubiel II | March 15, 2012 | 56,250 | $45.61 | $2,565,562.50 |
| David T. Kollat | March 6, 2012 | 60,000 | $43.96 | $2,637,600.00 |
| Dennis B. Tishkoff | March 7, 2012 | 4,000 | $44.62 | $178,480.00 |
| Jeffrey Paul Berger | March 12, 2012 | 20,000 | $45.21 | $904,200.00 |
| Joe R. Cooper | March 7, 2012 | 44,875 | $44.76 | $2,008,605.00 |
| Joe R. Cooper | March 27, 2012 | 25,000 | $46.60 | $1,165,000.00 |
| John Charles Martin | March 8, 2012 | 73,750 | $45.00 | $3,318,750.00 |
| John Charles Martin | March 27, 2012 | 15,000 | $46.60 | $699,000.00 |

| | | | | |
|---|---|---|---|---|
| Norman J. Rankin | March 6, 2012 | 21,300 | $44.37 | $945,081.00 |
| Paul Alan Schroeder | March 7, 2012 | 4,000 | $44.55 | $178,200.00 |
| Paul Alan Schroeder | March 22, 2012 | 5,000 | $45.11 | $225,550.00 |
| Paul Alan Schroeder | March 27, 2012 | 2,000 | $46.60 | $93,200.00 |
| Philip E. Mallott | March 9, 2012 | 1,500 | $45.39 | $68,085.00 |
| Robert Craig Claxton | March 13, 2012 | 37,500 | $45.71 | $1,714,125.00 |
| Robert Craig Claxton | March 27, 2012 | 15,000 | $46.60 | $699,000.00 |
| Robert Samuel Segal | March 7, 2012 | 11,250 | $44.85 | $504,562.50 |
| Robert Samuel Segal | March 9, 2012 | 5,792 | $45.41 | $263,014.72 |
| Robert Samuel Segal | March 13, 2012 | 5,458 | $45.65 | $249,157.70 |
| Robert Samuel Segal | March 21, 2012 | 1,875 | $45.70 | $85,687.50 |
| Robert Samuel Segal | March 27, 2012 | 4,264 | $46.40 | $197,849.60 |
| Robert Samuel Segal | March 28, 2012 | 7,736 | $45.86 | $354,772.96 |
| Russell Solt | March 6, 2012 | 6,425 | $43.57 | $279,937.25 |
| Steven Ray Smart | March 19, 2012 | 10,000 | $45.75 | $457,500.00 |
| Steven Ray Smart | March 27, 2012 | 10,000 | $46.60 | $466,000.00 |
| Steven S. Fishman | March 20, 2012 | 227,500 | $45.23 | $10,289,825.00 |
| Steven S. Fishman | March 27, 2012 | 106,125 | $46.40 | $4,924,200.00 |
| Timothy A. Johnson | March 14, 2012 | 5,625 | $45.47 | $255,768.75 |
| Timothy A. Johnson | March 27, 2012 | 649 | $46.40 | $30,113.60 |
| **Sum of Total Proceeds** | | | | **$37,080,028.08** |

51.     As set forth in the chart above, beginning on March 6, 2012, Defendants sold

massive amounts of their personally held Big Lots stock.  More specifically:

     a.   Defendant Lauderback sold approximately 74% of her Big Lots stock holdings;

     b.   Defendant Schroeder sold approximately 73% of his Big Lots stock holdings;

     c.   Defendant Kollat sold approximately 70% of his Big Lots stock Holdings;

     d.   Defendant Segal sold approximately 65% of his Big Lots stock holdings;

     e.   Defendant Martin sold approximately 62% of his Big Lots stock holdings;

     f.   Defendant Berger sold approximately 60% of his Big Lots stock holdings;

     g.   Defendant Claxton sold approximately 58% of his Big Lots stock holdings;

     h.   Defendant Cooper sold approximately 54% of his Big Lots stock holdings;

     i.   Defendant Smart sold approximately 50% of his Big Lots stock holdings;

     j.   Defendant Rankin sold approximately 49% of his Big Lots stock holdings;

     k.   Defendant Fishman sold approximately 46% of his Big Lots stock holdings;

     l.   Defendant Solt sold approximately 42% of his Big Lots stock holdings;

     m.   Defendant Haubiel sold approximately 41% of his Big Lots stock holdings;

    n.   Defendant Tishkoff sold approximately 22% of his Big Lots stock holdings;

    o.   Defendant Johnson sold approximately 17% of his Big Lots stock holdings; and

    p.   Defendant Mallot sold approximately 11% of his Big Lots stock holdings.

52.    Although certain of Defendants' sales on March 27 and March 28, 2012 were "pursuant to a plan intended to comply with Rule 10b5-1," all of these sales should be considered illicit insider sales.  With respect to this issue, the Forms 4 do not confirm that the sales on these dates comply with Rule 10b5-1, nor do the Forms 4 disclose the terms of the purported 10b5-1 plans or when Defendants entered into such plans.  Additionally, these sales appear to be but a continuation of the selling that begin in early March not pursuant to any 10b5-1 plan.

53.    Defendants' insider sales from March 6, 2012 to March 28, 2012 do not follow any of Defendants' historical patterns of sales.  Instead, Defendants' stock sales during this timeframe (which began right after the positive statements in the March 2, 2012 press release) demonstrate that the sales were unusual in timing and amount.  Thirteen of the Defendants sold 40% or more of their total stock holdings in the Company.

54.    These financial gains realized by Defendants came at the expense of Big Lots and, as a result of this breach of fiduciary duty, the Insider Selling Defendants should be compelled to disgorge proceeds from these stock sales and return such funds to Big Lots.

**D.**    <u>**The Truth Slowly Begins To Emerge**</u>

55.    After the market closed on April 23, 2012, Defendants issued a press release announcing updates to the Company's first quarter 2012 retail sales guidance.  Defendants forecasted a decline in first-quarter same-store sales, slightly negative in comparison to the prior guidance, which estimated a comparable stores sales increase for the quarter of 2% to 4%.  The release stated in part:

Based on retail sales results quarter-to-date and assumptions for the balance of the first quarter of fiscal 2012, *we now expect U.S. comparable store sales to be slightly negative compared to our prior guidance issued on March 2, 2012, which estimated a comparable store sales increase of 2% to 4%.* U.S. comparable store sales were on plan through the first six weeks of the quarter; however, sales compared to plan began to slow in late March and trends have further softened as we moved through the month of April. From a merchandising perspective, furniture, hardlines, and seasonal, particularly lawn and garden, have been our best performing businesses; whereas, consumables and play n' wear, particularly electronics, are currently below expectations for the quarter.

In terms of our recently acquired Canadian operations, based on results quarter-to-date, we anticipate retail sales for the first quarter of fiscal 2012 will be slightly above our guidance which estimated sales in the range of $25 to $30 million. [Emphasis added.]

56.     Following these disclosures, the reaction from the financial news media was swift and harsh. As *MarketWatch* noted on April 24, 2012[2]:

Big Lots also has been faced with increased competition. While Family Dollar and Dollar General are opening more than 1,000 stores annually, the chain of about 1,500 stores is looking to add only 45 stores this year, [Raymond James Analyst Dan] Wewer said.

"For the second time in 2 plus years, consumables has reared its ugly head as a problem, which suggests to us that structural issues (80% closeout driven) are at play – an issue that needs to get addressed" as soon as possible, said Deutsche Bank's analyst Charles Grom.

*He added the company's decision to cancel its scheduled appearance at a Barclays Capital conference on Tuesday only deepened his concerns about company's credibility issues.* [Emphasis added.]

57.     *Forbes* was even more skeptical, and highlighted defendant Fishman's positive statements about the Company's trends during the fourth quarter earnings conference call. These

---

[2] Article available at: http://articles.marketwatch.com/2012-04-24/industries/31390881_1_big-lots-dan-wewer-retailers/2

statements were made very shortly before he unloaded massive amounts of Big Lots stock.  An article entitled "A Very Fishy Smell Coming Out Of Big Lots"[3] set forth:

> You would think this is a run-of-the mill earnings warning but it's much more. ***In March, following the fourth quarter 8-K issuance on March 7, Big Lots executives dumped about 800,174 shares of stock. CEO Steve Fishman unloaded a cool $14.9 million of his Big Lots holdings, $10 million on March 20 and $4.9 million on March 27. Note that on the fourth quarter earnings call, Mr. Fishman was quoted as stating: "We have improving trends coming out of 2011 and a focused strategy to execute in 2012."***
>
> ***So, trends were improving in the first week of March, then significantly nosedived to the extent that sparked meaningful insider stock sales by the CEO on March 20 and March 27? Or, was the earnings call statement misleading to begin with seeing as executives began to unload Big Lots shares as soon as the calendar turned to March?***
>
> Keep in mind that retail has been delivering stronger than expected sales for the better part of 2012, suggesting Big Lots' initiatives to drive more consumable goods sales is not working as management has hinted and overall, there is market share loss occurring.
>
> Big Lots spent $46 million to repurchase 1.3 million shares in the fourth quarter at $36.79 per. In 2011, the company repurchased 15% of its outstanding shares. This is poorly allocated capital, in my view, especially strange in light of the CEO and other executives selling while the company is buying.
>
> I would not even consider reversing my generally bearish view on Big Lots in light of the second consecutive gap down on the chart in under a month, the latest being a result of clear fundamental deterioration in the business. [Emphasis added.]

58.     On this news, Big Lots stock collapsed $11.00 per share to close at $34.71 per share on April 24, 2012, a one-day decline of 24%.  This closing price was significantly less than the prices at which Defendants had sold their personally held Big Lots shares just weeks prior.

59.     On November 27, 2012, *The Wall Street Journal* ("*WSJ*") published an article entitled "Executives' Good Luck in Trading Own Stock."[4]   The article set forth, in relevant part:

---

[3]  Article available at: http://www.forbes.com/sites/greatspeculations/2012/04/24/a-very-fishy-smell-coming-out-of-big-lots/

The CEO of retailer Big Lots Inc. – while not trading in the week before news, but a longer time before—has drawn flak from shareholders for a highly beneficial trade he made as this year's first quarter drew to a close.

*The CEO, Steven Fishman, exercised stock options and sold a little over $10 million of Big Lots stock on March 20. On April 23, Big Lots surprised investors by disclosing that first-quarter sales had slowed.*

The stock plunged 24% in a single day. That meant shares worth $10 million in late March, when Mr. Fishman sold, suddenly would have been worth $2.4 million less.

*Mr. Fishman had a 10b5-1 plan calling for periodic stock trades, but he made this trade outside of the plan,* as is permitted.

A Big Lots official said the trade was properly made "at a time when the company's trading window was open." The company noted that in the stock-options exercise, the CEO paid about $5.3 million to buy the $10.3 million of shares that he sold.

Neither Mr. Fishman nor the company would comment on whether he knew of the sales slowdown when he sold the shares.

His trade displeased some shareholders, who had been primed for good news. Big Lots' guidance to investors in early March was for a 2% to 4% increase in sales. When the company on April 23 instead said to expect a decline, the stock fell by nearly a quarter in a single day, to $34. Mr. Fishman had sold at a little over $45. In a lawsuit against Big Lots and Mr. Fishman, filed in U.S. District Court for the Southern District of Ohio, some shareholders allege they were misled about the state of the business even as the chief executive was selling shares.

The Big Lots spokesman said the sales were proper and declined to comment on the suit. [Emphasis added.]

60.     On December 10, 2012, *WSJ* published a follow-up piece entitled "Insider-Trading Probe Widens."[5]   This article revealed, in relevant part:

.  .  . the Journal reported last week federal prosecutors and the SEC were examining trading of another executive cited in the article, Big Lots Inc. CEO

---

[4]       Article                       available                       at:
http://online.wsj.com/article/SB10000872396390444100404577641463717344178.htm

[5]       Article                       available                       at:
http://online.wsj.com/article/SB10001424127887323339704578171703191880378.html

Steven Fishman. The company said his trades were "properly made" at a time when allowed.

Unlike many of those the federal authorities now are looking at, Mr. Fishman didn't make his sale using a prearranged corporate-executive trading plan. The plans, known as "10b5-1" plans, permit executives to trade their own company's stock despite possessing important, nonpublic information, by scheduling their trades in advance at particular times or prices.

61.     Then, on December 4, 2012, *WSJ* published an article entitled "Big Lots Chief Probed by SEC."[6]   Among other things, the article highlighted the fact that the U.S. Securities and Exchange Commission ("SEC") was investigating defendant Fishman's March 2012 insider sales, and revealed that defendant Fishman intended to "retire" in the near future.  This article set forth, in relevant part:

> ***The Securities and Exchange Commission launched an inquiry into a $10 million sale of stock by Big Lots Inc. Chief Executive Steven Fishman before the company announced news that sank its stock, a person familiar with the inquiry said.***
>
> ***Big Lots said Tuesday that Mr. Fishman, 61 years old, intends to retire*** in order to spend time with his family. The discount retailer said it hadn't been contacted by the SEC and that the timing of Mr. Fishman's departure was coincidental to any regulatory interest.
>
> The company said his trades were "properly made" at a time when they were allowed by the company. Mr. Fishman didn't return calls seeking comment.
> Mr. Fishman's trading of Big Lots stock in March was cited in a front-page article in The Wall Street Journal last week. The article highlighted trades by corporate executives that were highly beneficial and occurred just before bad news hit, which spared the executives large price drops in their holdings.
>
> The Journal analyzed trading by more than 20,000 executives since 2004 and found that 1,418 executives who traded their company's stock in the week before news was announced averaged gains of 10% (or avoided losses of 10%) within a week of their trades. That was far more than those who saw trades move against them.

---

[6]                     Article                     available                     at:
http://online.wsj.com/article/SB10001424127887323401904578159672827941536.html

*Mr. Fishman's trades took place a bit more than a month before bad news hit. He sold $10.3 million of Big Lots stock on March 20 at a price of around $45, just before the end of the retailer's first quarter, according to regulatory filings. On April 23, the company told investors its sales had slowed, sending its shares down 24%, to $34, in a single day. Had Mr. Fishman waited to sell, the shares he sold for $10 million in March would have been worth $2.4 million less on April 24.*

Following the decline, shareholders sued in an Ohio federal court, alleging that they were misled about the state of the business as Mr. Fishman and other executives were selling shares. Big Lots has declined to comment on the suit and hasn't filed a formal response to it.

The SEC probe is at an early stage, said the person familiar with the inquiry. Companies often are unaware of inquiries by investigators when they are at an initial stage. Such a move by regulators doesn't necessarily suggest there would be any finding of wrongdoing.

Like everyone else, executives are prohibited from trading based on important, nonpublic information. A decade ago, the SEC gave executives an avenue for trading even when they do possess private information through "10b5-1" plans, which involve a preset plan for trading. Having such a plan can be a strong defense against allegations of improper trading.

*Mr. Fishman had such a 10b5-1 plan, but his March 20 trade was made outside of the plan, the company said.*

*The sale this year hit a nerve with investors and analysts who recalled 2010 trading activity, when Mr. Fishman, under his 10b5-1 plan, sold $8 million of Big Lots stock between April 23 and April 26 at an average price of $40.72. By May 7, the stock had fallen to $35, where it lingered as the company's business faltered in the second half of the year.*

A Big Lots spokesman said Mr. Fishman, who joined Big Lots in July 2005, formally informed the company's board on Tuesday morning of his decision to retire after a successor is found.

Big Lots, which has 1,450 U.S. stores, said the timing of his retirement stems from a three-year retention plan awarded by the board to Mr. Fishman in March 2010 that was set to expire in January 2013.

The SEC has been trying to crack down on insider trading, filing 115 insider-trading enforcement actions in the two years through September. Few have centered on allegations of senior corporate officers trading their own stock. Often, the cases involving stock trading by executives have been brought in conjunction with broader fraud charges. [Emphasis added.]

20

62.     The following day, on December 5, 2012, Defendants caused the Company to file with the SEC a Form 10-Q.  The Form 10-Q revealed, in relevant part:

> On November 29, 2012, we received a grand jury subpoena from the U.S. Attorney for the Southern District of New York requesting documents relating to Mr. Fishman's trades in our common shares. We are fully cooperating with the U.S. Attorney in connection with the subpoena. We also understand that the SEC has initiated an inquiry into this matter, but we have not yet received a document request from the SEC.

## DERIVATIVE AND DEMAND ALLEGATIONS

63.     Plaintiff brings this action derivatively in the right and for the benefit of Big Lots to redress the breaches of fiduciary duty and other violations of law by Defendants.

64.     Plaintiff will adequately and fairly represent the interests of Big Lots and its shareholders in enforcing and prosecuting its rights.

65.     In light of the events described herein, on January 28, 2013, Plaintiff issued the Demand pursuant to Ohio law on the Board to undertake an independent internal investigation into defendants' violations of Ohio and/or federal law, and to commence a civil action against each of the defendants to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties.  *See* Exhibit A.

66.     Thereafter, on September 9, 2013, Plaintiff's counsel received the Refusal from Cornelius of Squire Sanders.   The Refusal stated that a purported SC of the Board had determined that none of the officers or directors named in the Demand breached their fiduciary duties, and that the Board had determined to reject the Demand in its entirety.  *See* Exhibit B.

67.     The Refusal was most notable for what it lacked, rather than its scant contents. Specifically, the Refusal contained absolutely no information whatsoever concerning the kind of "investigation" the SC and/or the Board engaged in, or what the substantive findings were

21

regarding the merits of any of Plaintiff's claims as set forth in the Demand.  The Refusal merely contained a blanket refusal of the specific claims set forth in the Demand, with nothing more.

68.     Clearly, the Board's complete disregard of the actual merits of the claims set forth in the Demand is improper and demonstrates the Board's lack of diligence and good faith.

69.     Thus, this shareholder derivative action should be allowed to proceed.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

70.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.     As alleged in detail herein, each of the Defendants had a duty to ensure that Big Lots disseminated accurate, truthful and complete information to its shareholders.

72.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Big Lots shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

73.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

74.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

75.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in

22

accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

76.     Defendants willfully ignored the obvious and pervasive problems with Big Lots' internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

77.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR ENGAGING IN THE INSIDER SELLING SCHEME

78.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.     At the time Defendants sold their stock as alleged herein, they knew but failed to disclose material information related to the Company's worsening financial condition. Defendants engaged in this insider selling based on material, adverse, non-public information, while the Company was buying back its stock, thus propping up the share price.

80.     By engaging in this insider selling based on material, adverse, non-public information, Defendants breached their fiduciary duties of loyalty and good faith.

81.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.  Big Lots is therefore entitled to the imposition of a collective trust on any proceeds that Defendants obtained.

## COUNT IV
### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

82. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

83. By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Big Lots.

84. Plaintiff, as a shareholder and representative of Big Lots, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

85. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Big Lots, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing Big Lots to misrepresent material facts regarding its financial position and business prospects.

87. As a direct and proximate result of Defendants' abuse of control, Big Lots has sustained significant damages.

88. As a result of the misconduct alleged herein, Defendants are liable to the Company.

89. Plaintiff, on behalf of Big Lots, has no adequate remedy at law.

24

## COUNT VI
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.     Defendants had a duty to Big Lots and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Big Lots.

92.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Big Lots in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Big Lots' affairs and in the use and preservation of Big Lots' assets.

93.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Big Lots to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Big Lots, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Big Lots.

## COUNT VII
## AGAINST ALL DEFENDANTS FOR CORPORATE WASTE

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     In 2011, the Board approved a share repurchase program (the "Share Repurchase Program").  In the first fiscal quarter of 2012, Big Lots repurchased 2.5 million shares of Company stock under the Share Repurchase Program, spending a total of $99 million.

25

96.     Defendants (and particularly those Defendants who were Company directors) knew or should have known that they were engaging in illicit insider trading while the Share Repurchase Program was taking place.  Defendants (particularly Company directors) failed to implement any controls to prevent the Company from repurchasing shares form Defendants who engaged in insider trading.

97.     Defendants sold over 800,000 shares of Big Lots stock pursuant to their insider selling scheme set forth herein, garnering over $37 million in proceeds.

98.     It would be unreasonable to allow the Company to repurchase shares of Big Lots connected to an insider selling scheme.  Therefore, over $37 million of the $99 million spent under the Share Repurchase Program may have constituted a waste of corporate assets.

99.     As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Big Lots to incur (and Big Lots may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

100.     As a result of this waste of corporate assets, Defendants are liable to the Company.  Defendants should be ordered to disgorge to the Company all proceeds derived from the illicit insider sales of Big Lots stock, which the Company used corporate assets to facilitate.

101.     Plaintiff, on behalf of Big Lots, has no adequate remedy at law.

### COUNT VIII
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR VIOLATION OF THE COMPANY'S INTERNAL POLICIES

102.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.    Big Lots' Code of Business Conduct and Ethics specifically prohibits the type of insider trading set forth above.  Section 3 of this code applies to all Defendants.  Additionally, the Company's Code of Ethics for Financial Professionals, which forbids insider trading by certain senior members of management, applied to defendants Cooper, Johnson and Fishman.

104.    Sections 2.4.3 and 4.3 of the Company's Corporate Governance Guidelines require that Defendants maintain a "significant ownership of the Company's common shares" to align their interests with those of the Company's shareholders.  As alleged herein, a majority of the Defendants sold 40% or more of their Big Lots stock holdings.  As such, these sales indicate that Defendants are failing to align their interests with the interests of Big Lots' shareholders.

105.    Defendants breached their fiduciary duties of good faith and loyalty by failing to follow the Company's guidelines that prohibit insider trading.

106.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.  Big Lots is therefore entitled to the imposition of a collective trust on any proceeds that Defendants obtained.

## COUNT IX
### AGAINST ALL DEFENDANTS FOR VIOLATING OHIO UNIFORM TRADE SECRETS ACT, ORC §§ 1333.61 *ET SEQ*

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    According to ORC §§ 1333.61(D):

"Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

109.     The material, adverse, non-public information set forth herein constitutes "business information" and/or "financial information."  This information derives actual or potential independent economic value from not being generally known to, and not be readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and use.  When this material, adverse, non-public information was finally revealed, the price of Big Lots' shares fell dramatically.  As such, Defendants obtained value from the material, adverse, non-public information by selling their personal holdings of Big Lots stock prior to the disclosure of this information.  Moreover, the material, adverse, non-public information was subjected to efforts that were reasonable under the circumstances to maintain its secrecy, including the Company's explicit policies and procedures to keep the information confidential.

110.     According to ORC §§ 1333.61(B):

"Misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or

was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

111.     Defendants engaged in misappropriation by using material, adverse, non-public information without the Company's express or implied consent.  Defendants knew or should have known that as directors and officers of the Company, they possessed the duty to maintain the secrecy of the material, adverse, non-public information.  Further, the Company's internal policies, including the Code of Ethics, required Defendants to maintain the confidentiality of this information and to not use this information to sell their Big Lots Stock.

112.     According to ORC §§ 1333.63(A):

Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant in a civil action is entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty that is equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both, for a misappropriator's unauthorized disclosure or use of a trade secret.

113.     Big Lots is therefore entitled to damages as a direct and proximate result of Defendants' misappropriation of material, adverse, non-public information.  Further, since Defendants' misappropriation was malicious and willful, the Company is entitled to punitive or exemplary damages according to ORC §§ 1333.63(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Big Lots to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to Big Lots restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 18, 2013

s/Richard S. Wayne
Richard S. Wayne Attorney Bar No. 0022390
s/Thomas P. Glass
Thomas P. Glass Attorney Bar No. 0062382
s/Brett M. Renzenbrink
Brett M. Renzenbrink Attorney Bar No. 0086723
STRAUSS TROY
150 East Fourth Street
Cincinnati, OH  45202-4018
(513) 621-2120 – Telephone
(513) 629-9426 – Facsimile
E-mail: *rswayne@strausstroy.com*
E-mail: *tpglass@strausstroy.com*
E-mail: *bmrenzenbrink@strausstroy.com*

THE WEISER LAW FIRM, P.C.
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
22 Cassatt Avenue
First Floor
Berwyn, PA 19312
(610) 225-2677 – Telephone
(610) 408-8062 – Facsimile

RYAN & MANISKAS, LLP
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
(484) 588-5516 – Telephone
(484) 450-2582 – Facsimile

Counsel for Plaintiff

3485082_1.doc

## <u>VERIFICATION</u>

I, Alan Brosz, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: _Oct. 7, 2013_ 

Alan Brosz