## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **ALAN BROSZ, derivatively on behalf of BIG LOTS, INC.,** | Civil Action No. 1-13-cv-00753-MHW-NMK |
| Plaintiff, | |
| v. | |
| **STEVEN S. FISHMAN, et al.,** | |
| Defendants, | |
| and | |
| **BIG LOTS, INC.,** | |
| Nominal Defendant. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT OR, IN THE <u>ALTERNATIVE, TO CONSOLIDATE THIS CASE</u>

## **TABLE OF CONTENTS**

**PAGE**

I.     INTRODUCTION ............................................................................................1

II.    FACTUAL BACKGROUND .........................................................................5

    A.    Background of the Action................................................................5

    B.    Plaintiff's Demand and the Board's Improper Refusal...........................6

    C.    The Dismissal and Plaintiff's Inspection Demand.................................7

III.   ARGUMENT ................................................................................................8

    A.    The Complaint Adequately Pleads Wrongful Refusal...........................8

        1.    The Special Committee's Failure to Interview Representatives from the DOJ or the SEC Raises Doubt That Its Investigation Was Reasonable ..............................................................12

        2.    Based on the Record Before the Court, There is Reason to Doubt That the Special Committee Is Independent and Conflict-Free...............13

    B.    Defendants Concede That Plaintiff Has Adequately Stated a Claim for Corporate Waste.....................................................................16

    C.    The Action May Be Consolidated........................................................17

IV.   CONCLUSION...........................................................................................18

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*,
   604 F. Supp. 1106 (D. Del. 1985) ........................................................................ 10

*In re Amcast Indus. Corp.*,
   365 B.R. 91 (Bankr. S.D. Ohio 2007) .................................................................. 17

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ................................................................................. 9, 10

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ........................................................................................ 16

*Barovic v. Ballmer*,
   72 F. Supp. 3d 1210, 1215 (W.D. Wash. 2014) ....................................... 9, 10, 11, 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 16

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ...................................................................................... 9

*City of Orlando Police Pension Fund v. Page*,
   970 F. Supp. 2d 1022 (N.D. Cal. 2013) ........................................................... 11, 13

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984) .............................................................................................. 9

*Delaware Cnty. Emps. Ret. Fund v. Sanchez*,
   No. 702, 2014, 2015 WL 5766264 (Del. Oct. 2, 2015) ....................................... 16

*Grimes v. Donald*,
   673 A.2d 1207 (Del. 1996) ................................................................................ 9, 10

*Halpert Enters., Inc. v. Harrison*,
   06 CIV. 2331 (HB), 2007 WL 486561 (S.D.N.Y. Feb. 14, 2007)
   *aff'd,* 07-1144-CV, 2008 WL 4585466 (2d Cir. Oct. 15, 2008) .............................. 9

*In re Oracle Corp. Derivative Litig.*,
   824 A.2d 917 (Del. Ch. 2003) ............................................................................... 9

*Klein ex rel. Klein v. FPL Grp., Inc.*,
   No. 02-20170-CIV, 2004 WL 302292 (S.D. Fla. Feb. 5, 2004) ............................ 15

*Levine v. Smith*,
    591 A.2d 194 (Del. 1991) ...................................................................................9, 10

*Litton Indus., Inc. by Wildflower P'ship v. Hoch*,
    996 F.2d 1225 (9th Cir. 1993) .....................................................................................11

*In re MFW Shareholder Litigation*,
    C.A. No. 6566-CS .........................................................................................................15

*Mt. Moriah Cemetary on Behalf of Dun & Bradstreet Corp. v. Moritz*,
    Civ. A. 11431, 1991 WL 50149 (Del. Ch. Apr. 4, 1991) *aff'd*, 599 A.2d 413
    (Del. 1991) .....................................................................................................................10

*In re Par Pharm., Inc. Derivative Litig.*,
    750 F. Supp. 641 (S.D.N.Y. 1990) ..............................................................................15

*In re PSE&G S'holder Litig.*,
    173 N.J. 258 (N.J. 2002) .........................................................................................10, 11

*Scattered Corp. v. Chicago Stock Exch., Inc.*,
    701 A.2d 70 (Del. 1997) ................................................................................................9

*Smith v. Van Gorkom*,
    488 A.2d 858 (Del. 1985) .............................................................................................10

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) ..........................................................................................8, 10

*Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*,
    273 N.Y.S.2d 16 (N.Y. Sup. 1966) ..............................................................................11

*Zapata Corp. v. Maldonado*,
    430 A.2d 779 (Del. 1981) ..............................................................................................9

STATUTES, RULES, AND REGULATIONS

Ohio Rev. Code § 1701.37 ..................................................................................................2, 7, 8

Plaintiff Alan Brosz ("Plaintiff") submits this memorandum of law in opposition to Defendants'[1] Motion to Dismiss the Amended Verified Shareholder Derivative Complaint or, in the Alternative, to Consolidate this Case (the "Motion")[2] in the above-captioned derivative action (the "Action"). Because the Amended Verified Shareholder Derivative Complaint (the "Amended Complaint"),[3] which asserts a derivative claim on behalf of Big Lots, Inc. ("Big Lots" or the "Company"), raises a reasonable doubt as to the good faith and/or the reasonableness of Big Lots' Board of Directors (the "Board") in connection with the purported "investigation" by the Board and/or its "Special Committee" in response to Plaintiff's pre-suit demand, issued pursuant to Ohio Law (the "Demand"), and adequately pleads a claim for corporate waste, the Motion should be denied.

## I. INTRODUCTION

A stockholder who makes a pre-suit demand on an Ohio corporation's board of directors assumes that the board will conduct an independent and reasonable investigation in good faith into the allegations and claims raised in the demand. That assumption is grounded in Ohio law, which instructs that a board, either on its own, or through the formation of a truly independent committee, must conduct an independent and reasonable investigation of this demand in good faith, and provide the stockholder with a thorough response detailing the merits of the claims asserted, as well as a decision as to whether or not to pursue the claims. When these steps are properly followed, directors are entitled to the considerable protections afforded by the business

---

[1] "Defendants" include: Steven S. Fishman ("Fishman"), Joe R. Cooper, Charles W. Haubiel II, Timothy A. Johnson, Robert Craig Claxton, John Charles Martin ("Martin"), Norman J. Rankin, Paul Alan Schroeder, Robert Samuel Segal, Steven Ray Smart, Jeffrey Paul Berger, David T. Kollat, Brenda Lauderback, Philip E. Mallot, Russell Solt, and Dennis B. Tishkoff.

[2] Citations herein to the Motion shall appear in the following format: "Defs. Mem. at ."

[3] References herein to the Amended Complaint appear in the following format: "¶ or ¶¶ ."

judgment rule. When they are not, directors have forfeited that protection.

This Action stems from the Board's improper and wrongful refusal of the Demand (the "Refusal"), based upon the "investigation" and "findings" of a purportedly independent Special Committee (the "Special Committee"). In light of the peremptory Refusal, Plaintiff pursued an inspection request for corporate books and records pursuant to Ohio Rev. Code § 1701.37 (the "Inspection Request"). The documents produced in response to the Inspection Request provide reason to doubt that the Special Committee was free of conflicts and that it conducted a truly independent and reasonable investigation. Rather the record, as created by the Company itself, suggests the "investigation" was one solely designed and intended to exonerate Defendants. As discussed herein, the Amended Complaint adequately pleads that the Refusal suffers from serious deficiencies, which each independently (let alone collectively) raise doubt that the Refusal was reasonable and in good faith and should cause this Court to question the integrity of the Special Committee.

First, the Special Committee inexplicably failed to attempt to interview even a single representative from the U.S. Department of Justice (the "DOJ") or the U.S. Securities and Exchange Commission (the "SEC"), despite the fact that the respective investigations by the DOJ and SEC were both specifically referenced by Plaintiff in the Demand. Dkt. 41-1 at 7-8. Confronted with the Special Committee's glaring and inexcusable failure to even try to interview any individual(s) from the DOJ and SEC and the consequences of this stunning omission, Defendants go on the offensive, by responding that Plaintiff has failed to allege "how conducting such interviews would have altered the Special Committee's conclusions." Defs' Mem. at 7. In so doing, Defendants expressly suggest that ***Plaintiff*** was required to request and conduct interviews with such individuals and then allege how those interviews should have altered the

Special Committee's response to the Demand. Defendants' arguments in this regard are outrageous.

Defendants have done nothing short of attempting to turn the entire pre-suit demand requirement and demand review process on its head. It was ***the Special Committee's duty*** and the Special Committee's duty alone – not Plaintiff's or any other shareholders' duty – to make a reasonable effort to interview the individuals most knowledgeable about the allegations of misconduct set forth in the Demand, and had the Board and/or Special Committee done so, the question of what information the DOJ and SEC could have contributed to the Special Committee's investigation and conclusions would not be an open one. The fact that this question remains unanswered is precisely the reason this Court should reasonably doubt the Special Committee's investigation and conclusions, and does not inspire confidence.

Contrary to Defendants' assertions, Plaintiff was and is under no obligation to allege in the Amended Complaint what information the SEC or DOJ might have disclosed to the Special Committee, had the Special Committee bothered to request such interviews. Second, Defendants' question begs its own answer: by choosing to exclusively interview Company insiders, the Special Committee never once sought out information from anyone who might have served as a dissenting voice, one which was not biased in favor of exonerating the Company or his or her colleagues. The Special Committee's decision to circle the wagons and keep its investigation "in the family" cannot and does not instill confidence in its procedures, or its conclusions.

The Special Committee's insular investigation is particularly troubling where, as here, Plaintiff has learned from the documents reviewed pursuant to the Inspection Demand that the members of the Special Committee knew the individuals whose conduct they were charged with

investigating for over twenty-five years.  The Special Committee was composed of James Chambers ("Chambers"), Peter J. Hayes ("Hayes"), and James R. Tener  ("Tener") (the "Special Committee Members") – three members of the Board – who were charged with investigating their colleagues' conduct.  At the Special Committee's April 16, 2013 meeting, Hayes and Tener informed the Special Committee (and its counsel) that they had "known defendants Fishman and Martin for 20-25 years."  ¶13.  Incredibly, based on the record the Company itself created, the evaluation of the Special Committee Members' independence ended then and there, with no further analysis or discussion regarding the nature of those relationships.  Because the documents produced in response to the Inspection Request reflected no analysis or discussion in this regard, in a conversation with counsel for Defendants, Plaintiff's counsel inquired as to whether any other documentation concerning the process by which the independence of the Special Committee was determined exists.  ¶¶14-15.  Defendants' counsel confirmed that no such non-privileged documentation exists.  *Id*.

In other words, Hayes and Tener informed the Special Committee and counsel they each had a long-term relationship (the nature of which remains a complete mystery) with two of the individuals whose conduct they were investigating – including Fishman, whose conduct is at the very heart of the Demand[4] – and the Special Committee Members were nonetheless permitted to conclude that "there are no relationships or other facts or circumstances that would impair their ability to be totally independent, and none had any concern about the independence of any other Committee member," without any further inquiry or analysis whatsoever. ¶13. Such a determination, ***made by the Special Committee Members themselves***, especially when such relationships have doomed similar committees in derivative actions, again removes any

---

[4]    The SEC investigation specifically referenced in the Demand centered on the suspicious trading activity of Fishman.  Dkt. 41-1 at 7.

confidence the Court should have in the "investigation" of the Special Committee, and raises doubt as to the Special Committee's independence and the process taken to determine its independence.[5]

Accordingly, there is reason to doubt that the Special Committee's investigation was reasonable, and there is reason to doubt that the Special Committee is independent.  Under these circumstances, Plaintiff has adequately alleged that the Demand was wrongfully refused, the Motion should be denied, and this Action should proceed.

## II.  FACTUAL BACKGROUND

### A.  Background of the Action

According to its public filings, Big Lots is North America's largest broadline closeout retailer.  ¶2.  The Company operates over 1,400 Big Lots Stores in the 48 contiguous United States.  *Id.*  Big Lots' stores contain an assortment of merchandise, including consumables, seasonal products, furniture, housewares, toys and gifts.  *Id.*  During the Relevant Period, several of the Company's officers and directors engaged in illicit sales of Big Lots stock based on their possession of material, adverse, non-public information.  ¶3.  The relevant trades, which total

---

[5]     Perhaps it should come as no surprise that the Special Committee failed to explore the nature of the relationships between the Special Committee Members and defendants Fishman and Martin and how those relationships affected the Special Committee Members' ability to investigate independently, because there is reason to doubt that the Special Committee's own counsel, Squire Sanders (US) LLP ("Squire Sanders") was conflict-free.  At the same April 16, 2013 meeting during which the Special Committee Members blindly evaluated their own purported independence, Squire Sanders disclosed that it was simultaneously representing a party adverse to Weight Watchers International, the employer of Special Committee Member Chambers.  To address this conflict, the minutes of the April 16, 2013 meeting summarily state that Squire Sanders "erected an ethical screen between the Squire lawyers involved in the representation of the Committee and the Squire lawyers involved in the representation of a client in a transactional matter adverse to Weight Watchers International, Mr. Chambers' employer."  Again, no further investigation into the nature of the matter, or the efficacy of the proposed "ethical screen" or even whether any other law firms were pursued to represent the Special Committee was ever conducted.

*over $37 million* in proceeds, began only days after Defendants' March 2, 2012 announcement of positive guidance for fiscal 2012, and lasted until March 28, 2012. *Id.*

Beginning on April 23, 2012, however, the truth about the Company's financial prospects began to be revealed. ¶4. That day, Defendants announced that comparable same store sales would be slightly negative for the first quarter of 2012, as opposed to the positive guidance for these stores that was announced on March 2, 2012. *Id.* On this news, Big Lots stock declined by $11 per share to close at $34.71 per share on April 24, 2012, a one-day plummet of 24%. ¶5.

On May 23, 2012, Defendants confirmed that comparable store sales were in fact negative for the first quarter of 2012. ¶6. Defendants also reversed their prior positive guidance for the remainder of 2012. *Id.* At the same time, Defendants (at the Board's direction) announced that Big Lots spent $99 million of Company money to repurchase its own shares during the first quarter of 2012, propping up Big Lots' share price at the same time that Defendants engaged in their illicit insider selling. *Id.*

As a result of Defendants' suspiciously timed insider stock sales, the SEC and DOJ commenced an investigation. On December 5, 2012 Defendants caused the Company to file with the SEC a Form 10-Q which revealed, in relevant part, that the Company received a subpoena from the DOJ "requesting documents relating to Mr. Fishman's trades in our common shares." ¶72. The same Form 10-Q noted that that the Company was aware that the "SEC has initiated an inquiry into this matter, but we have not yet received a document request from the SEC." *Id.*

## B.    Plaintiff's Demand and the Board's Improper Refusal

Based on those events, on January 28, 2013, Plaintiff issued the Demand under Ohio law on the Board to undertake an independent internal investigation into Defendants' violations of

Ohio and/or federal law, and to commence a civil action against each of the Defendants to recover for the benefit of the Company the amount of damages sustained as a result of their breaches of fiduciary duties.   ¶8.   The Demand made specific references to the ongoing investigations by the SEC and DOJ.   Thereafter, on September 9, 2013, Plaintiff's counsel received the Refusal from Squire Sanders.   ¶9.   The Refusal peremptorily stated that the purported Special Committee determined that the individuals named in the Demand did not breach their fiduciary duties, and that the Board rejected the Demand in its entirety.  *Id.*

The Refusal was most notable for what it lacked, rather than its contents.   ¶10. Specifically, the Refusal contained no information whatsoever concerning the type of "investigation" the Special Committee and/or the Board engaged in, or what the substantive findings were regarding the merits of any of the claims as set forth in the Demand.  *Id.*  Plaintiff filed a Verified Shareholder Derivative Complaint (the "Initial Complaint") on October 18, 2013 which alleged that the refusal of the Demand was wrongful and asserted claims for breach of fiduciary duty, unjust enrichment, gross mismanagement and corporate waste.   Defendants would move to dismiss the Initial Complaint on December 18, 2013.

### C.     The Dismissal and Plaintiff's Inspection Demand

The Court would grant Defendants' motion to dismiss the Initial Complaint on April 14, 2015.   In its opinion, the Court found that Plaintiff failed to allege that the Demand was wrongfully refused because the Initial Complaint lacked "additional facts supporting the conclusion that Board actually did disregard the merits of Plaintiff's accusations that the Board acted in bad faith…"  Dkt. 35 at 12-13.   The Court further intimated that Plaintiff could have utilized Ohio Rev. Code § 1701.37 to seek specific details surrounding the Special Committee's investigation and the ultimate refusal of the Demand.  *Id.* at 13.   Finally, the Court found that

Plaintiff's corporate waste claim similarly suffered from a lack of specificity regarding the timing of the alleged share repurchases. *Id.* at 21. Ultimately, the Court would grant Plaintiff leave to amend the initial complaint with regard to the Refusal and Plaintiff's corporate waste claim.

In response, on May 8, 2015, pursuant to Ohio Rev. Code § 1701.37, Plaintiff issued the Inspection Request seeking, *inter alia*, all books and records created by, distributed to, or reviewed by, the Board, the Special Committee or any other committees/subcommittees in connection with their respective evaluations of the allegations set forth in the Demand, and any written communications and findings of the Board and Special Committee regarding the evaluation of the allegations contained in the Demand, and/or rejection of all of the allegations contained in the Demand.

On July 2, 2015, in response to the Inspection Request, the Company produced 154 pages of documents (the "Production"). The overwhelming majority of this material was redacted. What escaped redaction only furthers Plaintiff's position that there is reason to doubt that the Special Committee played anything more than merely a perfunctory role in investigating the Demand and, as discussed herein, the "investigation" was marred by conflicts and a failure to explore the actual allegations outlined in the Demand.

Armed with the Production, Plaintiff filed the Amended Complaint on August 17, 2015. Dkt. 41.

## III. ARGUMENT

### A. The Complaint Adequately Pleads Wrongful Refusal

The effect of making a pre-suit stockholder demand "is to place control of the derivative litigation in the hands of the board of directors." *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.

1990).  After the demand is issued, a board can decide whether to pursue litigation, resolve the grievance short of litigation, or reject the demand.  *Zapata Corp. v. Maldonado*, 430 A.2d 779, 783 (Del. 1981).  Critically, upon making a demand, "the stockholder has spent one – but only one – 'arrow' in the 'quiver.'  The spent 'arrow' is the right to claim that demand is excused.  The stockholder does not, by making demand, waive the right to claim that demand has been wrongfully refused."  *Grimes v. Donald*, 673 A.2d 1207, 1218 (Del. 1996); *see also Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74 (Del. 1997).

If the board accepts the demand, it assumes control of the derivative claims.  *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 533 (1984).  Far more frequently, however – indeed, in nearly every reported case – the board will reject the demand as purportedly not being "in the best interests of the corporation."[6]  If after a board's rejection of a demand a shareholder decides to proceed with suit, the shareholder must demonstrate that the board's decision to reject the demand was not protected by the business judgment rule.  *Grimes,* 773 A.2d at 1207.[7]

The business judgment rule creates a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company."  *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984).  Thus, a board's refusal of a demand is presumptively protected unless a plaintiff alleges facts supporting the inference that the board's investigation was unreasonable or that its decision-making process was not undertaken in good faith.  *Halpert Enters., Inc. v. Harrison*, 06

---

[6]    In many instances, of course, this is nonsense; directors merely do not wish to sue their friends and/or business associates.  *See, e.g., In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003).

[7]    Generally, the directors on a board who consider a litigation demand are afforded the presumption of business judgment protection.  *Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

CIV. 2331 (HB), 2007 WL 486561, at *5 (S.D.N.Y. Feb. 14, 2007) *aff'd,* 07-1144-CV, 2008 WL 4585466 (2d Cir. Oct. 15, 2008); *Barovic v. Ballmer*, 72 F. Supp. 3d 1210, 1214 (W.D. Wash. 2014) ("*Microsoft*"); *Levine,* 591 A.2d at 213.

By issuing a demand, a stockholder tacitly concedes that demand was required, and therefore, that a majority of the directors are independent or disinterested.  *Mt. Moriah Cemetary on Behalf of Dun & Bradstreet Corp. v. Moritz*, Civ. A. 11431, 1991 WL 50149 (Del. Ch. Apr. 4, 1991) *aff'd*, 599 A.2d 413 (Del. 1991).  Failure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation.  *Microsoft*, 72 F. Supp. 3d at 1214; *Grimes,* 673 A.2d at 1218.  Thus, when a board refuses a demand, "the only issues to be examined are the good faith and reasonableness of its investigation." *Microsoft*, 72 F. Supp. 3d at 1214; *Spiegel,* 571 A.2d at 777.  Stated another way, "***the court's inquiry is not into the substantive decision of the board, but rather is into the procedures employed by the board in making its determination***." *Microsoft*, 72 F. Supp. 3d at 1214-15; *In re PSE&G S'holder Litig*., 173 N.J. 258, 291 (N.J. 2002).

Directors are fiduciaries, and as such they owe both the corporation and stockholders a duty to inform themselves properly before making business decisions.  *Smith v. Van Gorkom,* 488 A.2d 858, 872-73 (Del. 1985).  In the context of a stockholder demand, this means (as in all other business decisions) directors are duty-bound to inform themselves of all material information reasonably available to them. *Mt. Moriah,* 1991 WL 50149, at *4; *see also Aronson,* 473 A.2d at 812.  As such, a board must "investigate and evaluate the charges in order to discharge its duty to the shareholders and manage corporate affairs responsibly." *Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985).

10

There is "no prescribed procedure that a board must follow," (*Levine,* 591 A.2d at 199) and "directors need not show that they performed a perfect investigation" (*see Litton Indus., Inc. by Wildflower P'ship v. Hoch*, 996 F.2d 1225 (9th Cir. 1993)), but the board's process must nonetheless be such that a court can conclude confidently that it reflects an "earnest attempt to investigate a shareholder's complaint." *PSE&G,* 173 N.J. at 292.

Refusal of a demand is not entitled to the protections of the business judgment rule where "the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or half-hearted as to constitute a pretext or sham." *Id.* (*quoting Stoner v. Walsh,* 772 F. Supp. 790, 806 (S.D.N.Y. 1991)); *see also Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.,* 273 N.Y.S.2d 16, 25 (N.Y. Sup. 1966). Based on the Board's conclusory, blanket Refusal and the evidence obtained through the Inspection Request – the only reasonable inference is that the Board made no meaningful effort to inform itself of all material information reasonably available to it and the Board simply brushed off material conflicts of interest. Accordingly, the Board's refusal of the Demand was wrongful and is not entitled to the protection of the business judgment rule.

Importantly, where (as here) a stockholder identifies a witness or set of witnesses "who should have been interviewed but were not," in connection with a board's investigation of matters set forth in a pre-suit demand, then that investigation may be deemed unreasonable. *Microsoft*, 72 F. Supp. 3d at 1214; *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1032 (N.D. Cal. 2013) ("*Google*"). This can particularly be the case where the only witnesses interviewed in connection with the Demand were current and/or former Company personnel, as opposed to witnesses from outside of the Company. *Microsoft*, 72 F. Supp. 3d at 1215-16 (finding that the failure to interview any witnesses from outside of the company

supported the inference that the investigation of the plaintiffs' demands was not conducted in good faith and was not reasonable).

Based on the only record before the Court, as created by Defendants' conclusory and inadequate Refusal and the documents produced in response to the Inspection Request, it is apparent that the Board and Special Committee made no real effort to inform themselves of all material information reasonably available to them, because they made no attempt to interview essential witnesses: appropriate representatives from the SEC and DOJ.[8]  Accordingly, for this and other reasons discussed herein, the Refusal was wrongful and is not entitled to the protection of the business judgment rule.

      1.     The Special Committee's Failure to Interview Representatives from the DOJ or the SEC Raises Doubt That Its Investigation Was Reasonable

The Board's complete disregard of the actual merits of the claims set forth in the Demand is improper and demonstrates the Special Committee's lack of diligence and good faith.  The Production confirms that the Special Committee only interviewed current and/or former Big Lots personnel as part of its investigation, and failed to even attempt to interview a single representative from the DOJ or the SEC, whose respective investigations into the Company and the conduct of its directors and officers are ***specifically referenced in the Demand***.  Dkt. 41-1 at 7-8.  The Special Committee's failure to seek out any potentially dissenting voice from outside the Company should not inspire confidence in the Special Committee's process, or its purported "findings."

Such interviews were of obvious need as nearly all of the events and allegations set forth in the Demand and the Amended Complaint were the subjects of investigations by the DOJ and

---

[8]    Defendants do not claim in the Motion that the Special Committee interviewed any SEC or DOJ representative(s), or anyone else from outside of Big Lots for that matter, thus tacitly admitting the Special Committee's failure to do so and the veracity of Plaintiff's allegations concerning wrongful demand refusal.

SEC.  The Special Committee's failure in this regard alone is enough to warrant the wholesale denial of the Motion.  *See Google*, 970 F. Supp. 2d at 1032 (holding that "plaintiff has identified witnesses who should have been interviewed but were not, and the court does find that any reasonable investigation of plaintiff's demand should have included an interview of [the lead investigator], or someone with comparable knowledge of the [] investigation."); *see also Microsoft*, 72 F. Supp. 3d at 1215  ("Plaintiffs argue that the fact that the DRC and Board did not interview Mr. Almunia or any other European Commission official regarding the company's violation of the 2009 Settlement agreement with the EU is sufficient grounds for calling into question the reasonableness and good faith nature of the Board's investigation. … This Court agrees…[a]s the Northern District of California found similarly problematic in [*Google*], the DRC did not interview a single individual who would have been likely to corroborate Plaintiffs' claims of wrongful conduct.")

The narrow scope of the Special Committee investigation inherently created a vacuum wherein the Special Committee spoke to no dissenting voices, including those investigatory bodies outside the Company charged with probing the conduct of the Company's officers and directors.  Given the extent to which the allegations in the Amended Complaint are based on the same subject matter as the Demand, and absent information from a source other than Big Lots personnel, there is reason to doubt that the Special Committee investigated reasonably and was adequately informed in its decision to seek dismissal of the Action.

      2.      Based on the Record Before the Court, There is Reason to Doubt That the <u>Special Committee Is Independent and Conflict-Free</u>

As part of the Production, Plaintiff reviewed the minutes from the April 16, 2013 Special Demand Committee Meeting (the "April 16 Minutes").  The April 16 Minutes make clear that Hayes and Tener, members of the Special Committee tasked with investigating the alleged

infractions against each defendant, had "known defendants Fishman and Martin for 20-25 years." The extent and nature of these relationships between these four individuals, however, was not, and has yet to be, provided to Plaintiff. Further, Hayes, Tener and the third Special Committee member, James R. Chambers, proclaimed that, "unequivocally, there are no relationships or other facts or circumstances that would impair their ability to be totally independent, and none had any concern about the independence of any other Committee member." Again, no information explaining *how* the Special Committee members reached this conclusion was provided, which is glaring given that Hayes and Tener have each known Fishman and Martin for more than two decades, and the nature of those relationships remains shrouded in secrecy.

As alleged in the Amended Complaint, Plaintiff's counsel conferred with counsel for Defendants prior to filing the Amended Complaint in order to determine if any redacted portions of the documents making up the Production further discussed or analyzed the relationships between Hayes, Tener, Fishman and Martin. ¶¶14-15. Plaintiff's counsel was informed that no addition non-privileged information concerning the respective relationships between the Special Committee Members and Fishman and Martin existed. ¶16.

These relationships cannot be therefore viewed as "plainly considered" when the record reflects that: (a) *no effort* was made to determine the extent of those relationships and (b) the Special Committee and its counsel were satisfied with the Special Committee Members' self-serving conclusions regarding their *own independence*. Defs' Mem. at 6.[9] The Special

---

[9] In what can only be considered a trend by the Special Committee, no further investigation was also conducted when counsel for the Special Committee, Squire Sanders, reported on the existence of a conflict so significant that it necessitated the erection of "an ethical screen between the Squire lawyers involved in the representation of the [Special] Committee and the Squire lawyers involved in the representation of a client in a transactional matter adverse to Weight Watchers International, Mr. Chambers' employer." ¶16. As with the personal conflicts faced by Hayes and Tener, any discussion regarding the conflicts faced by Squire Sanders – a

Committee had one chance to create a record that would inspire confidence and eliminate doubt that it had demonstrated its independence, and it has failed to do so.

Notably, the Delaware Court of Chancery has opined on the effect of long-term relationships between directors. Then-Chancellor Leo E. Strine, Jr. ("Strine") noted:

> . . . [W]hen human beings do important and meaningful things together over time, their relationships change. And I think one of the emerging issues – I agree the law hasn't gone there yet; but it would be surprising to me for an independent director to have the same relationship with a manager and controlling stockholder after a decade of such service that he or she did at the beginning. It would actually creep me out to think that people were so robotic that they would not change

*In re MFW S'holder Litig.*, C.A. No. 6566-CS (consol.) (Del. Ch. Mar. 12, 2013) (Transcript) at 139-140.

As Chief Justice of the Delaware Supreme Court two years later, Chief Justice Strine would conclude that derivative plaintiffs who alleged a fifty-year friendship along with business ties raised an inference that the directors lacked independence, noting: "[c]lose friendships of that duration are likely considered precious by many people, and are rare. People drift apart for many reasons, and when a close relationship endures for that long, a pleading stage inference

---

conflict material enough to warrant being raised by the Special Committee – abruptly ends. The Special Committee has failed to make any showing that the "ethical screen" that was allegedly implemented had any efficacy or more importantly, whether the Special Committee interviewed any other potential counsel given the significant conflicts faced by Squire Sanders. Instead, based on *Defendants' own record*, the Court knows that the Special Committee engaged conflicted counsel but the Court is (again) asked by Defendants to rely on self-serving conclusions by the Special Committee that the conflicts were addressed. In order for the Special Committee to adequately conduct a good faith and reasonable investigation into the allegations raised in the Demand and the Complaint, the Special Committee was required to engage truly independent counsel. *See, e.g., In re Par Pharm., Inc. Derivative Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990) ("…Delaware law contemplate[s] that a special investigation committee be represented by independent counsel."). "Such counsel should be free of any conflicts that might interfere with its ability to render unbiased legal advice." *Klein ex rel. Klein v. FPL Grp., Inc.*, No. 02-20170-CIV, 2004 WL 302292, at *22 (S.D. Fla. Feb. 5, 2004). Plaintiffs respectfully suggest that an investigation which fails to interview material witnesses, is spearheaded by conflicted individuals with personal relationships with the individuals they are investigating, and advised by admittedly conflicted counsel cannot pass muster under Ohio law.

arises that it is important to the parties." *Delaware Cnty. Employees Ret. Fund v. Sanchez*, No. 702, 2014, 2015 WL 5766264, at *4 (Del. Oct. 2, 2015).

Plaintiff has therefore plead a particularized allegation regarding the 20-25 year relationships between two of the Special Committee Members and the Company's then Chief Executive Officer, Chairman of the Board, and President which casts doubt on Hayes and Tener's ability to independently investigate the claims in the Demand that centered around Fishman's misconduct.[10]

### B. Defendants Concede That Plaintiff Has Adequately Stated a Claim for Corporate Waste

The Motion does not attempt to dismiss Plaintiff's corporate waste claim on the merits.[11] As such, Defendants concede Plaintiff has adequately stated a claim for corporate waste since the Amended Complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Here, Plaintiff adequately alleged corporate waste in connection with the Board-authorized 2011 share repurchase program (the "Share Repurchase Program"), during which Big Lots repurchased 2.5 million shares of Company stock for a total of ***$99 million***. ¶¶94-101. Specifically, pursuant to Defendants' illicit insider selling scheme, Defendants sold over 800,000

---

[10]    In the event the Court seeks additional information regarding the nature of these relationships, Plaintiff is prepared to conduct limited discovery, including depositions of the Special Committee Members, into the issue.

[11]    In fact, in the consolidated derivative action styled *In re Big Lots, Inc. S'holder Litig.*, Civ. Action No. 2:12-cv-00445 (the "Consolidated Action") Defendants answered this similarly plead claim on September 30, 2015.

shares of Big Lots stock in connection with the Share Repurchase Program for proceeds in excess of *$37 million*.

As specifically plead in the Amended Complaint, the Company's Form 10-Q for the period ending April 28, 2012 filed with the SEC on June 6, 2012 (the "June 6 10-Q") details the timing of these stock repurchases. ¶62. The Company purchased 83,000 shares between February 26, 2012 and March 24, 2012 at an average price of $43.93. *Id.* In addition, the Company purchased over 2.5 million shares between March 25, 2012 and April 28, 2012 at an average price of $39.50. *Id.*

There is a strong inference that the Company, through the Share Repurchase Program, purchased shares during the Relevant Period when the price of Big Lots stock was artificially inflated as a result of Defendants' conduct. In sum, the decision to use corporate funds to repurchase Big Lots stock on the open market at the same time Defendants were personally selling off their own Big Lots shares constitutes corporate waste. *See, e.g., In re Amcast Indus. Corp.*, 365 B.R. 91, 114 (Bankr. S.D. Ohio 2007) (citations omitted) (holding that corporate waste occurs when fiduciaries cause the corporation to enter into "a transaction on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange.").

### C. The Action May Be Consolidated

When this Court properly finds that the Demand was wrongfully refused and that Plaintiff's corporate waste claim has been properly plead,[12] Plaintiff agrees that this Action will be fundamentally in the same procedural posture as the Consolidated Action. Plaintiff would not object to such consolidation. However, Plaintiff expressly reserves all rights to seek relief from

---

[12] Again, Defendants do not challenge Plaintiff's corporate waste claim.

17

the governing consolidation order in the Consolidated Action to the extent that Plaintiff may seek appointment as lead demand-made plaintiff or as co-lead plaintiff.

## IV.     CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests the Court deny the Motion and conclude that the Demand was wrongfully refused and that Plaintiff has properly plead a claim for corporate waste.

Dated:  October 30, 2015                          **THE WEISER LAW FIRM, P.C.**

                                        By:  s/ Brett D. Stecker
                                              Robert B. Weiser
                                              Brett D. Stecker (admitted *pro hac vice*)
                                              James M. Ficaro
                                              22 Cassatt Avenue
                                              Berwyn, PA 19312
                                              Telephone:  (610) 225-2677
                                              Facsimile:  (610) 408-8062

                                              **STAUSS TROY**
                                              Richard S. Wayne, Attorney Bar No. 0022390
                                              Thomas P. Glass, Attorney Bar No. 0062382
                                              Brett M. Renzenbrink, Attorney Bar No. 0086723
                                              150 East Fourth Street
                                              Cincinnati, OH 45202
                                              Telephone:  (513) 621-2120
                                              Facsimile:  (513) 629-9426

                                              **RYAN & MANISKAS, LLP**
                                              Richard A. Maniskas
                                              995 Old Eagle School Road, Suite 311
                                              Wayne, PA 19087
                                              Telephone:  (484) 588-5516
                                              Facsimile:  (484) 450-2582

                                              *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2015, the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Verified Shareholder Derivative Complaint or, in the Alternative, to Consolidate This Case was filed electronically with the Court's Case Management/Electronic Case Files (CM/ECF) docketing system.  Notice of this filing will be sent to all parties by operation of the CM/ECF system.  Parties may access this filing through the CM/ECF system.

s/ Brett D. Stecker_____
Brett D. Stecker
