## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **ALAN BROSZ, derivatively on behalf of BIG LOTS, INC.,** | : | Civil Action No. 1-13-cv-00753-MHW-NMK |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| **STEVEN S. FISHMAN, et al.,** | : |  |
|  | : |  |
| Defendants, | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| **BIG LOTS, INC.,** | : |  |
|  | : |  |
| Nominal Defendant. | : |  |
|  | : |  |

## DECLARATION OF BRETT D. STECKER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT OR, IN THE ALTERNATIVE, TO <u>CONSOLIDATE THIS CASE</u>

I, Brett D. Stecker, hereby declare as follows under penalty of perjury:

1.      I am a partner at The Weiser Law Firm, P.C. counsel for Plaintiff Alan Brosz ("Plaintiff") in the above captioned action.  I am licensed to practice in the Commonwealth of Pennsylvania and in the State of New Jersey and admitted *pro hac vice* in the above captioned action.  I submit this declaration in support of Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Verified Shareholder Derivative Complaint or, in the Alternative, to Consolidate This Case.  By virtue of my representation of Plaintiff in this action, I have personal knowledge of the facts set forth below and I could and would testify competently to those facts if called to do so.

2.      Attached hereto as Exhibit A is a true and correct copy of the transcript of argument in *In re MFW S'holder Litig.*, C.A. No. 6566-CS (consol.) (Del. Ch. Mar. 12, 2013).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2015

s/ Brett D. Stecker

# EXHIBIT A

EFiled:  Apr 09 2013 02:34PM EDT
Transaction ID 51694533
Case No. 6566-CS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE MFW SHAREHOLDERS      :  Consolidated
LITIGATION                  :  Civil Action No. 6566-CS


                              -  -  -

                         Superior Courtroom No. 8B
                         New Castle County Courthouse
                         500 North King Street
                         Wilmington, Delaware
                         Tuesday, March 12, 2013
                         10:32 a.m.

                              -  -  -

BEFORE:  HON. LEO E. STRINE, JR., Chancellor.

                              -  -  -

ORAL ARGUMENT ON DEFENDANTS' MOTIONS FOR SUMMARY
                      JUDGMENT

                              -  -  -

---------------------------------------------------------
                 CHANCERY COURT REPORTERS
              New Castle County Courthouse
          500 North King Street - Suite 11400
               Wilmington, Delaware 19801
                      (302) 255-0524

```
                                                       2

 1   APPEARANCES:

 2        PETER B. ANDREWS, ESQ.
          Faruqi & Faruqi, LLP
 3             -and-
          CARL L. STINE, ESQ.
 4        MATTTHEW INSLEY-PRUITT, ESQ.
          of the New York Bar
 5        Wolf Popper LLP
               -and-
 6        JUAN E. MONTEVERDE, ESQ.
          of the New York Bar
 7        Faruqi & Faruqi, LLP
               -and-
 8        CARMELLA P. KEENER, ESQ.
          Rosenthal, Monhait & Goddess, P.A.
 9             -and-
          KIRA GERMAN, ESQ.
10        of the New Jersey Bar
          Gardy & Notis LLP
11          for Plaintiffs

12        THOMAS J. ALLINGHAM, II, ESQ.
          JOSEPH O. LARKIN, ESQ.
13        CHRISTOPHER M. FOULDS, ESQ.
          JESSICA L. RAATZ, ESQ.
14        Skadden, Arps, Slate, Meagher & Flom LLP
            for Defendants M&F Worldwide Corp., Ronald O.
15          Perelman, Barry F. Schwartz, and William C.
            Bevins
16
          MEGHAN M. DOUGHERTY, ESQ.
17        Paul, Weiss, Rifkind, Wharton & Garrison LLP
            for Defendants M&F Worldwide Corp., Bruce
18          Slovin, Charles T. Dawson, Stephen G. Taub,
            John M. Keane, Theo W. Folz, and Philip E.
19          Beekman

20        WILLIAM M. LAFFERTY, ESQ.
          D. McKINLEY MEASLEY, ESQ.
21        Morris, Nichols, Arsht & Tunnell LLP
               -and-
22        TARIQ MUNDIYA, ESQ.
          TODD G. COSENZA, ESQ.
23        of the New York Bar
          Willkie Farr & Gallagher, LLP
24          for Defendants Paul M. Meister, Martha L.
            Byorum, Viet D. Dinh, and Carl B. Webb
```

3

1                THE COURT:  So many people.  Welcome,
2    everyone.
3                MR. LAFFERTY:  Your Honor, I guess
4    I'll step up first, take care of some introductions.
5                My cocounsel at counsel table, Tariq
6    Mundiya and Todd Cosenza; Mac Measley from my office.
7    Mr. Mundiya is going to make the presentation on
8    behalf of the special committee defendants today.
9                THE COURT:  Welcome.
10               ALL COUNSEL:  Good morning, Your
11   Honor.
12               MR. ANDREWS:  Good morning, Your
13   Honor.  Peter Andrews, Faruqi & Faruqi, on behalf of
14   plaintiffs.  We have Carl Stine, Wolf Popper, making
15   argument today; and also Mr. Monteverde from Faruqi &
16   Faruqi.  We also have Matt Insley-Pruitt from Wolf
17   Popper; Ms. Keener from -- you know, her well.  And
18   Ms. Kira German from Gardy & Notis.
19               THE COURT:  Welcome, everyone.
20               Good morning, Mr. Allingham.
21               MR. ALLINGHAM:  Good morning, Your
22   Honor.
23               Before I begin, let me make a couple
24   of introductions, too.  I don't know if Your Honor

4

1   knows Stephen Fasman, who is the chief legal officer

2   at MacAndrews & Forbes Holdings.  I think you do know

3   my colleagues Joe Larkin and Chris Foulds; and

4   Jennifer Raatz I think is perhaps new to the Court.

5                   THE COURT:  Welcome.

6                   MR. ALLINGHAM:  May I proceed, Your

7   Honor?

8                   THE COURT:  You may.

9                   MR. ALLINGHAM:  First of all, Your

10  Honor, I want to personally thank you for postponing

11  this argument when I was a little under the weather a

12  couple weeks back.

13                  THE COURT:  No.  Everyone is glad

14  you're okay.  We were a little worried about you.  I

15  mean, there's always been reason to worry about you.

16                  (Laughter)

17                  MR. ALLINGHAM:  Having nothing to

18  do --

19                  THE COURT:  But this is more vivid.

20                  MR. ALLINGHAM:  Having nothing to do

21  with my physical health, I'm sure.

22                  I don't think -- I probably could have

23  dragged myself in here; but even if I could have, I

24  think that the issues presented on this motion deserve

5

 1   the most careful of attention, both because they have

 2   far-reaching implications for our corporate law and

 3   also because they have far-reaching implications for

 4   the disposition and litigation of shareholder

 5   challenges to control transactions in this Court.

 6               Here's what I'd like to do today, with

 7   the Court's permission.  I want to spend a little time

 8   discussing the standard of review that should apply to

 9   going-private merger transactions and, in particular,

10   the one being challenged here in which MacAndrews &

11   Forbes Holdings, which is 100 percent owned by

12   Ronald Perelman, purchased the roughly 56 percent of

13   the equity of M&F Worldwide, which we all call MFW,

14   that it did not already own.  So this is -- has always

15   been treated as and is the classic controller

16   transaction about which there's been considerable

17   discussion in recent years.

18               THE COURT:  Even though it's a

19   controller transaction, under the Exchange rules, did

20   the company have a majority of independent directors?

21               MR. ALLINGHAM:  Yes.

22               THE COURT:  Because it wasn't a

23   majority --

24               MR. ALLINGHAM:  Yes.  In fact, the

1  company has -- has had, I think, contractual

2  commitments with its subsidiaries to do so, certainly

3  with respect to MFW, and I think as to all the

4  affiliate companies.

5          I don't want to -- I don't want there

6  to be any suspense, Your Honor.  I'll argue that the

7  business judgment rule should apply to that

8  transaction because every trace of potential influence

9  that MacAndrews and Mr. Perelman could have wielded

10  over the transaction was voluntarily and conclusively

11  relinquished by them, so that this transaction was

12  consciously designed, intentionally designed,

13  conditioned from the outset on approval by both an

14  independent, fully functioning special committee and,

15  and a majority of MFW's minority stockholders, with

16  both conditions made explicitly nonwaivable from the

17  initial announcement.

18          So this merger fully replicated and

19  was intended and designed to fully replicate a

20  third-party arm's length deal.  And just as the

21  business judgment rule under our law clearly applies

22  to a third-party arm's length merger deal, so should

23  it apply to this transaction, because minority

24  stockholders in both situations benefit from exactly

7

1    the same protections: negotiation of the deal by

2    independent, disinterested, effective, and active

3    bargaining agents, one; and the opportunity on a fully

4    informed basis to accept or reject the product of

5    their agents' bargaining process in a shareholder

6    vote.  That, of course, is the issue that has

7    far-reaching implications for our corporate law.

8                    THE COURT:  You -- you concede, right,

9    that there's one -- there's still one remaining, I

10   suppose, distinction between this, sort of,

11   transaction and a situation where there isn't anything

12   like control, which is that when it's a third-party

13   deal where the voting power of management or any block

14   holder is -- let's just pick a safe number -- under 15

15   to 20 percent, for example, that one of the -- the

16   tools that the board has available to it to make sure

17   that it's getting an optimal deal is the ability to

18   benchmark it against other sales transactions; that

19   that factor is not present in a circumstance like

20   this, because to the extent that MacAndrews & Forbes

21   and Mr. Perelman made clear that they were not

22   sellers, you don't have the same sort of market check.

23   They might have the ability to say no to this

24   transaction and to stop it in the tracks, but they

8

1  don't have the ability to shop it against other deals.

2              MR. ALLINGHAM:  Yes.  It's a -- it's a

3  valid point, Your Honor.  The -- and it's -- Your

4  Honor has the facts correct.

5              The announcement from the beginning

6  was that MacAndrews was not a seller.

7              THE COURT:  Right.

8              MR. ALLINGHAM:  That has some

9  practical implications, i.e., that it is unlikely --

10  the special committee, for example, is not required to

11  do a vein act.  So to -- to -- to go out and actively

12  shop is, sort of, not a very meaningful exercise.

13              On the other hand, that does not mean

14  that the advisors to the special committee didn't

15  examine, as -- as an analytical exercise, the

16  availability -- the -- the values that might have been

17  created in such a transaction.

18              THE COURT:  No; I understand that.

19  It's just that parties don't do futile acts.  For

20  example, strategic -- you know, there are

21  implications, as you know, from representing buyers in

22  transactions, to expressing your interest in a

23  situation, because if you express your interest in --

24  for example, in a synergistic deal, it may not be the

9

1    only synergistic deal that the market has in mind --

2                    MR. ALLINGHAM:  Certainly true.

3                    THE COURT:  -- and one in which you

4    then are the baitfish rather than the predator fish

5    could occur to people.  And so people -- the

6    willingness of people to engage in search costs or

7    even -- private equity, rather, to engage in search

8    costs, if there is not a likelihood of acceptance, is

9    diminished.

10                    MR. ALLINGHAM:  Yes.

11                    THE COURT:  And so somebody could make

12   petro dollars -- Sovereign Wealth could make

13   Mr. Perelman an offer they -- that he couldn't refuse

14   because some sheik, rather than buying an English

15   premier league team or a modeling agency, decides he

16   wants to process checks for Bank of America; right?

17                    MR. ALLINGHAM:  A plausible scenario.

18                    THE COURT:  Right.  "Whatever the

19   intrinsic value of this is in the minds of the people

20   who wrote Van Gorkum, double it and we'll take this

21   off your hands."  That could have happened; right?

22                    MR. ALLINGHAM:  Well, it --

23                    THE COURT:  What I'm getting at here

24   is when we're looking at the dynamic, the legal

1   change, right, you're talking about, so the policy

2   issue is on the table, invoking the business judgment

3   rule in essentially a binary process where there's two

4   choices essentially: do a merger with the controller

5   or remain independent; and that if the committee is

6   given the ability to, effectively, say no -- and,

7   frankly, not only the committee to say no, but even if

8   the committee says yes, then the stockholders,

9   independent stockholders, have also the ability to say

10  no for themselves --

11                  MR. ALLINGHAM:  Right.

12                  THE COURT:  -- then our law should

13  recognize that and give that business judgment rule

14  protection.  Right?

15                  MR. ALLINGHAM:  That's exactly my

16  point, yes.

17                  THE COURT:  And we're not looking at a

18  Revlon market -- turning everything into a Revlon

19  thing, because then you're talking about controllers

20  basically saying they have to be willing to sell.

21                  MR. ALLINGHAM:  That's correct.  And

22  I -- and I view Revlon as changing the calculus of

23  directors' calculation of value.  That is to say, in a

24  decision to sell the company, we are -- we are -- we

11

1     are now looking at the highest price, not any number

2     of other considerations.

3               THE COURT:  I mean, the directors in

4     this situation should be looking for the highest price

5     they can get; right?

6               MR. ALLINGHAM:  That's correct.

7               THE COURT:  Well, why is this option

8     open to me?  Your friends are going to tell me --

9     they're going to cite four or five cases.  They're

10     going to say when there's a controlling stockholder

11     transaction, the entire fairness standard applies.

12     And they're going to be right about that literal

13     quotation; right?  We're not going to be able to

14     argue -- you're not going to be able to argue with

15     them about that.  They're actually going to be able to

16     cite something that says that, and it will actually

17     have the four-letter word that starts with H and ends

18     with D; right?  Hold; right?

19               MR. ALLINGHAM:  Yes.  My friends do

20     argue that Kahn v Lynch imposes a bright-line test.

21     If it's a controller transaction, then entire

22     fairness, period, end of story.

23               THE COURT:  And there are cases that

24     parrot that statement; right?

12

1          MR. ALLINGHAM:  Most recently in

2    Southern Peru in the Supreme Court.

3               I -- I would say, however, Your Honor,

4    that I disagree -- and with respect, I disagree with

5    some statements to this effect in the Cox opinion.  I

6    don't think either that, in -- in addressing that

7    argument in Kahn v Lynch, the argument that was being

8    addressed was one that presents these facts.  And

9    that's important -- let me just pause.

10              That it did not present these facts is

11   very important, because if you have only one

12   procedural protection or the other procedural

13   protection and not both acting in tandem, you have not

14   sealed off the potential exercise of influence by the

15   controller on the terms of the transaction or the vote

16   to approve the transaction.

17              THE COURT:  Because I -- I take it one

18   of your points there is -- about Lynch is that when

19   they're talking about the committee's ability to say

20   no, it was the threat to -- to use the tender offer

21   route --

22              MR. ALLINGHAM:  Well, sure.

23              THE COURT:  -- and bypass the

24   committee.  So as a factual matter, without having

13

1    both of them up-front, that -- that neither is as --

2    neither works as well without the other because --

3                    MR. ALLINGHAM:  That --

4                    THE COURT:  -- because if you have the

5    nonwaivable majority-of-the-minority condition, then

6    the controller can't say to the special committee "If

7    you say no to me, I'm just going to run to the

8    stockholders because" -- or you have the commitment

9    that you won't do a deal without the special

10   committee's approval, you can't run to the

11   stockholders with a tender offer.

12                   MR. ALLINGHAM:  That's exactly right.

13   And, in fact, our friends concede that in their brief.

14   They say it's -- it's -- it's definitional, almost,

15   that the two acting in tandem are better than one.  I

16   think that's important doctrinally when looking at the

17   Kahn v Lynch case because otherwise you have not, in

18   effect, sealed off all windows and doors --

19                   THE COURT:  Well --

20                   MR. ALLINGHAM:  -- of control.

21                   THE COURT:  -- I take it what you're

22   also saying is, pragmatically speaking, it's part of

23   why no one has been able to present the case -- and I

24   think this is where Cox and others -- people read

14

1   it that way.  People look at it, and they say there's

2   a statement that says this applies.  Then it says you

3   can do one of these -- if one or the other of these

4   things will give you this burden shift.  If you're not

5   sure that you're going to get any benefit for doing

6   both, why would you do both?  And, therefore, no one

7   does -- no one did both until your client did both.

8   Is that --

9               MR. ALLINGHAM:  I -- I can't say that

10  no one ever did both.  It certainly --

11              THE COURT:  It was the way they did --

12              MR. ALLINGHAM:  There's no opinion

13  that presents those facts.

14              THE COURT:  But the way they did both

15  wasn't a commonly the-train-is-leaving-the-station.

16  There's the call from the special committee that's

17  gotten happy to the --

18              MR. ALLINGHAM:  Yes.

19              THE COURT:  -- plaintiffs' lawyer and

20  they say, "We've gotten to a price with the thing,

21  plus we've added the majority of the minority."  And

22  so the majority of the minority gets added, tacked

23  onto the situation as part of the agreed upon --

24              MR. ALLINGHAM:  Yes --

15

1               THE COURT:  -- terms --

2               MR. ALLINGHAM:  -- not announced from

3    inception, which is what -- which is what makes it

4    effective.

5               THE COURT:  Right.  And in a weird

6    way, they got the business judgment -- they got

7    something better than the business judgment rule,

8    because they got -- actually at the same time that the

9    special committee got happy, the plaintiffs' lawyers

10   got happy, and there was a negotiated settlement.  And

11   so --

12              MR. ALLINGHAM:  Yes.  The only thing

13   better than the business judgment rule is a release,

14   Your Honor.

15              (Laughter)

16              MR. ALLINGHAM:  Let me come back to

17   Your Honor's question, though.  My friends do say

18   "It's a bright-line rule and you're bound."  And I --

19   I take this Court's insistence on deference to

20   controlling authority.

21              What I would say is that in our

22   reading, Kahn v Lynch is not controlling authority on

23   these facts.  We know for a fact that this argument

24   was not presented to Kahn v Lynch.  We, therefore,

16

1    should take it as true that Kahn v Lynch, in whatever

2    language it wrote -- it wrote, the Court wrote --

3                   THE COURT:  Right.

4                   MR. ALLINGHAM:  -- was not intending

5    to reject this argument, which was not presented to

6    it.  And then I would say, Your Honor -- Your Honor,

7    there is other language in Lynch that suggests that

8    the Court understood what it was doing and what it was

9    not doing.

10                  So -- this is also well-known

11   language, Your Honor.  The Court said, shortly after

12   the -- the bright-line rule, the -- the exclusive

13   standard -- we reaffirm the exclusive standard -- this

14   language:  "Nevertheless, even when an interested

15   cash-out merger transaction receives the informed

16   approval of a majority of [the] minority stockholders

17   or" -- not "and"; "or" -- "an independent committee of

18   disinterested directors, an entire fairness analysis

19   is the only proper standard of review."

20                  Now, as I said, the language doesn't

21   say when an interested cash-out transaction receives

22   the approval of a majority of the minority and a

23   committee, which is what it would say, presumably, if

24   the Court was speaking to these facts.

17

1            So our view -- and we urge the Court

2    to find -- that Lynch includes no holding as to the

3    standard of review for -- for a controller transaction

4    that includes both protections.  And doctrinally,

5    again, Your Honor, there's a reason for that.  One or

6    the other does not seal off the controller.  Both

7    does.

8              THE COURT:  And how -- how about

9    Tremont and Emerald Partners and Southern Peru or

10   American Mining or whatever it's called?

11             MR. ALLINGHAM:  None presents these

12   facts.  Tremont --

13             THE COURT:  Is it just, again, the

14   same situation where the Court cites that but isn't

15   presented with the question?

16             MR. ALLINGHAM:  Yes.  In my view, in

17   fact, you can reach back even farther than Kahn to --

18   to then-Vice Chancellor Jacobs' opinion cited in Kahn.

19   I think in each case the Court was citing to language

20   that did not address my particular fact situation.

21   And the, you know, sort of, exclusivity of the

22   standard of review just persists without reference to

23   the particular facts of the case.

24             THE COURT:  Because the Supreme Court

1 has never had a chance to actually be asked it.  And

2 to the extent that the market perceived it as

3 uncertain, controllers had no incentive to actually

4 provide both protections to stockholders up-front.

5     MR. ALLINGHAM:  That's exactly true.

6 And, in fact, just -- just to -- to finish the point,

7 the -- the alternative language -- the -- the other

8 language that I quoted to you, which is stated in the

9 alternative, is not a mistake, in my view.  It's

10 repeated in Southern Peru word for word.  So, again,

11 Southern Peru, which presented only one of those

12 protections, states the rule in the alternative.

13     THE COURT:  Right.  So, like, if you

14 said to your child, "You can go to the movies if you

15 do your math or your English homework," very few

16 adolescent children are going to do both --

17     MR. ALLINGHAM:  Both.

18     THE COURT:  -- right?  Or they're

19 going to be the ones that every other kid hates;

20 right?  "I do both."

21     (Laughter)

22     MR. ALLINGHAM:  "I'm swell."

23     So that's the first point I want to

24 talk about.  And I'll try to -- try to modify what I

19

1    was going say to take into account what we've already

2    discussed.

3              The second issue I want to turn to,

4    which I think has important implications for

5    challenges in this Court to controller transactions

6    and more generally to challenges in this Court to

7    any -- any M&A transactions, deals with the

8    difference -- and it's a fundamental difference, Your

9    Honor -- between pleadings-based motions to dismiss,

10   on the one hand, and evidentiary-based motions for

11   summary judgment on the other.  And that, in turn,

12   implicates what I think is a critical point in this

13   Court: the point at which plaintiffs actually have to

14   begin litigating and proving their claims.

15              This is a motion for summary judgment

16   under Rule 56.  That rule imposes obligations on me as

17   the moving party, and it imposes obligations on the

18   nonmoving party as well.  What this Court is presented

19   with today is an utter failure of the plaintiffs, the

20   nonmovants, to do what Rule 56 requires; that is, to

21   present evidence of specific facts showing that

22   there's a genuine issue of fact for trial on matters

23   on which I bear the burden, one; and, two -- and what

24   is really important today -- to present evidence of

20

1    specific -- specific facts showing that they can carry

2    their burden on issues on which they carry the burden.

3                    This is not an obligation that's

4    satisfied by a reference to the nonmovants' own

5    pleadings.  This is not a Rule 12 motion to dismiss.

6    Evidence of specific facts are required, not merely a

7    promise to present some evidence down the road, not

8    merely a promise that additional discovery is required

9    in order to carry those burdens.  Evidence of specific

10   facts now is required --

11                   THE COURT:  Well, is the big gap --

12                   MR. ALLINGHAM:  -- under Rule 56.

13                   THE COURT:  -- in your view, the

14   absence of a -- of an expert report from them on the

15   underlying fairness of the price that was paid?

16                   MR. ALLINGHAM:  That's certainly true

17   with respect to the price, but there are many other

18   issues and arguments presented, none of which is --

19   is -- is supported by evidence, placed in the context

20   of the legal framework that this Court has to apply to

21   these issues.

22                   And on the issue of an expert

23   report --

24                   THE COURT:  I mean, do you have an

21

1    expert report or you just have the opinion of

2    Evercore?

3                    MR. ALLINGHAM:  I have the opinion of

4    Evercore.  But the opinion of Evercore in Tanzer and

5    other cases even applies --

6                    THE COURT:  Oh, no, no, no.  I'm not

7    --

8                    MR. ALLINGHAM:  -- entire fairness, a

9    prima facie showing of fairness.

10                   THE COURT:  That was the special

11   committee's advisors.

12                   MR. ALLINGHAM:  It's not telling tales

13   out of school, Your Honor, for me to say that,

14   however, I have an expert.  It is not telling tales

15   out of school to suggest that the plaintiffs probably

16   have an expert.  And it's certainly true that these

17   lawyers have the ability, because they do it

18   frequently at the PI stage, to present financial

19   expert affidavits on fairness.  They're capable of it.

20   They just in this case chose not to do it.  And that's

21   okay at a PI hearing, if that's what they want to do.

22   That's okay on a motion to dismiss at the pleading

23   stage, if that's what they want to do.  It is not okay

24   under Rule 56 to do it at the evidentiary summary

22

1  judgment stage.

2              And the consequences of failing to

3  make that showing are stark in the rule.  "If the

4  adverse party does not ... respond [to a prima facie

5  showing], summary judgment ... shall be entered

6  against the adverse party."

7              So although we view the question of

8  the appropriate standard of review as -- as an

9  important issue for our corporate law and we view that

10  as an issue under which this Court can and should

11  grant summary judgment, it is not necessary for this

12  Court to determine to apply the business judgment rule

13  in order for summary judgment to be granted here.  It

14  can be granted under either of the standard of

15  reviews --

16              THE COURT:  But --

17              MR. ALLINGHAM:  -- possible.

18              THE COURT:  -- your friends would say

19  that -- they would say that -- they would point to the

20  following evidence: that MacAndrews & Forbes timed the

21  offer opportunistically to deal with the market lull

22  so that when they made their offer, it was at a

23  substantial premium to market, but it was timed at a

24  time when the stock price was well below the yearly

CHANCERY COURT REPORTERS

23

1    high; that the projections that the committee used

2    were overly conservative, which was proved by the fact

3    that the company within a calendar year after the deal

4    closed had substantially outperformed the projections

5    on which the deal was priced.

6                    And I know you have a response to, in

7    terms of the factual relevance of this, but this

8    impairment analysis, which they say, suggests casts

9    doubt on it; and they obviously criticize some of the

10   multiples used by Evercore and suggest that there's

11   some minor tweaking of the multiple, that the value

12   range used by the financial committee could have --

13   would have materially changed; and that, taken

14   together, that raises a triable issue of fact around

15   the fundamental issue of financial fairness.

16                    MR. ALLINGHAM:  So I have a -- sort of

17   an overarching response to that, and then I have

18   responses to each of those points.

19                    The overarching response is their

20   burden is not to show a triable issue on that fact.

21   The burden is on the plaintiffs now to show the

22   unfairness of this transaction.  And they have to do

23   that by evidence.

24                    Now, with respect to the points that

24

1   Your Honor has made, as to what Your Honor calls the

2   market lull, it's true.  The stock was down.  It's

3   also true --

4                   THE COURT:  Was the entire market

5   down?  Or was it just --

6                   MR. ALLINGHAM:  I -- I --

7                   THE COURT:  -- this business?

8                   MR. ALLINGHAM:  I'm sure we can answer

9   that question for Your Honor, but I can't, off the top

10  of my head, remember.

11                  I think -- I think we would then get

12  into issues was the market down in particular sectors.

13  I'm not sure that it's -- that it's an important -- I

14  don't think the market was moving dramatically in that

15  period, but we can find the answer.

16                  The real point is it is -- it is

17  uncontested that the price of the stock was down.

18  It's also uncontested that the performance of the

19  company was down.  And this is not temporary -- a

20  temporary problem.  The critical business of this

21  company, the core business, is check printing.  Check

22  printing is a business that is threatened -- and

23  nobody disputes this, not even the plaintiffs -- is

24  threatened by all manner of electronic forms of

25

1  payment which obviate the need for checks altogether

2  and by -- by the electronic data processing of checks,

3  which obviates the need for printing checks.  This is

4  a -- what we used to call in law school, a wasting

5  asset.  This is not a business --

6              THE COURT:  No, no.  I understand.

7  And there's all this testimony about why Mr. Perelman,

8  in particular, likes to buy nearly dead things.

9              (Laughter)

10              THE COURT:  It's not -- not quite as

11  grim as those insurance policy things where they --

12  you know, like -- like, they kill -- like, they gave

13  you, like, a million dollars that did really well for

14  three years, but you're going to die on the first

15  day --

16              MR. ALLINGHAM:  Your Honor, there --

17  there are opinions in this Court that talk about

18  Mr. Perelman's ability to see some value in mature

19  businesses.  That's entirely true.  This is a business

20  in which the performance of the core business was

21  clearly deteriorating.  We had information during the

22  pendency of this offer that the largest customer by

23  far was, for the first time, going to put its business

24  out to bid, which meant that even if we could retain

26

1　that volume, it was going to be under price pressure.

2　And that's what happened.

3　　　　　　　THE COURT:  No.  No.  I -- one of the

4　oddments you always have to deal with in this context,

5　right, is you always have a situation where the

6　defendant is coming in to buy something.  And the

7　defendant, therefore, in this context always has an

8　incentive to call it stinky in the non-French cheese

9　sense, just stinky, which raises the question of, you

10　know, is it an act of charity or is it perhaps not as

11　stinky as they're making out.

12　　　　　　　MR. ALLINGHAM:  And so in terms of the

13　incentives to buy or sell, I understand what Your

14　Honor is saying.  And clearly there are always

15　differences of opinion between buyers and sellers;

16　else, there would not be a transaction.

17　　　　　　　THE COURT:  Well -- and that's why you

18　get to where -- I thought the key -- and this is where

19　I think the doctrinal difference may make a

20　difference, which is if you're actually down into the

21　-- the dough of it, right, of fairness, it's really

22　pretty hard to miss -- it's really pretty hard to

23　avoid trial, because when you're debating about it,

24　there are debate -- there's a debate about the future

27

1   of the industry, about this or that.

2                    And isn't part of what the doctrinal

3   debate about is if, frankly, you get the benefit of an

4   independent bargaining committee who has the ability

5   to say no?  Well, they can say, no and they've

6   negotiated for you.  And even more, if you're a mature

7   adult, stockholder, if you don't like what the

8   committee did and you really think the check business

9   is going to go wild, you simply vote no.  It's not

10  like a tender decision.  It's a vote on a merger.  And

11  if you vote no and everybody else votes yes and you

12  don't want to seek appraisal, then you can still take

13  the deal.  So it's a totally free vote.  You don't

14  have to vote yes.

15                   I think that's where the rub is for

16  me, because I think -- as I read the spirit of the

17  fairness cases, it's not that easy for the Court to,

18  simply on a facial level, say that something is

19  clearly fair; right?  By fair, we don't mean if the

20  range of something was 19 to 32.  If you got $19.10, I

21  don't think, if you read Weinberger, you could simply

22  say that's fair; right?

23                   MR. ALLINGHAM:  Sorry.

24                   THE COURT:  Well, could you? if you

CHANCERY COURT REPORTERS

1   just simply knew there were some raw fairness range

2   and it was $19 to 31 and the committee got 19.10.

3                   MR. ALLINGHAM:  I think --

4                   THE COURT:  Is that what Weinberger

5   says is fair?

6                   MR. ALLINGHAM:  I think there are

7   circumstances in which I would argue that Weinberger

8   would permit a finding of fairness in that

9   circumstance.  I think it's fact specific to the

10  particular deal.

11                  THE COURT:  Right.  But that's what

12  I'm saying, which is I think it's one of these

13  situations where you could easily come out in a case

14  where you say "If I had to do an appraisal, I would

15  say this is 31.50.  They got 29.75.  It's an entire

16  fairness case.  29.75 is entirely fair."

17                  But it's this process and price test.

18  If you look into effect -- and, frankly, the 29.75 was

19  validated by the market because it was informed by a

20  majority-of-the-minority vote.  There had been

21  negotiations.  There were dynamics this way, and

22  you're just one court trying to guess, you'd say

23  that's fair.

24                  But I think there can be a

29

1    circumstance where somebody said "Look, it's within

2    the range of fairness."  You didn't see any evidence

3    of negotiation.  There was no negotiation of the

4    majority-of-the-minority vote.  Might have been in

5    some bare range of fairness.  But is that really what

6    an arm's length deal, right -- because part of what

7    you're trying to do is, how would an arm's length

8    negotiation come out; right?

9                    MR. ALLINGHAM:  Yes.

10                   THE COURT:  That doesn't mean it

11   necessarily comes out at the bottom of a fairness

12   range.

13                   MR. ALLINGHAM:  It's true it does not

14   necessarily mean that.

15                   THE COURT:  Right.  I mean, a market

16   test would not necessarily suggest that it comes out

17   that the winner of the negotiation always -- you know,

18   that the winner is always the buyer who paid at the

19   low end of the valuation range.  And what I'm saying

20   is complex.  When I get -- you're -- you're really

21   saying if they had a financial advisor who came in and

22   said that this deal was mispriced, they would meet

23   their burden under Rule 56.

24                   MR. ALLINGHAM:  Uh-huh.

1          THE COURT:  But by pointing to -- and

2     I admit they point to some of their complaint; but

3     they also point to things in the record, you know, the

4     stuff about the projections or the performance.  That

5     stuff's in the record; right?

6               MR. ALLINGHAM:  The -- the projections

7     are in the record, correct.

8               THE COURT:  How about the stuff about

9     the performance of the company afterwards?  Isn't that

10    in the record?

11              MR. ALLINGHAM:  It's in the record.

12    It's in the first quarter 10-Q.  It is, however -- let

13    me take that as an example, Your Honor, of the

14    difficulty with the discovery evidence that was

15    developed by the plaintiffs.

16              So there was -- there was extensive

17    discovery before the preliminary injunction hearing.

18    We moved heaven and earth to do what we had to do to

19    make the production, barrelling toward a PI hearing,

20    which days before the hearing plaintiffs abandoned.

21    Six months went by.  The plaintiffs filed a document

22    request.  We filed a motion for summary judgment.  The

23    plaintiffs demanded extensive discovery.  One of the

24    things that they asked for -- and -- and we

1  essentially agreed to give them all that discovery

2  with a single exception.  I said, "Look, Mr. Perelman

3  has no knowledge about the issues presented on the

4  summary judgment."  And they said -- they made no

5  objection to that.  We gave them everything else.  We

6  gave them the Perelman deposition.

7                    THE COURT:  Did that ultimately ever

8  happen?

9                    MR. ALLINGHAM:  Did what happen?

10                    THE COURT:  Did everybody enjoy their

11  turkey in France or -- you know, just as a human, I

12  bled for the --

13                    MR. ALLINGHAM:  Different case, Your

14  Honor.

15                    THE COURT:  Oh, that's a different

16  case, okay.

17                    MR. ALLINGHAM:  So one of the

18  issues --

19                    THE COURT:  They all bleed together.

20                    MR. ALLINGHAM:  One of the issues that

21  the plaintiffs specifically asked about was the new

22  set of projections.  And -- and I think it's

23  conceivable they asked about it because they knew that

24  the new -- new company had new businesses in it, among

32

1    other things.  And so you can't just take those

2    projections at face value.  You have to look at

3    what -- what goes into it.  And they said, "We want to

4    depose someone who can tell us about these

5    projections."  That sounds like a good idea to me.  We

6    said, "We can't object to that."  So we produced a

7    fellow named Pete Fera, and we all trooped down to San

8    Antonio right after Labor Day.  And the plaintiffs

9    took the deposition of Mr. Fera.  And the plaintiffs

10   asked not a single question about the new projections,

11   not one.

12                Now, this is all of a piece, Your

13   Honor -- and I said this in our brief --

14                THE COURT:  By "the new projections"

15   you mean the one -- the ones that were developed for

16   use by the committee or --

17                MR. ALLINGHAM:  No, no.  This is a new

18   set of projections in --

19                THE COURT:  The subsequent year.

20                MR. ALLINGHAM:  Yes, the

21   subsequent-year projections, okay, which were

22   responsive to the -- to the first-quarter results that

23   were better than had previously been projected, partly

24   as a result of acquisitions.

33

1          So that curious decision not to ask a

2    single question about a fact that they were going to

3    then present to Your Honor just as a bald fact is --

4    is all of a piece with what appears to be the

5    discovery strategy in this case.

6          THE COURT:  Because they thought it

7    would be attractive to you.

8          MR. ALLINGHAM:  So -- so all the piece

9    was a strategy in this case, what seems to be, anyway.

10   So they deposed all of the special committee members,

11   and they develop facts that relate to -- that show

12   that the special committee members were not complete

13   strangers to Mr. Perelman.  Not surprising.  Clearly,

14   not, as a matter of law, a problem.  But it's -- it's

15   some connection of some kind.

16          So, for example, Mr. Webb used to be

17   an equity partner with Mr. Perelman in a bunch of

18   enterprises that made a lot of money for both of them.

19   It's a fact.  It means they're not strangers.

20          What they didn't do was to ask a

21   single question about the legal construct that matters

22   here, which is materiality.  So I can -- I can say to

23   Your Honor in my brief, "I think Mr. Webb is a very

24   rich man.  I think Mr. Webb is a person who was

34

1  standing alongside Gerald Ford and Ronald Perelman in

2  the construction of these banking enterprises" --

3              THE COURT:  This is a different Gerald

4  Ford; right?

5              MR. ALLINGHAM:  It's a different

6  Gerald Ford.  "And I think" -- "Tom Allingham thinks

7  that this is really not" --

8              THE COURT:  Because if you were

9  standing next to Gerald Ford now --

10             (Laughter)

11             THE COURT:  I mean, he was --

12             MR. ALLINGHAM:  A return --

13             THE COURT:  -- a really decent guy.

14             MR. ALLINGHAM:  A return of the

15  vertigo.

16             THE COURT:  We lost him,

17  unfortunately.  So we'd really be in a very different

18  realm.

19             MR. ALLINGHAM:  But I, Tom Allingham,

20  might say "That's not a relationship that causes

21  Mr. Webb to be so beholden to Mr. Perelman, and he'll

22  abandon his fiduciary duties and just do whatever

23  Mr. Perelman wants."

24             THE COURT:  No.  And I was focused

1   more -- because I think the financial fairness issue

2   is a very difficult one and part of why, again, the

3   policy decision about which standard of review is a

4   very important one.

5                    MR. ALLINGHAM:  I -- I --

6                    THE COURT:  Because I think a

7   litigable -- again, as I read the spirit of entire

8   fairness review, you have to look at both the process

9   and price.  You're not allowed to just look at one.

10  Obviously the price is usually the most ponent thing,

11  but you look at the process as well.  That things that

12  go to the process or go to questions about it go to

13  value.

14                    I mean, I -- for example, I think an

15  effective plaintiffs' lawyer, if you -- if you

16  actually at trial were able to pick apart the

17  financial analysis undergirding the deal, you wouldn't

18  necessarily need your own expert; right?

19                    MR. ALLINGHAM:  That's true, Your

20  Honor, but you would need some evidence to support

21  your picking apart.  That is, it's not enough to

22  say --

23                    THE COURT:  Oh, I agree with that.

24                    MR. ALLINGHAM:  It's not enough for me

1   to say "Oh, I think that the terminal value multiple

2   is wrong.  And although I'm not going to show you my

3   math, I think that if you change the terminal value

4   multiple to something I think is right," I, Tom

5   Allingham, then you get numbers that are, you know,

6   50 percent larger.

7                   THE COURT:  No.  For example, what

8   they do with Evercore is say "If you look at the

9   component parts of the business if you're doing a DCF

10  and you're looking at the exit multiple, you got to

11  look at the" -- "the contributing factors as of the

12  time you're doing your," you know, "valuation."  I

13  think they're talking about the terminal date.

14                  MR. ALLINGHAM:  Uh-huh.

15                  THE COURT:  And they're saying "Look,

16  the components of this are changing.  They didn't give

17  appropriate weight to that changing.  And if you use

18  just a moderately higher exit multiple, the fairness

19  range moves in a very significant way, which casts

20  doubt on the fairness of the deal."

21                  MR. ALLINGHAM:  Yes.  So in -- if Your

22  Honor is offering that as an example --

23                  THE COURT:  Well, I think that is one

24  of the points that they make.

37

1          MR. ALLINGHAM:  So that -- that's a

2    point.  That point is supported by citation to the

3    complaint and to nothing -- to nothing else.  The

4    calculations are not replicated anywhere.  They are

5    just stated as an attorney's ipse dixit.  You can

6    present --

7          THE COURT:  What exactly is an

8    attorney's ipse dixit?

9          MR. ALLINGHAM:  It is to say the

10   thing.  So it's just to say the thing.  I just say it;

11   right?

12          So -- so at -- that's fine on a motion

13   to dismiss.  On a Rule 56 summary judgment motion,

14   we --

15          THE COURT:  They don't even cite to

16   the Evercore report for the underlying data.

17          MR. ALLINGHAM:  Just for the facts,

18   but they don't challenge Evercore's independence or

19   expertise.

20          THE COURT:  No, no.  I think what

21   they're -- what I'm saying is, is it true that you can

22   calculate from the evidence that they cite to?  I

23   thought their point was when you look at the terminal

24   value year, that a much higher percentage of the

CHANCERY COURT REPORTERS

38

1    overall earning of the company was one of the

2    businesses.  When you looked at the multiples for that

3    business, they were significantly higher than the

4    multiples used by Evercore.  Evercore did not adjust

5    for the changes in contribution; and that if they had

6    simply moved the exit multiple by .5 percent, then the

7    fairness range would move.  And they do that, I

8    thought, by citation to actual parts of the Evercore

9    report.

10              MR. ALLINGHAM:  So let me -- let me --

11   let me respond to that.

12              It is true that an argument is made

13   that the terminal value multiple derived from

14   comparable companies based on their performance in

15   2012 is challenged by the plaintiffs.  It is true that

16   the challenge that they make is to say "Okay.  I

17   observe" -- I did, by the way, ask Gus Christensen of

18   Evercore about this, another example of a willful --

19   apparently willful decision not to ask any questions

20   that might have developed some evidence on the points

21   that they are going to advance as attorneys' ipse

22   dixit.  Sorry for using it again.  I didn't ask

23   Mr. Christensen about this.

24              But the argument is "Evercore did what

```
 1   Evercore always does in a circumstance where there are
 2   multiple businesses in a company.  They say, 'I'm
 3   going to identify comparable companies.  I'm going to
 4   extract trading multiples based on 2012 trading prices
 5   for those comparable companies.  I am going to apply
 6   those business unit terminal'" -- sorry; "'those
 7   business unit trading multiples to each business unit
 8   of MFW, and I'm going to derive a single terminal
 9   value multiple for MFW for application in 2015 cash
10   flows by weighting those individual business unit
11   comparable company derived trading multiples as a
12   one'" -- "'a global terminal value multiple,'" okay?
13                    THE COURT:  Uh-huh.
14                    MR. ALLINGHAM:  Now, there are a lot
15   of ways you could do that.  One way is the way that
16   Evercore did it, which is the way they always do it,
17   which is to weight it based on a thing that we know,
18   the 2012 EBITDA contributions of each individual
19   business unit.  It is quite true that another way you
20   could do it is to weight it in 2013 or '14 or 2015.
21   And the plaintiffs say, "You should have done it based
22   on the not knowable about projected business unit
23   contributions in 2015 because you're trying to derive
24   a multiple for 2015 cash flows."
```

1                THE COURT:  Well -- and I think what

2    they're saying there is that -- and this gets to

3    whether it's evidence.  And this gets -- this gets at

4    whether the Rule 56 standard, which is not what I'm

5    ultimately persuaded of now, right.  But if what

6    they're saying is in 2015 you're doing a DCF on your

7    terminal value based on cash flows of that terminal

8    year.  You've weighted them, which is by virtue of the

9    accepting the projections, you have, in fact, made a

10   decision about what percentage contribution would be

11   made by each of the businesses.

12                MR. ALLINGHAM:  I don't know --

13                THE COURT:  So why aren't you aligning

14   your judgment as to the projections, or is this some

15   sort of hedge?

16                And I guess where I'm down into the

17   weeds about this stuff is, I get your point if they

18   were just citing to their complaint.  What I'm a

19   little confused about -- and believe me, I'm no, you

20   know -- I can -- the judges of this Court are more

21   willing victims of appraisals than, you know,

22   enthusiastic participants in them.  I mean, it's some

23   sort of exercise of, like, the judicial -- because the

24   lull -- nobody wants -- no one is better able to

CHANCERY COURT REPORTERS

41

1  appraise a company than a law-trained judge faced with

2  two experts who are entirely divorced from any

3  academic or, you know, kind of principle who come in

4  and apply the same accepted methodologies and come out

5  an 80 percent value difference.

6                    So I -- I don't really hunger to get

7  into this stuff.  But what I'm trying to get at is

8  your friends have that point, which you say is a

9  debatable point; right?  I get that.  That's the

10 question, is in entire fairness --

11                   MR. ALLINGHAM:  Before we leave that

12 point, Your Honor, let me just say the real question,

13 I think, on that point is not whether you should pick

14 this alternative approach or that alternative

15 approach.  It's, in the context of an overall

16 valuation, which is the only valuation in the record,

17 is that a reasonable -- reasonable approach to take?

18 And -- and --

19                   THE COURT:  But, see, that's where it

20 also bleeds into the role of the financial advisor as

21 not simply giving a fairness opinion but also as a

22 negotiator and whether they should have been using

23 these things to push back.  And don't they also make

24 the point -- was it -- this was a comparable companies

42

1  analysis?

2           MR. ALLINGHAM:  There is a comparable

3  companies analysis, yes.

4           THE COURT:  Was there a comparable

5  transactions analysis?

6           MR. ALLINGHAM:  Yes.

7           THE COURT:  Okay.

8           MR. ALLINGHAM:  And in both of those

9  cases they're just flat wrong.  This is not even a

10 debatable point.  In the comparable companies analysis

11 they just arbitrarily say, announce that in a

12 comparable companies analysis you have to add control

13 premiums to the comparable companies, okay?

14          Now, there are circumstances in which

15 you do add control premiums to a comparable company

16 analysis.  Those circumstances do not -- this is just

17 Tom Allingham talking, which is just as good as Carl

18 Stine talking -- but do not include controller

19 transactions where control has already passed.  So

20 that the remaining minority stockholders hold exactly

21 the same kind of economic interest as a single -- a

22 single stockholder trading on the Exchange.

23          THE COURT:  Well, that's an

24 interesting question, because that's not actually a

43

1  purely financial question.  It's one in which legal

2  policy itself actually plays as much a role as any

3  anything else.  I mean, you know, you get into all

4  these debates about -- I don't think that there's,

5  really, any evidence that solvent companies -- and I

6  use the term "solvent."  I mean, healthy, profitable

7  companies, that it can actually test the market, sell

8  at a premium as an entire company typically to

9  minority trades in their stock, which I don't really

10 understand and I don't know why some law professors

11 get confused by it.  It presents no corporate finance

12 problem at all, because buying an entire company is

13 very different than buying a thousand shares.  You're

14 getting something very different.  It has additional

15 risks, but it has additional benefits.  But you're not

16 buying the same thing.

17            What you're saying, the problem with

18 saying in a situation where there's a controller, that

19 obviously you know there's control.  And so when

20 you're assessing what a fair price should be, you

21 should accept your fate that you bought a stock in the

22 controlled enterprise.  The problem with that is the

23 intersection of appraisal value and our law; right?

24            MR. ALLINGHAM:  I agree with that.

44

1              THE COURT:  Right.  What you would be

2    implying there is actually the standard of fair value

3    is different than the standard that would apply in

4    appraisal.

5              MR. ALLINGHAM:  What I'm really

6    saying, Your Honor, is that --

7              THE COURT:  Well, right, because in an

8    appraisal, you would have to make sure that there's

9    not a minority discount.

10             MR. ALLINGHAM:  That's correct.

11   That's our law.  I understand that.

12             But -- but what we have here is an

13   announcement by an attorney citing to his complaint

14   that, in a controller transaction, even in a

15   controller transaction, we have to add a control

16   premium to the comparable companies analysis prepared

17   by Evercore.  Now, Evercore clearly didn't think so.

18             THE COURT:  Oh, no, no.  I get that.

19   And that's why I asked -- there's a different

20   comparable transactions analysis; right?

21             MR. ALLINGHAM:  Yes.  And I can speak

22   to that in a minute, but just --

23             THE COURT:  Well -- and that would be

24   an analysis that would presumably take into account

45

1    the value at which entire companies were purchased in

2    the marketplace and, therefore --

3                    MR. ALLINGHAM:  It --

4                    THE COURT:  -- for someone looking for

5    an appraisal-type value, if you're talking about

6    adjusting out minority discounts, that analysis would

7    address that.

8                    MR. ALLINGHAM:  It might or it might

9    not, Your Honor.  I can imagine -- and, remember,

10   you've got to place this particular transaction on a

11   spectrum of control transactions.  So the plaintiffs

12   point out that this transaction is placed at the low

13   end of the spectrum of those control -- of those

14   comparable transactions.  They didn't ask

15   Mr. Christensen why he placed this transaction there.

16                   I would suggest to Your Honor -- and,

17   again, it's just as good as Mr. Stine or

18   Mr. Monteverde's opinion.  I would suggest to Your

19   Honor that in that universe of whatever it was, 50 or

20   80 transactions, there was not a single controller

21   transaction in there.  So it might be that you would

22   say -- but we don't know because they didn't ask

23   Mr. Christensen.  And it's their burden to develop

24   this record.

46

1          THE COURT: Isn't this notion of a

2 controller transaction inconsistent with the test of

3 fairness itself?

4          MR. ALLINGHAM: I'm not sure I

5 understand, Your Honor.

6          THE COURT: If the idea under entire

7 fairness is that an asset will pass at essentially the

8 same price as it was the product of arm's length

9 bargaining --

10          MR. ALLINGHAM: Uh-huh.

11          THE COURT: -- isn't that inconsistent

12 with a controller overlay?

13          MR. ALLINGHAM: I don't think so, but

14 I think we're now talking about intersections of law

15 and corporate finance.

16          THE COURT: Oh, no, no. I get that.

17 But that's important, because the problem is when you

18 talk about -- like, when we do an appraisal, we don't

19 appraise the value of a company in some Brealey and

20 Myers way. We appraise the company in a

21 jurisprudentially defined way that our Supreme Court

22 has defined. That's why, when I do appraisals, it

23 makes my head hurt because I'm supposed to, A, adjust

24 for the -- make sure there's no minority discount but

47

1    then value the company as a going concern, which means

2    you've got to adjust away for any minority discount,

3    but then have to try to identify if there's something

4    -- synergistic value in the marketplace when people

5    buy and sell companies, and you have to take that out.

6                    MR. ALLINGHAM:   I --

7                    THE COURT:   People in the real world

8    don't have to, you know, do that.  But in the world of

9    262, we do.

10                   MR. ALLINGHAM:   But let me circle back

11   to the -- I think the -- the fundamental question Your

12   Honor is asking.

13                   So we could go to trial and we could

14   examine the question of fair price and fair process at

15   trial.  We could do that.  I take Your Honor's point

16   -- and I agree with it -- that we have this process

17   here.  These two procedural protections would be

18   powerful evidence of fairness.  I take that point,

19   too.

20                   What I'm saying is -- is a little bit

21   different.  What I'm saying is that there can be no

22   question that the burden has shifted to the plaintiffs

23   to prove unfairness in this case.  I say that because

24   we have an uncontested majority-of-the-minority vote

48

 1   here, and Southern Peru --

 2                    THE COURT:  But the burden is to prove

 3   it, but it's not -- it's to introduce now, to point to

 4   admissible evidence that, you know, taken in its

 5   entirety and construed -- has to be construed,

 6   obviously, in a -- I guess there are all kinds of

 7   philosophical debates about rational or reasonable

 8   that I don't want to -- with my head cold, I can't

 9   even begin to approach; but either -- at least let's

10   say it has to be a rational reading of that evidence

11   that the plaintiffs have pointed to, if accepted,

12   would persuade the tribunal that the deal was unfair;

13   right?

14                    MR. ALLINGHAM:  Yes.

15                    THE COURT:  And I think what your

16   friends say is too low terminal multiple, when -- just

17   looking a consistent analysis of what Evercore

18   accepted, which is the relative case with cash flows

19   of the businesses as of the terminal value, if you

20   just adjust for that and they all point to the

21   specific evidence, it would suggest that the deal was

22   unfair.  Even excluding the new businesses that were

23   purchased by -- is it the check business?

24                    MR. ALLINGHAM:  Yes.

49

1                    THE COURT:  Yeah.  That even --

2                    MR. ALLINGHAM:  I'm sorry, no.  It's a

3   call center business.

4                    THE COURT:  The call center business.

5   Even if you exclude those, within six months there's

6   substantially overperformance, casting doubt on the

7   conservatism of the original projections.  Then they

8   would put into the account, again -- they would say

9   "Look at this stress test on impairment, which

10  suggests a much more robust valuation of the same

11  assets.  And, Judge, you might not believe us after

12  trial; but we at least get to go to trial and get our

13  shot at convincing you that this is unfair."

14                   MR. ALLINGHAM:  And my response -- and

15  I won't beat a dead horse, Your Honor -- is Rule 56

16  contemplates that, particularly in a situation where

17  the plaintiffs bear the burden.  They can go and take

18  additional discovery.  They can make their showing by

19  affidavit.  They have to make their showing by

20  evidence.  We have a situation here where there was

21  comprehensive discovery.  Everything they asked for

22  they got.

23                   What they have now presented to Your

24  Honor -- let me just talk about -- because remember

50

 1    the scintilla of evidence issue on summary judgment.

 2    It doesn't take just a scintilla.  You can't just say

 3    "Well, I got one," right?  Or "I got two."  It has to

 4    be substantial evidence that would support the thing

 5    on which they bear the burden.

 6                    So what we have is a comprehensive

 7    valuation analysis from Evercore Partners, whom they

 8    have not even bothered to challenge the independence

 9    or expertise of.  Okay, so there's no question here

10    that -- that Evercore was, you know, hiding the ball.

11                    THE COURT:  They deposed Evercore?

12                    MR. ALLINGHAM:  They deposed Evercore.

13    And it's important that in deposing Evercore, they

14    didn't ask Gus Christensen about any of the points

15    that they now make.  And -- and with respect to the

16    overperformance question, they didn't ask Mr. Fera

17    down in San Antonio any questions about this point.

18    It's as if -- and -- and with respect to the

19    independence of the directors.  They didn't ask any

20    questions about the materiality of it.  It's as if

21    they thought to themselves, thinking about the

22    pleading-stage type motion, "If I don't ask these

23    questions, I won't get a bad answer.  If I don't ask

24    these questions, I won't get a bad answer."

1          So they didn't ask the questions.  And

2     so what you now have is, with respect to the terminal

3     value multiple, they have an argument that someone, an

4     unspecified someone, might make a different judgment

5     on this relatively small point than Evercore did.

6     They didn't ask Gus Christensen why he made that

7     judgment.  So that's Point No. 1.

8               Point No. 2, what is the result of the

9     change -- the proposed change in that terminal value

10    multiple?  Or said differently -- let's make it two

11    stages, Your Honor.  They say that causes half-a-turn

12    increase in terminal value multiple.  How do I know

13    that?  It's just in their -- they just cite to their

14    complaint.

15              THE COURT:  You can't figure it out

16    from the --

17              MR. ALLINGHAM:  I can't figure it out.

18    In fact, I will tell, Your Honor, when I make the

19    calculation that I think they're trying to make, I

20    come out with a lower turn, not lower than Evercore's,

21    but lower than they've suggested.  I can't replicate

22    it.  And that illustrates the point.

23              How do we know?  There's no -- there's

24    no evidence that's what happens if you do that.

52

1   There's no evidence that it is better to make the

2   judgment that they propose than Mr. Christensen's

3   judgment.  They didn't ask Mr. Christensen why he made

4   that judgment.

5                   And fundamentally, Your Honor, let's

6   just accept the half-a-turn increase.  There's no

7   evidence in the record to suggest the massive

8   increases in value that they say flows from that.  And

9   it's not my job --

10                  THE COURT:  It doesn't flow from math?

11                  MR. ALLINGHAM:  A, it's not my job

12  to -- to do terminal value calculations.  And I don't

13  have a spreadsheet --

14                  THE COURT:  I know, but you --

15                  MR. ALLINGHAM:  -- and my computer

16  doesn't do it.

17                  THE COURT:  But we all know that you

18  love it.

19                  (Laughter)

20                  MR. ALLINGHAM:  But, two, we have a

21  construct here.  Rule 56 requires evidence.  No one

22  can tell.

23                  THE COURT:  Okay.  If I can do the

24  math, if Strine can do the math, is that in the

CHANCERY COURT REPORTERS

53

1    record?  I mean, it's -- it's the movement from 5 to

2    5.5.  I mean, it's a range; right?  You never did

3    the -- what you're saying, they needed to do the

4    actual math?

5              MR. ALLINGHAM:  It is their burden,

6    and they need to put in the evidence of math.  It

7    could be "I have expertise in this area.  I've done

8    the calculations, and the result is this."  It cannot

9    be "Here's my brief."

10             THE COURT:  Do they cite the analysis

11   of Evercore, though?

12             MR. ALLINGHAM:  Not for this -- not

13   for the impact on the price.  They cite -- it's on

14   page 29 of their brief.  They cite complaint Nos. --

15   paragraph 79 and complaint paragraph 80 on the way

16   Evercore calculated its terminal value.  They do cite

17   Evercore.  But for the conclusions they draw on which

18   they rely for the notion that there is a disputed

19   issue of fact on fairness, they cite to their

20   complaint, and that's it.

21             And, Your Honor, plaintiffs put in

22   expert affidavits all the time.  They're capable of

23   doing that.  You know, there's the old principle in

24   Van Gorkum that we get evidence -- where strong

54

1   evidence is available, ought to be -- you ought to

2   derive inferences from that.  They know how to do

3   this.  This is their burden.

4                   With -- with respect -- and so what we

5   have is this unsupported calculation on a terminal

6   value multiple turn of half a turn and an unsupported

7   calculation about its value impact.  You have

8   projection -- and -- and, again, they didn't develop

9   the evidence that they could have developed when they

10  had the opportunity to.  On the overperformance, they

11  didn't ask a question of Mr. Fera about that.  These

12  are -- these are issues on which they bear the burden

13  and where they affirmatively made a decision not to

14  ask.

15                  THE COURT:  Do you have anything

16  further at this time, Mr. Allingham?

17                  MR. ALLINGHAM:  May I have a minute,

18  Your Honor?

19                  THE COURT:  Sure.

20                  MR. ALLINGHAM:  We've -- we've strayed

21  from my prepared script.

22                  THE COURT:  That's surprising to you,

23  I know.

24                  MR. ALLINGHAM:  If I might take a

55

1    minute, Your Honor, to talk about the -- the one

2    arguable point that the plaintiffs -- you know what?

3    I'll wait.

4                    I think, Your Honor, that I'll

5    reserve --

6                    THE COURT:  Okay.

7                    MR. ALLINGHAM:  -- for rebuttal.

8                    THE COURT:  Thank you, Mr. Allingham.

9                    We should probably hear from the

10   special committee, and then you can ...

11                   MR. MUNDIYA:  Thank you.  Good

12   morning, Your Honor.

13                   THE COURT:  Good morning.

14                   MR. MUNDIYA:  I'll be -- I'll

15   reasonably brief.

16                   There is no genuine issue here that

17   the special committee acted -- it was independent,

18   acted thoroughly, understood its mandate, and did the

19   job that was expected of it throughout the summer of

20   2000 --

21                   THE COURT:  How many meetings did the

22   special committee have?

23                   MR. MUNDIYA:  Eight meetings from June

24   through September, Your Honor.

56

1                    No question that there are independent

2     legal --

3                    THE COURT:  They're all in the

4     Hamptons?

5                    MR. MUNDIYA:  No, Your Honor.  They

6     were -- they were various places, but they met in

7     person and over the phone.

8                    THE COURT:  Went from Ina Garten's

9     place to Billy Joel's place to a trashy weekend outing

10    with some fallen former Disney teen idol.

11                   MR. MUNDIYA:  They --

12                   THE COURT:  A full summer in the

13    Hamptons.

14                   MR. MUNDIYA:  There was extensive

15    discussion, Your Honor, over this -- this deal.  They

16    understood -- they understood their mandate,

17    independent legal advisors, independent financial

18    advisors.

19                   THE COURT:  What about these

20    connections with law firms?  I mean, the Bancroft

21    firm, what exactly -- what work had they done for the

22    Perelman-controlled entity?

23                   MR. MUNDIYA:  There was some discrete

24    work that the Bancroft law firm did.  There was no

57

1   specific engagement letter, and the amount of fees was

2   $50,000.  So de minimis in 2010, 2011.  There was

3   $150,000 that was charged by Bancroft for Scientific

4   Games, which is a Perelman affiliate.  Again, discrete

5   work, de minimis.  The record is clear it was de

6   minimis.  So -- and it was also discussed at the

7   special committee.  So --

8                   THE COURT:  What year was that?

9                   MR. MUNDIYA:  That was 2010, 2011.

10  2010 --

11                  THE COURT:  So a couple hundred

12  thousand fees for the 2010 --

13                  MR. MUNDIYA:  Yes.  Maybe even going

14  back to 2009 as well, Your Honor.  So it was de

15  minimis.

16                  With respect to Ms. Byorum, similarly,

17  2007, 2008.  They did some investment banking work

18  for --

19                  THE COURT:  Is it really wise for

20  independent directors to be service providers?

21                  MR. MUNDIYA:  Your Honor, it -- it

22  is -- it's not wise as a -- as a policy matter; but

23  Mr. Dinh is a -- is a partner in a law firm.  It

24  was -- he has special expertise in some of these

CHANCERY COURT REPORTERS

58

1    matters.  It was discrete advice.  It wasn't ongoing

2    -- certainly wasn't ongoing at the time of the deal.

3                    THE COURT:  Was he personally working

4    on these matters?

5                    MR. MUNDIYA:  I think he was

6    supervising the matters.  I think the work was done --

7    was work done by associates.

8                    THE COURT:  He was the billing

9    partner?

10                   MR. MUNDIYA:  Yes, Your Honor.  Yes,

11   Your Honor.  He was -- he was involved.

12                   Let -- let --

13                   THE COURT:  Was he ever asked about

14   his total billings for the firm?

15                   MR. MUNDIYA:  I think he was -- he

16   was -- he was asked about the billings generally.  And

17   I think he said -- he gave -- he gave the number,

18   50,000 to a hundred thousand.

19                   THE COURT:  No.  His billings.

20                   MR. MUNDIYA:  I don't think he was

21   asked that question, Your Honor.

22                   THE COURT:  He wasn't asked?

23                   MR. MUNDIYA:  He was asked about the

24   -- the amount of work that Bancroft had done.

59

1                    THE COURT:  Oh, no.  I understand.

2    But he wasn't asked personally about, like, you know

3    --

4                    MR. MUNDIYA:  "How many hours did you

5    spend on this project?"

6                    THE COURT:  No.

7                    MR. MUNDIYA:  Sorry.

8                    THE COURT:  What his denominator was.

9                    MR. MUNDIYA:  No, he was not asked

10   that question, but he did testify it was de minimis.

11   The denominator was not --

12                    THE COURT:  Yeah, but you know your

13   denominator; right?

14                    MR. MUNDIYA:  Yes, yes, we do.

15                    THE COURT:  Or a pretty close range of

16   it; right?

17                    MR. MUNDIYA:  No.  That's right, Your

18   Honor.  But that -- that was -- again --

19                    THE COURT:  That's what I'm saying.

20   They chose not --

21                    MR. MUNDIYA:  They chose -- that's the

22   point.  You know, they chose not to ask that question.

23                    But the -- but the testimony is -- the

24   testimony is that the amount of fees that were charged

60

1    were, quote, de minimis, both with respect to

2    Ms. Byorum and with respect to Bancroft.

3                    And if you go back to the summer of --

4                    THE COURT:  Yeah.  I just observe I

5    think as a matter of, like, when people say things are

6    de minimis, I'm not saying they're not de minimis.  If

7    things are immaterial and de minimis -- you know,

8    here's good advice for the world -- stop doing them.

9                    MR. MUNDIYA:  Okay.

10                   THE COURT:  Because then the cost of

11   legal briefs to argue about them exceed them, but they

12   create question -- I mean, I really -- the question

13   is -- I know the Exchanges have much tighter

14   definitions; but why people would be service

15   providers, you're kind of in one bucket or they're --

16   you know, we're in a new rung.  You're either a

17   service provider or you're the other.  And that's

18   where you know you're going to get people -- I'm not

19   saying that's the law, but people come in all the time

20   and say "I did something that was de minimis and

21   immaterial."

22                   MR. MUNDIYA:  Right.

23                   THE COURT:  Which makes them sound

24   frivolous, which is you think that they're, you know,

61

1   again, happy-go-lucky because that day they just

2   happened to do de minimis, immaterial things.

3            MR. MUNDIYA:  Your Honor, understood.

4   And -- and these -- these did go back in time, and it

5   was -- it was discussed --

6            THE COURT:  Yeah, it wasn't that much

7   time, 2009 -- this transaction was consummated in ...

8            MR. MUNDIYA:  2011, Your Honor.

9            THE COURT:  Okay.

10           MR. MUNDIYA:  When -- when we go back

11  to what the special committee did, the -- the one

12  thing that I think stands out is the amount of work

13  that did go into understanding the transaction, the

14  fact that alternatives were looked at over the summer

15  of 2011.

16           I don't know whether Your Honor's had

17  a chance to look at the -- the August 10th and

18  August 17th presentations by Evercore, but that tells

19  you how thorough Mr. Meister, Mr. Dinh and Ms. Byorum

20  and Mr. Webb looked at this transaction.  They asked

21  Evercore to look at a potential sale of Harland Clarke

22  to a competitor, even though that may not have been

23  feasible; but they said, "Let's check to see that the

24  deal on the table is the best that we can get for the

62

1   shareholders."

2                       So they went out and they looked at a

3   deal, a potential transaction, that may not have been

4   viable as a practical matter, but, as an economic

5   matter, to see if that was the best deal available for

6   shareholders.  And Evercore concluded that it was not.

7                       THE COURT:  The practical obstacles

8   were Mr. Perelman's objection -- would have been his

9   objection to selling --

10                      MR. MUNDIYA:  No, Your Honor.

11                      THE COURT:  -- or the antitrust

12  concern about --

13                      MR. MUNDIYA:  That's right.

14                      THE COURT:  -- having only one big

15  check-writing, check-printing gorilla --

16                      MR. MUNDIYA:  That's right, Your

17  Honor.  The antitrust concerns --

18                      THE COURT:  -- in a dead market.

19                      MR. MUNDIYA:  Right.

20                      So when we go back -- when we go to

21  the specifics of -- of the special committee members,

22  you see Mr. Meister.  He is -- there's no challenge to

23  his independence.  He's been a director of this

24  company since 1995.  He understood the business

1  extremely well; public company experience, private

2  company experience, you know, understood his mandate,

3  was very involved in the -- in the discussions with

4  Evercore and led the charge.  So he was a

5  quintessential special committee member.

6              We have Ms. Byorum, who had great

7  investment banking experience.  Any work that she'd

8  done ended four years prior to this transaction for

9  Scientific Games.

10              The only other issue they have on

11  the -- on the independence are the, quote, clubby Wall

12  Street entanglements.  Doesn't -- doesn't amount to

13  anything, Your Honor.

14              THE COURT:  They're just expected.

15              MR. MUNDIYA:  Well, it's historical.

16  And the fact that she was at Citibank from 1996 to

17  2007 --

18              THE COURT:  No.  I understand.

19              MR. MUNDIYA:  -- is really --

20              THE COURT:  I mean, that's -- what

21  you're talking about, that's the old structural bias

22  argument; right?

23              MR. MUNDIYA:  Right.  There was no

24  business with Ron Perelman entities between 1996 and

64

1    2007.  So I think -- I think that should -- that

2    disposes of that.

3                    And with respect to Mr. Webb, you

4    know, no -- no relationship with Mr. Perelman for 10

5    years.  They're not -- the evidence is there's no

6    social relationship.  They're not friends.  They meet

7    at board meetings.

8                    THE COURT:  I take it Mr. Webb is

9    pretty wealthy.

10                    MR. MUNDIYA:  He is pretty wealth,

11   Your Honor.

12                    So with that, we don't think there's

13   really any genuine challenge to the independence of

14   the committee.

15                    THE COURT:  Thanks.

16                    MR. MUNDIYA:  For those reasons, the

17   Court should grant summary judgment.

18                    THE COURT:  Thank you.

19                    MR. STINE:  Good morning, Your Honor.

20                    I think we have to take a step back

21   here and take a look at what motion the defendants

22   made.  Defendants did not make a motion saying that

23   the burden should shift to entire fairness.  They

24   didn't make that motion.  They also did not make a

65

1    motion saying that the evidence shows that we meet our

2    burden of entire fairness here.  The motion that they

3    actually made, which is not really what they argue

4    today, the motion that they made was the standard of

5    review should be under Cox/CNX and not under Kahn

6    versus Lynch and that business judgment should apply

7    and, under business judgment, they win.

8                    So we got this motion.  We got

9    discovery on that motion.  We got discovery on that

10   motion.  And then defendants filed a reply.  And the

11   reply all of a sudden says, out of nowhere, we don't

12   meet our burden -- "Plaintiffs don't meet [our] burden

13   of entire fairness."  Well, that wasn't the motion

14   they made.  Certainly, had they made that motion, we

15   would have come to Your Honor and said, "Your Honor,

16   we would like to complete discovery.  We would like to

17   complete expert discovery.  We would like to put in

18   expert reports."  At that point we think it's

19   reasonable, then, to talk about a summary judgment

20   motion on entire fairness or shifting the burden.

21   Or -- and in the reply they don't withdraw their --

22   they don't withdraw their motion and file a new

23   motion.  They don't seek to amend their motion.  They

24   just file a reply.

66

1                   First of all, it's outside -- way

2       outside of the scope of the original motion and,

3       therefore, the reply is improper.  And the whole

4       discussion of whether or not plaintiffs meet their

5       burden of showing entire fairness is really not

6       proper, given the scope of the initial motion, the --

7       not the initial motion; the motion that is here before

8       Your Honor.

9                   Second of all, in Southern Copper --

10                  THE COURT:  So you're saying they do

11      not argue in the alternative --

12                  MR. STINE:  They do not.

13                  THE COURT:  -- in the opening brief.

14                  MR. STINE:  They do not.  They don't

15      argue in the alternative.  They don't even mention

16      entire fairness.  They don't say, "Your Honor, if you

17      should choose to apply Kahn versus Lynch, it's

18      plaintiffs' burden to show fairness."  They don't say

19      that.  They don't say, "In the alternative, Your

20      Honor, if" -- "if Your Honor wants to follow Kahn

21      versus Lynch, we want to make a motion to shift the

22      burden."  They don't --

23                  THE COURT:  You're saying they do that

24      in their reply brief.

67

1          MR. STINE:  It's all in their reply

2   brief.  It's not in their opening brief.

3          The discovery that we did based on the

4   motion that they made, they didn't seek to amend their

5   motion.  They didn't withdraw their motion and file a

6   new one.  So we're here today -- and there has been

7   literally an hour discussion -- about entire fairness

8   and plaintiffs' supposed burden of coming with

9   evidence --

10          THE COURT:  So you view the motion as

11   presenting a purely legal question.

12          MR. STINE:  Well, in a sense.

13          THE COURT:  Or in a doctrinal, which

14   is you either -- once you're in business judgment rule

15   land, then you're in the

16   if-a-rational-person-could-approve-it-as-fair.

17          MR. STINE:  Exactly right.  So -- so

18   Your Honor, the -- the question isn't, you know,

19   whether or not we have an expert affidavit to show

20   that -- our view on the fairness of the price.  We'll

21   get to that.  You know, we haven't gotten to that

22   point yet.  We get to that after -- when we get to

23   expert discovery.  We haven't gotten to expert

24   discovery.  It wasn't an issue in their opening brief,

68

1   in their motion -- I keep saying "opening," but it's

2   not an issue in their motion.  They didn't make that

3   motion.

4                   THE COURT:  Well, the motion was just

5   a form motion; right?

6                   MR. STINE:  Oh, no, no, no, no.  It

7   wasn't, Your Honor.  It was a brief.  They filed a

8   brief in support of.  It was not a --

9                   THE COURT:  Oh, no, no, no.  What I

10  mean is the motion itself, right, is -- they filed

11  their opening brief the same day as their motion.

12  Therefore, what explains the basis for seeking summary

13  judgment is the brief.

14                  MR. STINE:  Yes.

15                  THE COURT:  Right.

16                  MR. STINE:  That's true, Your Honor,

17  yes.

18                  THE COURT:  All right.

19                  MR. STINE:  The brief explains it.

20                  And so -- and the second point is

21  they -- they -- defendants, you know, Mr. Allingham,

22  said that it's obviously our burden because they had a

23  special committee and a majority of the minority.  So

24  in Southern Copper, Your Honor -- I'm sure Your Honor

69

1  knows this better than I do because it was --

2                THE COURT:  Not necessarily.

3                MR. STINE:  Not necessarily.

4                (Laughter)

5                THE COURT:  In order to process

6  current developments, I think it's most -- it's

7  critical to me, I think -- and to many other people --

8  to eliminate previous --

9                MR. STINE:  Right.

10                THE COURT:  -- information.

11                MR. STINE:  The brain wipe, yes.  I

12  understand, Your Honor.

13                So in Southern Copper --

14                THE COURT:  I mean, I'm happy when I

15  go back and read something that I wrote and say, "Wow,

16  I still agree with myself."

17                (Laughter)

18                THE COURT:  But I -- I don't

19  necessarily have any recollection of having written

20  it.

21                MR. STINE:  Right.  With me, it's even

22  what I ate for dinner the night before.

23                THE COURT:  Exactly.

24                MR. STINE:  So -- but in Southern

CHANCERY COURT REPORTERS

1    Copper, the defendants moved for summary judgment,

2    saying that the burden should be shifted.  So they did

3    that.  And according to the Supreme Court decision,

4    Your Honor could decide whether to shift the burden

5    based on the -- on the pretrial record.  And the

6    Supreme Court said, "In the absence of a renewed

7    request by the Defendants during trial that the burden

8    be shifted to the Plaintiff, the burden of proving

9    entire fairness remained with the Defendants

10   throughout the trial."

11            Here, they didn't make a motion.

12   There's been no judicial ruling.  I think -- I think

13   it's pretty clear under Southern Copper that the

14   Supreme Court was saying that the burden stays with

15   defendant until a judge says otherwise, they make a

16   motion or there's some other --

17            THE COURT:  So what you're saying is

18   you view this as teeing up the purely -- well, I mean,

19   not that it's purely legal, because there are elements

20   of their motion in terms of things like whether the

21   committee members were independent, whether the

22   committee's mandate was sufficient.  You agree they

23   teed those up, issues, but solely for purposes of

24   saying -- they didn't get to the point of well, if

1  it's entire fairness lite -- for the students, that's

2  spelled l-i-t-e, just like lite beer.  If it's entire

3  fairness lite, the plaintiffs haven't -- don't have,

4  you know, evidence of financial fairness.

5            MR. STINE:  They didn't -- they didn't

6  argue that in their -- in their motion.  That's not in

7  their motion.  It's in their reply and --

8            THE COURT:  So what you took yourself

9  as your charge to do was to just, one, say "No.  The

10 law is" -- "under Lynch, Tremont, Emerald Partners,

11 and Southern Peru, the law is it's entire fairness no

12 matter whether you use both" --

13            MR. STINE:  Right.

14            THE COURT:  -- "and even if you were

15 going to be eligible, the committee" -- "the committee

16 was not sufficiently independent or empowered."

17            MR. STINE:  That's exactly right, Your

18 Honor.

19            THE COURT:  Okay.

20            MR. STINE:  And that's what's in our

21 opposition.  And it's -- so we didn't -- we didn't

22 respond to a motion that they didn't make.  So that's

23 the first thing.

24            So, first of all, the burden hasn't

72

1 | shifted because there hasn't been a judicial

2 | determination that the burden hasn't shifted.  That's

3 | the first point.

4 |                     But --

5 |                     THE COURT:  Okay.  Can we then talk

6 | about what you thought the motion was about?  Because,

7 | you know, I think Mr. Allingham admitted -- and, you

8 | know, the special committee's lawyers would have to

9 | admit -- that there are sentences that say when you

10 | have a merger with a controlling stockholder, the

11 | entire fairness standard applies.

12 |                     MR. STINE:  Right.

13 |                     THE COURT:  No question.  You got -- I

14 | mean, you can take that thing, and you say -- I

15 | actually think it uses -- some of them use the H word.

16 |                     How is it, though, that cases that

17 | never addressed a question address the question?

18 |                     MR. STINE:  I'm sorry?

19 |                     THE COURT:  How is it that cases that

20 | never addressed a specific question in fact address

21 | that specific question?

22 |                     MR. STINE:  Well, Your Honor, I

23 | think --

24 |                     THE COURT:  That sounds philosophical,

CHANCERY COURT REPORTERS

73

```
 1  but it is.  I mean, it's actually important.
 2                  MR. STINE:  Right.  No.  And I
 3  understand the question, Your Honor.
 4                  And I think I would answer it that --
 5  that there's always a way to distinguish any case.
 6  That's first of all.
 7                  And the second point is the Delaware
 8  Supreme Court decides cases on the facts, but it also
 9  provides guidance to all practitioners and to the
10  courts --
11                  THE COURT:  Well -- but no one is
12  bound -- I mean, we do have a system of hierarchy, and
13  I take it very seriously.  That's why I'm asking these
14  points.
15                  MR. STINE:  Right.
16                  THE COURT:  You know, I've -- I think
17  I've discussed the -- some of these questions in three
18  or four cases over a 14-year judicial career --
19                  MR. STINE:  Right.
20                  THE COURT:  -- even though I have many
21  entire fairness cases.  And I never have addressed the
22  specific question here directly because I never was
23  actually presented with the question.  No one has ever
24  presented the question before.
```

74

1      And that's why -- I understand people
2  give guidance, but one of the problems with
3  guidance -- one of the problems with dictum is an
4  overbroad statement of what a holding is when it's, in
5  fact, not a holding, leaves people uncertain.
6      And as I said about the homework, I
7  think the homework analogy is apt.  If you tell
8  people -- you tell your kid, "If you do your math or
9  your English homework Saturday, you get to go to the
10  movies on Saturday night."  That means Sunday, when
11  you want to just have a martini or a cold milk and a
12  cookie and homework all to be done, you know your kid
13  is going to have taken the one homework assignment and
14  waited until Sunday night; right?
15      MR. STINE:  Right.
16      THE COURT:  Whereas if you say "You
17  only get to go to the movie if you do both on
18  Saturday" so that Sunday is relaxing, the kid has an
19  incentive to actually do both.
20      MR. STINE:  Right.  And that is why,
21  Your Honor, we just didn't stop in our analysis in our
22  brief with "Judge, you have to follow Kahn versus
23  Lynch because that's the law."  We didn't stop at
24  that.  What we did is we then moved on to the next

1    point and said "Judge, the law should remain as it is"
2    --
3              THE COURT:  I get that, but what I'm
4    saying -- Mr. Stine, you would say both that the
5    cognitive tension that I would face as a trial judge
6    is that "I have flat-out statements from the Supreme
7    Court that say this is the standard of review."
8              MR. STINE:  Right.
9              THE COURT:  That's the strong point in
10   your favor.  The strong point in Mr. Allingham's favor
11   is the precise question asked -- being asked of this
12   Court now has never been asked of my Supreme Court.
13             MR. STINE:  Right.
14             THE COURT:  And they've never had the
15   opportunity to answer; right?
16             MR. STINE:  Right.  Well, they haven't
17   had --
18             THE COURT:  So doesn't it come down to
19   what the technical -- what it actually means to do a
20   holding?
21             MR. STINE:  Right.
22             THE COURT:  And can we say if the
23   definition of an actual holding in something that's
24   necessary to a decision, isn't the only holding that

76

1    was necessary in the prior decisions to say that using

2    one of these procedural devices will not invoke the

3    protections of the business judgment rule?  As a

4    precise matter, the only thing that was necessary to

5    decide the case was to hold that using one of them is

6    not good enough?

7                     MR. STINE:  Right.  And --

8                     THE COURT:  Is that correct?

9                     MR. STINE:  In response to that, what

10   I would say, Your Honor, is courts always decide

11   whether they want to interpret holdings of a higher

12   court narrowly or broadly.

13                    THE COURT:  Well -- and I don't want

14   to decide that.  What I'm asking is if there's a

15   precise definition of what is dictum or not, if the

16   definition is is it necessary to decide the question

17   before the Court, that in all of those previous cases

18   it was -- it was totally sufficient to simply say that

19   the use of one of the devices would not alleviate the

20   ultimate burden to have an inquiry as to substantive

21   fairness; right?

22                    MR. STINE:  Right.  Well, I think --

23                    THE COURT:  Is that correct?

24                    MR. STINE:  No.  I think what Your

1  Honor is saying is it wasn't an issue at the time.  So

2  you didn't -- so they didn't need to decide the issue.

3                THE COURT:  As a result, as a formal

4  matter of whether something is binding precedent under

5  the classical definition, it would not be.

6                MR. STINE:  Right.  And -- and I agree

7  with that, Your Honor.

8                THE COURT:  Okay.

9                MR. STINE:  And I don't disagree with

10 that.  I think we all --

11                THE COURT:  No.  And I want --

12                MR. STINE:  In fact, I think the law

13 students would agree with that, too, that that's the

14 definition of "holding."

15                THE COURT:  And I think one of the

16 issues is, then, because you have a statement, it can

17 affect corporate -- it can affect people's behavior

18 because they do have to read -- as you said, there's

19 a -- some of my colleagues or the previous colleagues

20 on the Court, you know, used to talk about the

21 difference between the -- you know, listening to the

22 entire musical piece rather than one note.

23                MR. STINE:  Right.

24                THE COURT:  Because even in Lynch,

78

```
 1   wouldn't you agree, one of the issues in Lynch, for
 2   example, about why it wasn't enough was that what you
 3   were going to do is run and do a tender offer if the
 4   committee said no?  And a tender offer is a form of
 5   acceptance; that my friend, Professor Bebchuk, for
 6   example, would say a tender offer is intrinsically
 7   more coercive than a merger vote because if you don't
 8   tender, you could be left in even a worse situation
 9   where you're, like, now a stub part of, like, having a
10   7 percent public float or something like that; right?
11                  MR. STINE:  Right, right.
12                  THE COURT:  Whereas in a merger vote,
13   you can vote freely and still get the deal closed.
14                  MR. STINE:  Right.
15                  THE COURT:  I appreciate that candor.
16                  Why don't we talk about the why not,
17   because what -- I think it is -- it's an --
18   interesting and rational minds can differ about it.
19                  The problem with the current dynamic,
20   obviously from your clients' own perspective, is if I
21   rule for your current clients, who I assume hold stock
22   in many other companies, why will they as stockholders
23   in any other companies ever have the benefit of these
24   procedural protections in combination?
```

79

1              MR. STINE:  Well, I think that the

2   Delaware Supreme Court and in -- in Southern Copper

3   actually dealt with that, that it's a matter of good

4   corporate practice.  But to back off of that --

5              THE COURT:  So people should just do

6   good things selflessly --

7              MR. STINE:  Well, no, it's not a

8   question --

9              THE COURT:  -- and they'll see a wave

10  of -- I mean, policy -- part of why you have a go

11  toward things, like Unocal, which had to go towards

12  independent directors, right, Revlon -- is you set --

13  there are risks, right, with any kind of standard,

14  because for a standard to create the right incentive

15  effect, somebody has to get something for it.  When

16  they get something for it, it's a cost because in a

17  particular case there could be a cost.  But if what

18  you gain from the overall standard is systematically

19  valuable to the people you're trying to protect, then

20  you might do it.

21              MR. STINE:  Right.

22              THE COURT:  And isn't it fairly stark

23  that if you don't actually give credit to doing both,

24  rational controllers will not do both except as some

80

1    deal-closing metric with a settlement; right?

2                    MR. STINE:  Right.  And my response to

3    that is I'm -- I'm not sure why they would do both,

4    but they might do -- first of all, there's two

5    responses.

6                    First of all, if there's an actual

7    independent special committee negotiating and they

8    think that there's a benefit to the shareholders to

9    get a majority-of-the-minority provision, then they

10   will use that in negotiations, and maybe they will

11   decide a higher price in response to that.

12                   But my real response to that is what

13   we wrote in our brief about majority-of-the-minority

14   provisions.  And that's that in -- in the real world,

15   our -- our arbitrageurs come in and they buy shares,

16   and their interest is not in voting in -- in favor of

17   a deal or against a deal because it's fair or unfair.

18   They're looking for their 10 cents.

19                   THE COURT:  But isn't that -- but the

20   problem with that is -- I mean, you know -- and I

21   admit to my own -- I think that the smartest people in

22   the market often get the most disserved by our

23   corporate governance system.  The smartest people in

24   the market are the people who index.  That's the real

1    smart money.  Smart money doesn't get represented in

2    our corporate governance system.  Dumb money sets the

3    tone.

4              What do I mean by "dumb money"? is

5    every corporate finance class in the country teaches

6    that an active trading strategy is likely to result in

7    a poor outcome because you're trying to outguess the

8    entire market.  You're unlikely to do that, and you're

9    likely to run up really high costs and particularly if

10   you're not taking any nondiversifiable risk.  I mean,

11   private equity or someone like Mr. Perelman, arguably,

12   get compensated for taking nondiversifiable risk

13   because they actually buy particular companies and

14   have control to go with it.  So I get all that.

15             But isn't there an issue -- and I

16   think Chancellor Chandler pointed this out in Airgas.

17   It was certainly pointed out across the pond when the

18   people who make dairy milk were sold.  Who did the

19   arbitrageurs sell to?  Who did they get their shares

20   from?

21             MR. STINE:  They got them from regular

22   shareholders, yes, that's --

23             THE COURT:  Regular shareholders who

24   presumably decided that the price in the marketplace

82

1  after MacAndrews & Forbes made its premium-to-market

2  offer was sufficiently attractive that they would

3  voluntarily sell their shares; right?  So arbitrageurs

4  -- if the whole argument is arbitrageurs, all they

5  want is 10 cents more, it may be because people are

6  longer holders.  Now, it may be a mutual fund and it

7  may have held it for 17 months.  But, remember, in

8  this country you get a long-term capital gains rate

9  when you hold an asset for how long?

10              MR. STINE:  A year.

11              THE COURT:  A year; right?  That's our

12  idea of the long term is, is a year.  All the

13  arbitrageurs got their shares presumably from

14  longer-term holders who concluded that the price

15  increase that had already resulted from the offer was

16  sufficiently attractive for them to sell.

17              So I'm not sure it even -- to say,

18  then, the arbitrageurs only want X percent more, if

19  they could get X plus 25 percent more, wouldn't they

20  be happier?

21              MR. STINE:  No, no.  Absolutely.  And

22  the response to that is I just -- I would say because

23  people are selling to arbs at that point doesn't

24  necessarily mean that they -- that's not necessarily a

83

1   referendum on the fairness of the transaction.

2                    THE COURT:  No.  Of course there's

3   not.  I mean, everybody has different horizons.  For

4   example, if you've got an actively traded mutual fund

5   that has had some problems in its performance and

6   other sectors of the portfolio having a premium come

7   in, the ability to take a premium and another thing

8   might be a useful thing -- I mean; right?  I mean,

9   everybody has different things.  Somebody needs --

10  your kids' tuition is due.

11                   MR. STINE:  No, no.  Absolutely.

12  And -- but I don't --

13                   THE COURT:  But that's not always --

14  that's not a company-specific factor.  And if you want

15  to, sort of -- you'd have to prove that this is

16  somehow -- that the blend of sellers for this company

17  were different; right?  Because that affects every

18  stockholder base.

19                   MR. STINE:  No.  No.

20                   THE COURT:  Everybody has different

21  horizons.

22                   MR. STINE:  I don't think it's a

23  question of horizons.  I think it's a question of

24  here's Ron Perelman; right?  And the analysis -- they

84

```
 1   announce a proposal by Ron Perelman for $24.  Time
 2   goes by, and a lot of people sell and buy at $24 at
 3   that point.  Time goes by, and they announce that a
 4   deal is done, there's a merger agreement at 25.  And a
 5   significant, you know -- maybe they think -- maybe
 6   it's based on horizon, but I doubt it.  I think it's
 7   based on the fact that "This is a done deal.  I'm
 8   going to take my $25 now."
 9                   THE COURT:  But isn't that, Mr. Stine,
10   what we're really, then, saying, that the stockholders
11   really shouldn't be even given rights?
12                   MR. STINE:  No.
13                   THE COURT:  No, no.  What I mean by
14   that is they are essentially folks who have -- are
15   infants, not even adolescents or --
16                   MR. STINE:  Are what?  I'm sorry.  Are
17   what?
18                   THE COURT:  Life is full of risk.
19                   MR. STINE:  Right.
20                   THE COURT:  Every day you take a risk.
21   You cross the street.  You do whatever.
22                   MR. STINE:  Right.
23                   THE COURT:  What we're saying as
24   stockholders, "Okay, it was a $24 offer that was a
```

85

1 41 percent premium to market.  We held through that.

2 We were hoping the special committee" -- "they get 25.

3 That's only a dollar more.  Now it's what?  --a 44,

4 45 percent premium.  We think the long-term value is

5 higher, but let's just take the 25 now."

6 Their choice is obviously to vote no.

7 Here's another reason why they could

8 vote no.  You're not talking about them having to wait

9 long to actually get the 25; right?

10 MR. STINE:  You never know.

11 THE COURT:  No, no.  Wait a minute.

12 If they vote no and a majority of them vote no, then

13 they get to remain as investors in the company; and if

14 the company's prospects are better, which is what

15 they're supposedly -- that's why they think it's more

16 than 25 -- they're still in the same situation.

17 There's still a substantial public float. If they vote

18 no and a majority of the stockholders vote yes, the

19 only economic consequence to them of not having sold

20 before the vote is some three- or four-week time

21 period, because when the deal closes -- and most

22 people who buy companies like to close fairly rapidly;

23 right?

24 When did they close here?

CHANCERY COURT REPORTERS

1                    MR. STINE:  It was --

2                    THE COURT:  This particular --

3                    MR. STINE:  It closed --

4                    THE COURT:  -- like, really fast.  I

5     mean, this one may never have won another lag in

6     history between, you know, closing, if you might

7     remember --

8                    MR. STINE:  Yes.

9                    THE COURT:  -- the Technicolor gap.

10                   So really what you're talking about is

11    somebody holding out.  They cast their no vote.  If

12    their no vote doesn't succeed, they can take the deal

13    price when the deal closes with everybody else; right?

14    So they're really -- what they're risking there is the

15    difference between getting $25 per share five weeks

16    before they would otherwise get it.  And what we're

17    saying is that kind of value gap makes stockholders

18    unable to freely vote.

19                   MR. STINE:  I'm not saying that

20    they're not freely able to vote.

21                   THE COURT:  Wait a minute.  That's --

22    you are kind of saying that; right?  Is that the

23    courage to have the actual courage to stick out,

24    right, to get paid five weeks later, that stockholders

CHANCERY COURT REPORTERS

87

1    can't actually wait that long.  If that is the case,

2    that it -- really fundamentally undermines giving them

3    the right to vote on anything.

4                    MR. STINE:  Well -- and in response to

5    that what I would say is:  First of all, it's not a

6    question of whether or not they're waiting.  It's --

7    it's a question of there are no deals that get

8    announced that are voted -- where a majority of the

9    minority actually works.  It just doesn't happen in

10   the real world except for situations, unusual

11   circumstances where there are large minority

12   shareholders.  But in general, cases -- there aren't

13   cases where majority-of-the-minority provisions work

14   in this kind of transaction.  That's the first --

15                    THE COURT:  There aren't repriced

16   transactions?

17                    MR. STINE:  After a merger agreement

18   and --

19                    THE COURT:  Isn't one of the issues

20   here is because there haven't been real up-front

21   majority-of-the-minority provisions? which is if

22   you're lumping in all your stats, the

23   majority-of-the-minority provisions tacked onto

24   negotiated settlements, is that really an apt

88

1   comparison?

2                    MR. STINE:  Well, first of all, you

3   know, I -- you would be -- Your Honor would be in a

4   much better position to know about those kind of

5   tacked-on situations.

6                    THE COURT:  Well, I just know there

7   used -- I mean --

8                    MR. STINE:  There used to be -- there

9   used to be --

10                   THE COURT:  It used to be fairly

11  common.

12                   MR. STINE:  Right, up until Your

13  Honor's decision in Cox, and then more recently --

14                   THE COURT:  Well, I would like to say

15  up until Mr. Weiss' objection --

16                   MR. STINE:  Right, up until --

17                   THE COURT:  -- eminent member of the

18  plaintiffs' bar.

19                   MR. STINE:  And I would say that they

20  slowed down after that.  But when Vice Chancellor

21  Laster wrote his Revlon decision, I would say they

22  ground to a halt.  Maybe there are other situations

23  that they weren't.  So --

24                   THE COURT:  But what I'm getting at is

CHANCERY COURT REPORTERS

89

1    the fact that stockholders don't say no doesn't mean

2    they cannot.  And -- and --

3                        MR. STINE:  It's possible.

4                        THE COURT:   And it also doesn't mean

5    that it doesn't influence the committee's leverage,

6    because one of the advantages when you have the

7    majority of the minority is that the controller knows

8    going in that the special committee's work is going to

9    have to be subject to stockholder review; right?

10                       MR. STINE:  Well, that's either --

11   that's either a threat to them or it's not, depending

12   on the situation.  So when the situation where the

13   company has all small minority shareholders, I don't

14   think that that's a concern.

15                       THE COURT:  What company has all small

16   minority shareholders?

17                       MR. STINE:  Well, it depends on the

18   situation.

19                       THE COURT:  I mean, I always love when

20   they talk about -- my friends at the SEC still talk

21   about retail investors.  If they want to talk about

22   the real retail investor, they're talking about the

23   ordinary person who is -- has to give their money into

24   a 401(k) plan.  That's your retail investor.  And so

90

1    what they should be focusing on is the mutual funds,

2    because I don't know about you, but I don't get to

3    pick particular stocks in my retirement savings plan.

4    I don't know anyone who gets to.

5                    MR. STINE:  Right.

6                    THE COURT:  And -- and either of my

7    college savings plan do I get to do that.

8                    But was there something here that --

9    did they not have institutional investor holdings

10   and --

11                   MR. STINE:  I don't think that they

12   had any significant ones.

13                   THE COURT:  What do you mean by

14   "significant"?

15                   MR. STINE:  I don't know the numbers;

16   but when we looked at it, there was not any -- any

17   that were threatened -- that would threaten the

18   transaction.

19                   THE COURT:  That's not what I'm

20   saying, which is were there large institutions who

21   held the securities of this case?

22                   MR. STINE:  Yeah.  And -- and I looked

23   at that, and I -- and I don't know the -- the -- the

24   size.

CHANCERY COURT REPORTERS

91

1            THE COURT:  Well -- and if you're an

2  individual investor, you might actually have a longer

3  horizon; right?

4            MR. STINE:  Well -- but, Your Honor, I

5  still don't think it's a question of horizons.  You --

6  you know, I don't think it's a question of horizons

7  because when you announce a --

8            THE COURT:  Why do I have to take 25

9  if I get a free chance to vote no if I think the

10  company is worth 31?

11            MR. STINE:  I think in the real world,

12  it just doesn't work that way.

13            THE COURT:  And that's what I mean.

14  So in the real world, stockholders -- there should

15  always be a risk-free option because there's no -- if

16  you believe the company's worth 31, you can hold the

17  stock.  Now, the risk is that you're wrong.  The whole

18  bet of a sales transaction is you're saying "I think

19  it could be 31, but I realize it could be 20.  I

20  realize it could go down to 17.  I now have a chance

21  to get 25."

22            As long as you're freely making the

23  decision, how is it not meaningful?

24            MR. STINE:  Well --

92

1          THE COURT:  I mean, the fact that you
2  would like -- we would all like, right -- I would like
3  to be able to eat the same amount of food I used to be
4  able to eat when I was 19.  When I was 19, I would --
5  when I was 17, I was "Why can't I gain weight?"
6          MR. STINE:  Right.
7          THE COURT:  That is not a question,
8  you know -- you get your wishes in life in weird ways;
9  right?  So, I mean, whatever wish, you know, I should
10  have taken back the time delayed.  Like, the Lord
11  processed my -- my wish, you know, a generation later.
12          So -- but when you're an investor,
13  right, the whole point -- I get the point about tender
14  offers.  That's Professor Bebchuk's point; right?
15  which is a takeover is one of these situations where
16  you're afraid that you're left in; right?
17          MR. STINE:  Right.  And --
18          THE COURT:  So you may actually --
19  having a stub equity position, we could all agree
20  that's a dangerous, you know -- if you're down to six
21  or seven, you don't have a float.
22          Here's the situation -- this company
23  is going to have a big float if the merger went down
24  because it's going to have the same float it had

93

1    before; right?

2                    MR. STINE:  Right.  And --

3                    THE COURT:  All you're saying is that

4    it's really hard to turn down a 45 percent premium to

5    market when you know for sure you can put that in your

6    bank account.  And -- so that's really powerful.  And

7    stockholders tend to like that kind of thing, and they

8    tend not to turn it down in exchange for the

9    possibility that the stock might go to 28 or 29;

10   right?

11                   MR. STINE:  Right.  And --

12                   THE COURT:  Is that involuntary or is

13   that just coming to grips with not everybody was born

14   to be Jay-Z?

15                   MR. STINE:  Right.  And -- and I would

16   respond to that, Your Honor.  We all know that in the

17   context of fairness, determining fairness, or in an

18   appraisal that the stock price is really not looked at

19   by this Court in terms of the analysis.  You look at

20   the discounted cash flow analysis, comparable company,

21   precedent transaction.

22                   And in terms of the timing of this

23   transaction, here's a situation where they were

24   offered that premium.  And you're right, you're

94

1    exactly right.  National stockholders looked at that

2    premium and said, "This is a done deal.  It's a

3    premium" --

4                    THE COURT:  No, no.  This is a done

5    deal.

6                    MR. STINE:  Right.

7                    THE COURT:  There's nothing -- there's

8    a negotiated contract, which -- to which the board

9    approved the transaction subject to the stockholders.

10                   MR. STINE:  Right.

11                   THE COURT:  The party that ultimately

12   determined that it was a done deal are the party,

13   you're saying, had no ability to say it was not done.

14                   MR. STINE:  I'm not saying they don't

15   have the ability.  I'm saying in the real world, it

16   doesn't happen.  It just doesn't happen.  So somebody,

17   a holder of shares --

18                   THE COURT:  Was there an appraisal cap

19   in this deal?

20                   MR. STINE:  No.  In fact, I think Your

21   Honor had a -- an appraisal cap?  No, I don't think

22   so.  But there was an appraisal -- you had an

23   appraisal action in this case, I believe.  I think --

24                   THE COURT:  I don't know.

95

1              MR. STINE:  I think you did.  I think

2    it was settled.  But, anyway.

3              THE COURT:  See how I bring a really

4    fresh perspective? because, I mean, I may have had an

5    appraisal action, and it doesn't vividly ...

6              MR. STINE:  Right.

7              THE COURT:  What I'm saying is

8    sometimes people condition not only majority of the

9    minority, but sometimes the buyer will actually say

10   that you can't have an appraisal petition in excess of

11   a certain amount --

12             MR. STINE:  No, there wasn't anything

13   like that.  But, Your Honor -- and I don't want to

14   beat a dead horse with this.  But the fact is --

15             THE COURT:  There are markets for

16   that.

17             MR. STINE:  I know, really.  In -- at

18   furniture stores, I think; right?

19             But --

20             THE COURT:  We actually have some

21   horse meat submarine sandwiches for the students who

22   are --

23             MR. STINE:  Right.  Do you have names

24   for the horses?

1          THE COURT:  Well, you know, we have a

2   selection, actually, of delicious Mid-Atlantic

3   sandwiches for the students.  Horse meat had not been

4   a specialty; but in honor of --

5          MR. STINE:  Right.

6          THE COURT:  -- of our desire for

7   closer ties with the EU, we've --

8          MR. STINE:  Right, right.  And I think

9   IKEA gives a discount on furniture.

10          THE COURT:  Exactly.  Many of the

11   students probably have an IKEA card.

12          MR. STINE:  Right, right.

13          So -- but I think the situation is, is

14   the majority-of-the-minority provision, is it some

15   kind of a referendum of fairness?  Does it provide

16   some -- does it provide some protection for the

17   shareholders to get a fair price?  And I think that's

18   what's clear --

19          THE COURT:  Let's just pause on that.

20          MR. STINE:  Right.

21          THE COURT:  Is what you're saying in

22   the vote in this context is actually distinct from the

23   third-party situation?  Because in the third-party

24   situation you would say the same dynamic is true --

97

1              MR. STINE:  Right.

2              THE COURT:  -- which is when the board

3   of directors signed up a third-party deal at a

4   substantial premium to market, stockholders are

5   overwhelmingly likely to accept it.

6              MR. STINE:  Right.  That's --

7              THE COURT:  Right?

8              MR. STINE:  And the difference is --

9   there's a difference between those two situations.  In

10  the situation of an arm's length deal, the vote isn't

11  considered some type of protection to the minority

12  against a majority shareholder --

13              THE COURT:  Oh, sure it is.

14              MR. STINE:  No.

15              THE COURT:  That's the whole --

16              MR. STINE:  No, but there's no -- but

17  there's no conflict of interest in that situation.

18              THE COURT:  No, no.  But it -- but it

19  still is a protection.  Our law carefully, by

20  statute -- people ignore -- but it's also easy for us

21  to make central our ornamental contributions and lose

22  sight of what's really fundamental.

23              The whole reason why stockholders vote

24  on mergers or asset sales is because of the concern

98

1   that this is a really substantial thing and you want

2   them, the fiduciaries, to actually be on their toes

3   and to have that subject to ultimate approval by the

4   equity owners.

5               MR. STINE:  Absolutely.

6               THE COURT:  And that's why there's

7   also burden -- there's standard-of-review effect

8   that's given in third-party situations to approval by

9   stockholders; right?

10              MR. STINE:  Right.  No; absolutely.

11             THE COURT:  All I'm saying is on this

12   point, Mr. Stine, your point that the stockholders

13   don't tend to turn down premium deals, right --

14             MR. STINE:  Uh-huh.

15             THE COURT:  -- when they don't have a

16   sure other offer that's higher, that in the dynamic

17   where the third-party deal is a 45 percent premium to

18   market and the stockholders believe, you know, "We

19   really think it should be a 53 percent premium," where

20   they have the ability to vote down the 45 percent

21   premium and continue to own the stock and see whether

22   their view of value comes true, they almost always

23   take the 45 percent premium.

24            MR. STINE:  I think they almost always

99

1  take the 45 percent premium.  I think they almost

2  always take the 25 percent premium or the 15 percent

3  premium.

4  THE COURT:  Again, I mean, one of the

5  problems is you do know that you're arguing -- what

6  you're saying about the behavior of stockholders,

7  right --

8  MR. STINE:  Yes.

9  THE COURT:  -- suggests that they're

10  really not adults.

11  MR. STINE:  Well --

12  THE COURT:  What I mean by "adults" is

13  people who have to actually -- you're allowed to make

14  choices, but you understand that with every choice

15  comes a downside.

16  MR. STINE:  Right.  I -- I totally

17  agree with you, Your Honor.  But to go back to the

18  difference between an arm's length deal and this kind

19  of deal where there's a controller, is in an arm's

20  length deal we all know that shareholders have

21  their -- whatever reason they have for voting, whether

22  it's they need the money for their, you know, kids'

23  college or whether they don't like -- you know, it's a

24  bad day for them, whatever reason they have, they're

100

1   allowed to vote in favor or against a deal in an arm's

2   length transaction.  And that's the way -- the way it

3   is; right?

4              But in a situation here, where you've

5   got Ron Perelman, who's the 800-pound gorilla in the

6   room, the law has been set up to protect minority

7   shareholders from that situation, where -- where

8   there's coercion, where there's a --

9              THE COURT:  But what is the coercion

10  here --

11             MR. STINE:  -- conflict of interest.

12             THE COURT:  -- other than, again -- I

13  would put it the inherent coercion.  This is the

14  theory that was first in the du Pont case, that

15  essentially if you have a controller, everybody's just

16  afraid.  Why -- what, based on market behavior about

17  stockholders in this day and age, suggests that

18  they're afraid?

19             MR. STINE:  See, that wasn't the -- I

20  understand.

21             THE COURT:  No.  But that is the

22  premise of inherent coercion --

23             MR. STINE:  No.

24             THE COURT:  -- which is that you can

1    never -- that no matter what anybody says, you're

2    hovering in fear from Mr. Perelman.

3                    MR. STINE:  See -- see, I don't

4    necessarily agree with that.  I think that more --

5    first of all -- my -- my point really wasn't about the

6    coercion.  It was more about the right, against

7    somebody who is in a conflict situation and sitting

8    there.  I think there's probably more coercion over

9    this supposedly independent board --

10                    THE COURT:  Than over the

11   stockholders.

12                    MR. STINE:  -- than over the

13   stockholders, right.  So -- because the independent

14   board, these are all people who -- supposedly

15   independent board.  These are all people who have

16   known him for years.  Whether they worked with him or

17   not, they're together.  Here's a guy who I am sure is

18   difficult to say no to; right?

19                    And -- and so it's kind of off topic,

20   the point; but to go back to -- and I'd like to stick

21   on this idea of the majority of the minority because I

22   don't think it's been explored.

23                    I think that a difference between the

24   arm's length transaction where people are allowed to

102

1   vote whatever they want and that's just the result of

2   it and they have different reasons and in a situation

3   with a controller, it isn't just a vote.  It isn't

4   just a vote on something.  It's a protection.  And --

5   and the -- it's supposed to be a protection.  And my

6   point, and our point, is it really isn't a protection

7   that people say it is.  It's not really the

8   protection, because the arbs come in.  They buy it.

9   People decide whether or not they want to sell the

10  shares based on, you know, whatever the reason; but --

11  but the fact is in the real world, it almost always

12  goes through, if not always, you know.

13                  And I was trying to think of

14  situations.  Vice Chancellor Laster, I think in the

15  CNX decision, gave some examples in -- of where he

16  said that there were majority-of-the-minority

17  provisions that -- that were successful.  And I -- I

18  know about the Revlon situation that he pointed to.

19  But there was an exchange -- it was an exchange

20  transaction for, you know, preferred shares for -- for

21  common shares.  It wasn't the same kind of situation

22  where arbs would come in and buy --

23                  THE COURT:  But isn't part of the

24  point the vote -- the dynamic you're worried about is

103

1   that the special committee is overwhelmed in some sort

2   of way by Mr. Perelman?  But that the fact that

3   there's the majority-of-the-minority provision creates

4   good incentives for the committee as well, because

5   independent directors also have reputational issues

6   and things that they have to deal with.  Many

7   independent directors serve on multiple boards.

8   There's a thing that changed its name to something

9   that sounded like a kind of low-end California

10  vineyard.  And I think it's back to its three initials

11  now, but they're pretty powerful.  And they monitor

12  these things, and they take into account director

13  behavior.  And there are institutional investors who

14  do.

15          Because when you just said, again, the

16  arbs come in, again, that's a voluntary decision of

17  the stockholder who was a long-term holder to say that

18  the price was enough and that "I want to take that

19  price now."

20          That -- that happens all the time.

21  And I don't know how it contradicts the theory.  And

22  isn't it true that majority of the minority is a

23  contextually specific device that's not in the DGCL

24  itself except in 144; right?

104

```
 1                    MR. STINE:  Right.

 2                    THE COURT:  So it's something on top

 3  of -- this would have required a stockholder vote and

 4  votes beyond Mr. Perelman to be accomplished, in any

 5  event; right?

 6                    MR. STINE:  Right.

 7                    THE COURT:  He didn't have enough

 8  votes to accomplish it.

 9                    MR. STINE:  He was short.  I think he

10  said 40 -- 43 percent, something.

11                    THE COURT:  Right.  So in order to --

12  he would have had to have gotten votes.  But what this

13  does is say "Mr. Perelman, your votes don't count."

14  It takes him, practically speaking, to zero influence

15  over the vote in terms of being able to push the vote

16  through; correct?

17                    MR. STINE:  That's right.  Yeah; no.

18  I understand that, Your Honor.  It really --

19                    THE COURT:  And then the theory would

20  have to be that -- you're not saying stockholders

21  voted -- they're influenced by their economic dynamics

22  of the risk of holding when they can get a premium.

23  It's not that they really think that if

24  Mr. Perelman -- if the vote went down, that
```

105

1   Mr. Perelman is going to be able to --

2                   MR. STINE:  I don't --

3                   THE COURT:  -- pillage --

4                   MR. STINE:  -- personally, I don't

5   believe that.  I mean, I think it's the economic

6   situation.  You know, they announce a merger

7   transaction.  The stock goes up to 20 cents below the

8   merged transaction.  They look and they say, "I'll

9   take it now.  You know, there might be a risk that the

10  thing is going to fall apart."

11                  THE COURT:  I mean, what is better for

12  stockholders -- I mean, why is it better for

13  stockholders -- let's assume the following:  Let's

14  assume that I read Lynch your way and I conclude "If

15  you do both, you don't get any extra credit."

16                  MR. STINE:  The shift of the burden.

17                  THE COURT:  Yeah.  You know, "I do

18  both.  I don't get any extra credit.  I don't need

19  both to get credit.  I'm not going to do both."

20                  MR. STINE:  Right.

21                  THE COURT:  No stockholders are going

22  to get this package or protection.  Why is the value

23  of litigation under entire fairness lite sufficiently

24  valuable to stockholders to deny them an incentive

106

1   system where you get a combination of protections that

2   replicates a genuine third-party deal?  So you get a

3   special committee with the real ability to say no; and

4   even if the special committee says yes, you, as a

5   stockholder, get the free and uncoerced ability to

6   vote no.  So you're going -- it's two starkly

7   different worlds, which is there's going to be a risk

8   in the world where you give effect to those two

9   devices, that in a particular case somebody is going

10  to say "Those two devices didn't work as well as we

11  would like."  So there's a cost.  There's no --

12                  Again, I'm not like -- I view people

13  as being adults.  There's a cost to every rule.  But

14  in that rule the gain has to be that litigation

15  itself, the litigation-intensive standard produces

16  some sufficient benefit to outweigh the cost that you

17  will never get the two devices used in tandem

18  up-front.

19                  MR. STINE:  Well -- and the answer to

20  that is -- I mean, we cite in our brief -- I think

21  it's in a footnote -- that in Siliconix -- after

22  Siliconix there was a study done by Professor Sub --

23                  THE COURT:  Subramanian.

24                  MR. STINE:  -- Subramanian.

107

 1                    THE COURT:  Hockessin, Delaware, boy.

 2                    MR. STINE:  What's that?

 3                    THE COURT:  He's a Hockessin,

 4    Delaware, boy.

 5                    MR. STINE:  Yeah.  Good.

 6                    (Continuing) -- where, post Siliconix,

 7    he looked at the premiums and --

 8                    THE COURT:  People don't know that in

 9    Hockessin.  A story written about one of the most

10    distinguished corporate law scholars in the country,

11    dual-tenured Harvard Business School, Harvard Law

12    School, Hockessin, Delaware, boy.  Mr. Allingham

13    famously tangled with him in Toys "R" Us.

14                    MR. ALLINGHAM:  (Inaudible)

15                    THE COURT:  Sorry for that shot.

16                    MR. STINE:  It's a little side ...

17                    He did a study.  And it's not one of

18    the conclusions of the study; but if you look at the

19    chart in his -- his paper, post-Siliconix controlled

20    buyouts had greater premiums than post-Siliconix

21    controller tender offers.

22                    Now, you can look at that and say

23    okay, here's a situation where, with a buyout that's

24    subject to -- to entire fairness and the threat of --

108

1  of litigation like this, that the share -- that the --

2  that the special committee and the -- the controller

3  himself is going to be more apt to provide --

4              THE COURT:  But aren't you drawing a

5  lesson from that data that Professor Subramanian

6  himself does not draw?  Isn't what he -- the lesson he

7  draws from it, that if you do a stockholder referendum

8  in isolation without an effective negotiating agent

9  for the stockholders, that you get lower outcomes than

10  when you're in a legal rubric where there's incentive

11  for a special committee?

12              And I thought Professor Subramanian

13  actually comes out to the policy conclusion of him

14  looking at the landscape; that if the -- if

15  stockholders -- that the best of all worlds for

16  stockholders, in terms of reducing litigation where it

17  doesn't provide value to stockholders and getting them

18  a fair pricing, is to give credit when both

19  procedures, both a negotiating agent and an uncoerced

20  stockholder approval mechanism, are used; and that the

21  flaw in Siliconix is that you can go right to the

22  stockholders with a so-called tender offer.  A tender

23  offer, for the reasons Professor Bebchuk and others

24  have written about, is not the same as a merger vote.

109

1    It's binary because you've had no negotiating agent.

2    And so you tend to get a lower price.

3                    MR. STINE:  Right.  I -- first of all,

4    Your Honor, I -- I acknowledge Your Honor's a scholar

5    in this area.

6                    THE COURT:  I don't know that I'm a

7    scholar.  I just have read a lot of junk.

8                    MR. STINE:  Well, you've read a lot

9    and you've written on the subject.

10                   THE COURT:  Not junk.  By "junk" I

11   mean the good stuff.

12                   MR. STINE:  The good stuff, of course.

13   I think it's hard to imagine -- all right.  I'll back

14   up.

15                   THE COURT:  I mean, isn't Professor

16   Subramanian's bottom line that when he looks at the

17   data, he says an independent special committee with

18   the right mandate, plus noncoerced informed

19   majority-of-the-minority vote should get business

20   judgment rule protection?

21                   MR. STINE:  I think it does.  But --

22   but to -- I don't necessarily -- I obviously don't

23   agree with him.

24                   THE COURT:  I understand.  I'm saying

110

1   the data you're providing is his data.  The

2   conclusion, you would admit, he draws from the data is

3   different on a policy basis than yours.

4                    MR. STINE:  I absolutely agree with

5   that, but I think that the data shows what the data

6   shows.  And I think from experience -- I mean, this --

7   this was a paper written a few years back.  But I

8   think that experience from the cases post Cox and post

9   CNX is that -- that entire fairness cases get

10  litigated, and they are being litigated, as an example

11  here, postclosing more and more.  And plaintiffs --

12  the plaintiffs' bar is being -- is faced with

13  situations where they look and they say, "Oh, what did

14  I sign up for here, you know?"  Is there a case where

15  there actually is an unfair price?  Because the

16  defendants certainly are coming, saying "Let's settle

17  this thing right away."

18                   So here's this dynamic where

19  defendants are fighting them, and defendants are

20  saying, "This was a fair transaction.  We're going to

21  litigate."  And plaintiffs are saying, "This is" --

22  "is this an unfair or fair transaction?"

23                   If it's unfair, we have -- we're in a

24  postclosing land that we weren't in before, where

111

1    we've got experts, not the kind who, you know, you

2    have to pay a few thousand dollars to to give some

3    kind of an opinion for a PI, but you have to pay hefty

4    amounts of money and make big commitments on.  So the

5    dynamics switched to real litigation, you know, real

6    litigation about real transactions.

7                    So it's a situation where here's a

8    controller, and he's in a situation where he's

9    negotiating a deal, and he's saying with his advisors,

10   "If I don't offer a fair price here, I'm going to get

11   sued by Mr. Monteverde or Mr. Stine" or whoever, "and

12   they're going to hire experts.  And I'm going to have

13   experts, too.  And what's my expert going to say?  Is

14   my expert going to say this is a fair price or is this

15   an unfair price?"

16                   Let's -- let's think ahead here,

17   right, because that's what's going to be important.

18   And I don't want to come up with a situation like, you

19   know, Southern Peru where we're going to be -- have to

20   shell out billions of dollars in litigation.  Let's

21   just do it the right way to start off with.

22                   So it comes back to real litigation,

23   which -- which, you know, Your Honor, I hope -- I

24   think what you were looking for when you wrote Cox was

112

1  that there be real litigation --

2             THE COURT:  I wasn't really looking --

3  again, I think there's a lot of mystery around Cox.

4  I -- I was not looking for anything.

5             MR. STINE:  Well -- but --

6             THE COURT:  Mr. Weiss made -- had made

7  three previous objections in the earlier iterations

8  brought here by another plaintiff -- another of your

9  colleagues in the plaintiffs' bar.

10             MR. STINE:  Right.

11             THE COURT:  He then sought fees on

12  fees for his objections.  I recall where he objected

13  to a fee; and when I cut the fee, he wanted a fee for

14  his contribution in cutting the fee.

15             MR. STINE:  Right.

16             THE COURT:  But I -- I wanted nothing

17  of Cox but for it to go away.

18             (Laughter)

19             MR. STINE:  Understood.

20             THE COURT:  It did not.

21             (Laughter)

22             MR. STINE:  Understood.  But --

23             THE COURT:  And part of why I

24  understand the literature here is it was a big debate

113

1  about literature, if you read Mr. Weiss' -- not

2  surprising, given that he was a professor at the time.

3              MR. STINE:  Right.  Right.  So -- so

4  --

5              THE COURT:  But he apparently met some

6  people who do your line of work.  And he's a good guy

7  and he -- you guys took him into the bosom of your

8  side of the V.

9              MR. STINE:  Right.  So --

10             THE COURT:  I don't know if he's still

11  there or not.  Do we know?

12             MR. STINE:  I don't know, Your Honor.

13             So to -- to move on -- and we've

14  talked a lot about the reasons why -- and, Your Honor

15  -- you know, I haven't dealt with the arguments at all

16  about the special committee is not independent.

17             THE COURT:  Well, let me just -- on

18  the one thing, what is -- how do I conclude that the

19  fees paid to the Bancroft firm are material?

20             MR. STINE:  Well --

21             THE COURT:  What's the standard?

22  And -- because if you didn't ask anything about the

23  denominator --

24             MR. STINE:  Your Honor, I -- I don't

114

1   think that we get there today based on the motion that

2   they made.  They --

3             THE COURT:  Well, I think we have to

4   get there today, because I would say that, at the very

5   minimum, they would have to establish that it was --

6   that -- that there's not a -- a triable issue of fact

7   about the independence of the special committee.

8   Right?  I mean, the whole premise of the burden -- of

9   the business judgment rule would be that it was an

10   independent committee, the members were independent of

11   Mr. Perelman for purposes of our law.  And that's why

12   I'm asking about the materiality of the fees involving

13   the Bancroft firm to Mr. Dinh.

14             MR. STINE:  Right.  Well --

15             THE COURT:  Would you admit that

16   there's nothing in there -- I mean, your friends say

17   that you-all did not ask anything about Mr. Dinh's

18   denominator.

19             MR. STINE:  We asked about the

20   amounts, and I don't see --

21             THE COURT:  The amounts, but there's

22   nothing in comparison.

23             MR. STINE:  I understand.

24             THE COURT:  And that's important;

115

1   right?

2                   MR. STINE:  Well, I think it's -- I

3   don't think that --

4                   THE COURT:  And Mr. Webb, for example,

5   would you concede he's, like, a seriously rich dude?

6                   MR. STINE:  Listen, I wouldn't be

7   surprised if he's a seriously rich dude; but I think

8   that the point that we're trying to make about

9   Mr. Webb is not so much that he was beholden in terms

10  of dollar amounts to Mr. Perelman.  I think that what

11  you see here is a pattern with the whole board about

12  these relationships that they had.

13                  THE COURT:  And I get that.  And

14  that's -- I mean, that's an important debate within

15  American corporate law that goes -- that predates

16  Aronson versus Lewis.  But, you know, at the Yogi Bera

17  moment the fork was taken.  When you got to the fork,

18  they took it.  And the direction that they took it in

19  was that so-called structural bias, simply because

20  people had relationships, that that was not

21  sufficient; that in order for them to not be

22  independent, there had to be a quality of

23  beholdenness, where there was a materiality to the

24  relationship such that the relationship was

116

1    sufficiently tangible to where the party would not put

2    that relationship at risk by saying no in a

3    transactional setting.

4                    I mean, I had a situation -- obviously

5    you can strain this.  I had a situation where the

6    brother-in-law of a controller was independent of him

7    on the presumption that brothers-in-laws don't

8    necessarily like their -- each other.  A person might

9    recall I pointed out, "Well, if they didn't really

10   like each other, why was he on the board of all the

11   guy's companies?"  I don't know if that's scratching

12   memories of anyone here.

13                   But is -- is -- so I get that.  And I

14   think people say "mere friendship."  There's a

15   difference between mere friendship, right, someone has

16   lunch, or dinner a couple times, a year; right?  If

17   you rent a vacation house with your family every

18   summer for five years, that's not mere friendship.

19   You're drawing next generations, other people into it.

20   And so these things are contextual.

21                   But I thought Aronson versus Lewis

22   pretty clearly slammed the door on the mere fact that

23   people are -- travel in the same world means they

24   can't act independently of each other on a negotiating

117

1    committee.

2                    MR. STINE:  Right.  And I think that

3    we do more than that overall.  But I just --

4                    THE COURT:  Well, Mr. Webb, for

5    example, he doesn't know his wealth to Mr. Perelman,

6    does he?

7                    MR. STINE:  I -- you know, he -- he

8    was in a situation where he was partners with --

9                    THE COURT:  They made a lot of money

10   together; right?

11                   MR. STINE:  Let -- let's say they were

12   current partners.  I mean --

13                   THE COURT:  But they were co-fat cats,

14   and they made opportunistic killings -- not actual

15   killings --

16                   MR. STINE:  Right.

17                   THE COURT:  -- like metaphorical --

18                   MR. STINE:  Right.  But -- but, Your

19   Honor --

20                   THE COURT:  They made literally

21   metaphorical killings --

22                   (Laughter)

23                   THE COURT:  -- to use the current way

24   of talking.

118

1              MR. STINE:  Right.

2              THE COURT:  Literally metaphorical

3    killings.

4              MR. STINE:  (Inaudible)

5              THE COURT:  Exactly.  And so together,

6    a couple decades back or a decade or so back; right?

7              MR. STINE:  Right.  Yeah, but I think

8    that the question is not whether he only made the

9    money because of Mr. Perelman, but you have to look,

10   well -- if they were current partners -- like, if they

11   were current brothers-in-law, it doesn't necessarily

12   mean that the brother-in-law in the example that Your

13   Honor gave, always gives money to his brother-in-law.

14             THE COURT:  No, no.  But what you

15   presume in the brother-in-law situation is, one, you

16   don't put your brother-in-law on the board if you have

17   a strained relationship.  The problem with the

18   brother-in-law situation is if you're the

19   brother-in-law, you're married to the sister.  The

20   sister has a relationship with their brother.

21             MR. STINE:  Right.

22             THE COURT:  There might even be that

23   the sister and the brother might just share a mother

24   and a father.

119

1              (Laughter)

2              THE COURT:  The cousins may just be

3   friends.  And it all gets really icky.

4              MR. STINE:  Right.

5              THE COURT:  And there's all kinds of

6   things in people's mind.

7              Now -- and I also think it's

8   contextually different.  Like, I happen to view

9   accusing someone of a crime as a different level of

10  being able to say no than saying no on a transaction.

11             MR. STINE:  Right.

12             THE COURT:  Right?  I mean, like, if

13  you actually -- I had a case that involved insider

14  trading accusations.  Well, you're going to accuse

15  somebody of insider trading.  That's kind of, like,

16  you know, "Hey, cousin, got the bad news.  The good

17  news is we're all still going to be friends; right?

18  We all decided we were independent of each other.  The

19  bad news, I've concluded that there are good grounds

20  to believe you committed insider trading, and we are

21  authorizing the company to bring suit, and likely it

22  will draw the U.S. Justice Department into the thing."

23             MR. STINE:  Right.

24             THE COURT:  "But we're all good";

120

1    right?

2                    MR. STINE:  Right.  So --

3                    THE COURT:  I think that's a little

4    different conversation than "I think you're

5    going-private price is too low."

6                    MR. STINE:  Right, right.  A little

7    bit different.

8                    Your reference to ickiness with

9    this --

10                   THE COURT:  Right.

11                   MR. STINE:  -- I think that that

12   really, kind of, is the word.  It's the degrees of

13   ickiness here.

14                   THE COURT:  And then what you're

15   saying is -- I would tend to agree with you, as part

16   of my colloquy with your friend for the special

17   committee, was every -- every member has a little bit

18   to explain; right?

19                   MR. STINE:  Right.  Exactly right.

20                   THE COURT:  But do you get to a point

21   where if everybody has a little to explain, it adds up

22   to material or do you have to actually, under our law,

23   under Mr. Allingham's favorite line of cases, do you

24   have to actually go director by director?  I thought

121

1    Technicolor and other cases said you have to actually

2    look at the specific director and make a judgment

3    on -- as to that director about materiality.  And I

4    think Martha Stewart, the case -- may be actually the

5    person, too, but the Martha Stewart case says the same

6    thing.

7                         MR. STINE:  Right.  Well --

8                         THE COURT:  I don't know what she's

9    saying on the show about --

10                        MR. STINE:  I think in the context of

11   when there's a special committee and whether or not

12   one or more of these infect the process, I think it's

13   a little bit different.

14                        And I just -- Your Honor, in the -- in

15   the Southern Copper case, the reason why Your Honor

16   didn't shift the burden was you found that that

17   analysis was fraught with factual complexity.  And I

18   think -- and that had to do with the special committee

19   independence.  And you said, "... [and] will rarely be

20   determinable on the basis of the pre-trial record

21   alone."

22                        And the Supreme Court acknowledged the

23   position that Your Honor took with that and said, "...

24   the general inability to decide burden shifting prior

122

1   to trial is directly related to the reason why entire

2   fairness remains the applicable standard of review,

3   even when an independent committee is utilized, i.e.,

4   'because the underlying factors which raise the

5   specter of impropriety can never be completely'" --

6   "'never be completely eradicated and still require

7   careful judicial scrutiny.'"

8                    I think that --

9                    THE COURT:  But that's why I think

10  what your friends' motion is premised on, is when you

11  use both devices up-front in tandem, they have an

12  effect together that they don't have in isolation.

13  And Lynch itself, for example -- as I mentioned

14  before, Lynch itself, the threat the committee was

15  rendered -- the concern about its independence -- or

16  to mandate its ability to say no, the controller

17  basically said, "Well, if you say no, it doesn't

18  matter because the other people can say yes.  And

19  we'll present to them a tender offer," which, for all

20  the reasons you would say were -- all the reasons you

21  gave for why a vote is not enough, apply more fully to

22  a tender offer.

23                    MR. STINE:  Right.

24                    THE COURT:  I think what your friends

123

```
 1   are saying here is the standard they want is good
 2   old-fashioned corporate Delaware law.
 3                    MR. STINE:  Well --
 4                    THE COURT:  A strong brew, which is if
 5   you don't do it the right way, you get entire
 6   fairness.  But if you do it the right way, there's a
 7   nonlitigation-intensive way to get the business
 8   judgment rule standard, which is an independent
 9   committee meeting the recognized tests for
10   independence under our law, with the appropriate
11   mandate and the ability to say no and recognizing
12   up-front that even if they say yes, the deal will only
13   go through if there's an informed, uncoerced vote.
14                    MR. STINE:  Right.
15                    THE COURT:  And they're saying if you
16   establish those things up-front, you should get
17   business judgment rule, and business judgment rule
18   means we don't go back and say "Well, you know, if you
19   added Warren Buffett to that committee, they would
20   have gotten another dollar and a quarter."
21                    But that's the difference between
22   entire fairness and what they're asking for.
23                    MR. STINE:  Right.  And I understand
24   that.  I get that.
```

124

 1              THE COURT:  And what they're saying

 2    about the difference between Southern Peru is that

 3    under the existing line of the "or," you have to get

 4    down into the dough of fairness, anyway.  And the

 5    reason why no one wastes a lot of time on burden

 6    shifting is, as I understand the burden, what you got

 7    is only if -- I mention this because I'm a kid and I

 8    remember one of the most painful things is -- did you

 9    ever fall off the front of your bike seat and you land

10    on that bar and you're just stuck there?  You can't

11    talk because you're in excruciating, agonizing pain,

12    and you think that your ability to have a future

13    generation has been entirely lost.

14              If you're stuck there on that bike, as

15    I understand what the burden shift does, is the

16    other -- the party who has it gets to just push you

17    and you fall off the other side of the bike; right?

18              MR. STINE:  Right.

19              THE COURT:  Under a preponderance

20    standard.  And so no one ever cared about it.

21              I think this standard -- I think what

22    Mr. Allingham and his friends are arguing for is, it's

23    not that approach to it.  You -- you do the things

24    that classically cleanse an interested transaction,

125

1    but you do them together.  You actually do not just

2    one of the things that 144 says; you do them together.

3    The litigation intensiveness of the fairness review is

4    actually out of the process.

5                         MR. STINE:  Right.  And, Your Honor --

6                         THE COURT:  And I say there's risks to

7    that; right?

8                         MR. STINE:  And, Your Honor, I

9    understand.  It's what Your Honor talked --

10                        THE COURT:  What I don't understand

11   is, I don't believe there's any value to saying you

12   get business judgment rule if you pass entire

13   fairness, which is there's no -- I mean, what I mean

14   is if up-front what you have to do is to say "Would I

15   have made every move or not" -- "or decided not to

16   make every move that Mr. Meister and the committee

17   made, would I have pressed back, using certain

18   valuation metrics to get, sort of, higher" --

19                        MR. STINE:  Right.

20                        THE COURT:  If you're down into that,

21   you're not -- you're not even talking about them

22   qualifying for the business judgment rule.  You're

23   talking about some factually intensive heightened

24   review process.

126

1          MR. STINE:  You're talking about a

2     situation where, at the pleading stage, you can

3     dismiss what would be generally --

4               THE COURT:  Well, I mean, I'm talking

5     about summary judgment, which is I think there's a big

6     difference of whether you're looking at whether the

7     committee is structurally empowered in the right way

8     in a controller situation so that they can effectively

9     say no and have bargaining power, whether they engaged

10    in an obviously rational process in terms of actually

11    having meetings and being able to pick their own

12    advisors, having the right mandate.  I think those are

13    very distinct up-front things that people can assess.

14              If you're getting down into

15    substantive fairness review, combining process and

16    price, and seeing whether it came out like an arm's

17    length transaction, that's fairness review; right?

18              MR. STINE:  Well, that's --

19              THE COURT:  That's what you do in a

20    fairness review; right?

21              MR. STINE:  Right, that's what you do

22    in a fairness review.

23              THE COURT:  So if you do not, you

24    don't do that -- that's exactly what the business

127

```
 1   judgment rule was about.  It's that when you're in
 2   business judgment rule land, you don't do that.
 3                   MR. STINE:  See --
 4                   THE COURT:  What I'm saying is I don't
 5   know -- there's not a real in-between here; right?
 6                   MR. STINE:  Well, that's a good
 7   question.  I mean, I don't know whether there's a real
 8   in-between --
 9                   THE COURT:  Well, what is the
10   in-between?  Because if the in-between is -- and this
11   is where I thought you started with a strong point and
12   I want to hear from your friends, which is your
13   friends say they starkly want business judgment.  Part
14   of why you said "I didn't get into" -- "I put in some
15   things to kind of cast doubt on it, but I didn't feel
16   like it was my burden at this point to actually engage
17   whether entire fairness lite was the standard and,
18   thus, I have the burden of persuasion under the
19   preponderance thing.  So I didn't get my financial
20   expert at this point.  That wasn't the motion I was
21   confronted with."
22                   MR. STINE:  Right.
23                   THE COURT:  Which suggests that in
24   your own mind it's a distinct concept; right?
```

128

1              MR. STINE:  Right.

2              THE COURT:  To be in business judgment

3    rule.  You were saying why it shouldn't be business

4    judgment rule.

5              MR. STINE:  Right.  And -- and we do

6    say in our -- I'll just say we do say why we -- even

7    if it's business judgment rule, why summary judgment

8    still is inappropriate.  We say that.  And I

9    understand.  But -- but you're right.  It's a

10   different situation.

11             But ... All right.  If it -- if it's a

12   Cox/CNX situation and it's not a -- and they had both

13   starting off with and then it --

14             THE COURT:  Shouldn't this case

15   actually be CMX?

16             MR. STINE:  CMX?

17             THE COURT:  Yeah.  I mean, if we're

18   going to go sequentially like this, it really should

19   be CMX.  I don't know if anybody but me has ever

20   noticed that, but I always thought it was odd.  It's

21   like some DNA sequencing.

22             MR. STINE:  Right.  I don't -- I think

23   under Kahn versus Lynch, I think it's pretty clear --

24   and especially under -- you know, Your Honor talked

129

1   about dictum at the Supreme Court versus holding.  And

2   I think that there's always the -- you know, the --

3   the statement that you hear over and over is there's

4   dictum and there's good dictum.  You know, the fact is

5   that --

6                   THE COURT:  Good dictum is dictum that

7   you like?

8                   MR. STINE:  Well, dictum is dictum

9   from the Delaware Supreme Court that says what they

10  think that the law -- the law is in a certain area.

11  And I think it's pretty clear that they think that

12  Kahn versus Lynch applies and that in any controller

13  situation --

14                  THE COURT:  Well, let me ask what my

15  legal duty is, though.  I owe a duty of fairness to

16  your clients and a duty of fairness to all parties to

17  apply the law.

18                  MR. STINE:  Right.

19                  THE COURT:  If a question has not been

20  spoken to, do you apply dictum and act like it has

21  been spoken to?  Or do you have to actually address

22  the question and then give the Supreme Court your

23  honest view as a trial judge on the open question and

24  say -- admit that they have language that's at

130

```
 1   tension -- they have dictum that's at tension with the

 2   holding but, nonetheless, it is dictum; that

 3   ultimately it's up to the Supreme Court to decide this

 4   question for itself, but the trial court needs to

 5   address with an open mind the question that's not, in

 6   fact, been presented, squarely presented, by prior

 7   cases?

 8                     MR. STINE:  And I'm sure Your Honor

 9   has dealt with the situation in the past, as have all,

10   you know, trial judges throughout the country all the

11   time.  It's a situation where there's a -- you know,

12   something is not on all fours --

13                     THE COURT:  Well, no.  I think Airgas,

14   for example, was a situation where you could take

15   various Supreme Court decisions and, you know, could

16   reach a different conclusion.  For example, I don't

17   believe -- there is only one purpose to a poison pill,

18   and that's to preclude an offer.

19                     MR. STINE:  Right.

20                     THE COURT:  But the Unocal test says

21   that if you preclude, and then it says that you can

22   go -- well, then there was other law that says you can

23   go do an election contest.  Well, Moran said there

24   were two ways around the pill.  Not just an election.
```

131

1          MR. STINE:  Right.

2          THE COURT:  It said that the Court

3  would enjoin the operation of the rights plan if it

4  wasn't a reasonable thing.  Then you had Unitrin and

5  other things that said things are unreasonable if

6  they're preclusive.

7          And -- and then, I think, Chancellor

8  Chandler parsed it correctly, which said the only way

9  you take law -- yes, you can preclude -- you can

10  actually preclude if you have a reasonable basis to

11  believe that stockholders would be making a mistake to

12  take the bid, even as to a noncoerced offer.  But it

13  took awhile for the law to, kind of, get to that

14  place.

15          And, I mean, I appreciate candor.  I

16  don't think there's ultimately an answer to this --

17          MR. STINE:  Right.

18          THE COURT:  -- because we talked about

19  before -- even the judges who wrote the previous

20  decisions are not the same people anymore.

21          MR. STINE:  Right.

22          THE COURT:  I mean, just -- that's

23  just not how the world works and --

24          MR. STINE:  Well, Southern Copper was

132

1    recent.  But --

2                    THE COURT:  And it was.  But, again,

3    that was precisely not posed by that case; right?

4                    MR. STINE:  That's -- that's true.

5    But in -- I think they went out of their way to say

6    things that were necessary for the decision.  They

7    went on pages about entire fairness in Kahn versus

8    Lynch.  I don't think -- all they needed was one

9    sentence.

10                   THE COURT:  Well, I think part of why

11   they did, because something was at issue in that case.

12   If you recall, there was a complaint on appeal by new

13   counsel, I believe, for the defendants that the burden

14   shift had not been determined before trial.

15                   MR. STINE:  Right.

16                   Unless Your Honor has other questions

17   ...

18                   THE COURT:  No.  Thank you, Mr. Stine.

19                   MR. STINE:  Okay.  Thank you.

20                   THE COURT:  Mr. Allingham and

21   Mr. Mundiya.  If -- I think we've -- if you could be

22   pointed.  You're between --

23                   MR. ALLINGHAM:  I see the time, Your

24   Honor.

133

1          THE COURT:  You're between hunger -- a

2    reporter who wishes to kill me -- and she should --

3    and students and delicious subs from, I believe

4    Capriotti's.

5          MR. ALLINGHAM:  The pressure is

6    overwhelming.

7          (Laughter)

8          THE COURT:  They've never had a Bobby.

9          MR. ALLINGHAM:  The surprise at having

10   to argue about summary judgment on this motion -- on

11   entire fairness on this motion, we teed up the issue

12   in our opening brief at pages 31 and 32.  Burden

13   shifting is explicitly argued there.  Did the

14   plaintiffs think, nevertheless, that this was just a

15   binary bright-line motion or did they understand that

16   it was more?  To get the answer to that, Your Honor,

17   look at the discovery they asked for.

18          THE COURT:  Let me just look at --

19   wait a minute.

20          Yeah.  There's a problem here, though.

21   What you say is what you should get is summary

22   judgment on burden shift.

23          MR. ALLINGHAM:  Sure.  And -- and did

24   the plaintiffs continue to think that this was a

CHANCERY COURT REPORTERS

134

```
 1   bright-line argument?  The answer is no.  If you look

 2   at the discovery that they asked for, it was broad and

 3   it addressed issues that relate to entire fairness.

 4                  THE COURT:  But as a matter of

 5   precision, your motion was, at best, that if you were

 6   denied your argument on the -- your ... if you were

 7   denied your argument about business judgment rule,

 8   that you would get a burden shifting, to go into trial

 9   with a burden shift.  Isn't that precisely what your

10   brief says?

11                  MR. ALLINGHAM:  That's the argument on

12   pages 31 and 32.

13                  THE COURT:  Well --

14                  MR. ALLINGHAM:  What then happened in

15   the plaintiffs' brief was that they made 15 pages of

16   arguments on entire fairness, pages --

17                  THE COURT:  Well, they make arguments

18   on entire fairness or ...

19                  MR. ALLINGHAM:  They have 12 to 15

20   pages, Your Honor, attacks on the price which would

21   have been entirely unnecessary.

22                  THE COURT:  No, no.  I mean, what they

23   say is this:  They have headings "Even if the Court

24   follows" -- this term "unifying standard," I'm not
```

135

1  always -- somehow makes me think of the Soviet Bloc or

2  something.

3            But the -- that even if that applies,

4  that the special committee was not independent, was

5  not fully empowered; and they questioned things about,

6  right -- earlier they, obviously, have stuff about the

7  buyout.

8            MR. ALLINGHAM:  Yeah, the buyout price

9  was unfair to MFW shareholders with subsections.

10           THE COURT:  But part of that is you

11  pour in -- you have your own

12  patriotic-trumpets-blaring part of your brief, which I

13  don't -- I think would be unsurprising for you not to

14  have.  But as a very precise matter, your request for

15  summary judgment in your brief is to apply the

16  presumptions mandated by the business judgment rule

17  and grant the motion for summary judgment.  Then at

18  the end of the brief the same thing is repeated, "...

19  find that Defendants' decision to enter into the

20  Merger is protected by the Business Judgment Rule

21  ...."

22           And what you're saying on page 31 and

23  32 is, "At the very least, though, Judge, if we lose

24  on that" -- now, you do say "at the very least," but I

136

1   take that like a plaintiff's -- like a complaint,

2   where it says "damages of at least," because you never

3   want to sell yourself short.  At the very least, you

4   get a burden shift in the ultimate trial.

5                   MR. ALLINGHAM:  I -- I think that I

6   made my point, Your Honor.  I don't --

7                   THE COURT:  I'm saying -- I'm not

8   saying that your -- I understand they joined issue

9   with you.  It would be impossible for even the most

10  moderate of lawyers, let's say, you know,

11  Mr. Bouchard, Mr. Lafferty, like the most unruffled

12  of, you know, practitioners, right, Mr. Monteverde,

13  people of equilibrium and calm temperament, they would

14  be unable to face your opening brief without

15  commenting something on the price; right?

16                  MR. ALLINGHAM:  I take your point.  My

17  only point is this motion progressed from the opening

18  brief through the answering brief to the reply

19  brief --

20                  THE COURT:  I understand that.  But

21  what they -- their job in their answering brief is to

22  meet your motion.  And your motion was predominantly,

23  almost exclusively about business judgment rule, which

24  is why your client took on this -- I mean, your

137

1   client -- not why.  But your client -- what your

2   client was saying is, "I did these two powerful things

3   together, and I get credit for it."  That's the major

4   part of the motion.

5              And then on 31 and 32, what you've

6   been able to point to is, "Well, at the very least,

7   though, if we don't win on our major argument, then we

8   get -- going into the trial, we get the burden shift

9   under the Lynch standard as the plaintiffs articulate

10  it."

11             MR. ALLINGHAM:  That is -- that's

12  correct, Your Honor.

13             THE COURT:  As a formal matter.  I'm

14  saying there might be a spirit -- you know, like, we

15  have the spirit of the remand.  That might be the

16  spirit of the briefing where it's evolved; but if

17  you're looking formally within the four corners of

18  your opening papers, this is the motion.

19             MR. ALLINGHAM:  And -- and Your

20  Honor's latter point is the point I was trying to

21  make.

22             THE COURT:  Okay.

23             MR. ALLINGHAM:  The second point I

24  want to make is this:  In Southern Peru, the Supreme

138

1  Court found it was not inappropriate to decline to

2  address the burden-shifting question before trial.

3  That was with respect to a burden-shifting device

4  where there was a factual dispute.  In our case, there

5  is no factual dispute.  There was a

6  majority-of-the-minority vote.  There were no

7  disclosure claims.  And there was a 2 to 1 margin on

8  that majority-of-minority vote.  So perfectly

9  appropriate to decide the burden-shifting question

10 now.

11                    THE COURT:  Like even right now.

12                    MR. ALLINGHAM:  Yes.

13                    THE COURT:  Like, literally right now.

14                    (Laughter)

15                    MR. ALLINGHAM:  With -- with respect

16 to the issue of burden, it is clear under any

17 procedural scenario that the burden to show a lack of

18 independence on the part of special committee member

19 is on the plaintiffs.  As Your Honor pointed out, they

20 asked no questions.

21                    THE COURT:  How about this

22 accumulation of unnecessary de minimis questions that

23 your clients present?

24                    MR. ALLINGHAM:  I think --

CHANCERY COURT REPORTERS

139

1              THE COURT:  What I think Mr. Stine's

2    point is, that there's -- each member of the committee

3    has something that at least the Court has to consider.

4              MR. ALLINGHAM:  I, frankly, don't

5    agree with that, Your Honor.  I don't think

6    Mr. Meister has even been argued to lack independence.

7    The allegations about Mr. Webb are legally

8    insufficient.

9              THE COURT:  Well, Mr. Meister, I

10   suppose, just raises the new emerging question that's

11   going to exist in corporate governance, which is how

12   long can one be independent; right?

13             MR. ALLINGHAM:  That is, is it a good

14   thing or a bad thing to have an experienced director?

15             THE COURT:  No.  I think that's a --

16   that's, as I would expect from you, a scintillatingly

17   fine dodge of the fundamental question --

18             (Laughter)

19             THE COURT:  -- which is when human

20   beings do important and meaningful things together

21   over time, their relationships change.  And I think

22   one of the emerging issues -- I agree the law hasn't

23   gone there yet; but it would be surprising to me for

24   an independent director to have the same relationship

140

1   with a manager and controlling stockholder after a

2   decade of such service that he or she did at the

3   beginning.  It would actually creep me out to think

4   that people were so robotic that they would not

5   change.  What you're saying is the law hasn't gone

6   there, and there's no, even, argument about

7   Mr. Meister; right?

8                   MR. ALLINGHAM:  There is no argument

9   about Mr. Meister.

10                  THE COURT:  And the only thing is he

11  has served as independent director in

12  Perelman-affiliated companies for over a decade now?

13                  MR. ALLINGHAM:  Yes.  But as Your

14  Honor says, that's not an issue.  I'm not going to

15  make the argument to the contrary, but it's not an

16  issue our law has ever gone to --

17                  THE COURT:  No.  And neither -- even

18  with the -- and the Exchanges haven't even gone there.

19  Although they've gone in all kinds of interesting

20  places, this is not one place they have gone.

21                  I mean, I suppose from our colonial

22  experience, you could say that, you know, we were

23  actually capable of being independent after over a

24  century of dependency.  So ...

141

1          MR. ALLINGHAM:  Your Honor had a
2    lively discussion with Mr. Stine about the
3    appropriateness of determining entire fairness
4    questions on summary judgment.  We cite in our brief
5    the leading case on that, which is the Tanzer
6    decision.  That's a case in which the burden had not
7    been shifted.  The plaintiff -- sorry.  The defendants
8    made a prima facie showing of fairness, and the
9    defendants failed to bring forward any evidence.  The
10   Court entered summary judgment on the question of
11   entire fairness.  And in various forms, that opinion
12   and that ruling have been cited in subsequent cases,
13   including Arnold versus Society for Savings.
14          The Celotex decision from the U.S.
15   Supreme Court supports the notion that a failure to
16   make a showing in the -- where there is -- where
17   there's an allegation of an absence of evidence on --
18   on which the plaintiffs bear a burden is adequate for
19   summary judgment.
20          THE COURT:  No.  I get that stuff.
21   And I think we're -- is there anything else you're --
22   you're metaphorically dying to say?  Actually, if
23   you're literally dying to say, we -- we want to urge
24   you to choose life, but --

142

1                    (Laughter)

2                    MR. ALLINGHAM:  Yes.  Let me make one

3    final point, and that has to do with the inherent

4    coercion discussion.  I think that the question of the

5    standard of review should address the particular

6    transaction facing the Court.

7                    So what's the concern about inherent

8    coercion?  It's not, obviously, that Mr. Perelman or

9    MacAndrews would dictate the terms of this

10   transaction.  We know they're insulated from that.

11   It's not, obviously, the vote.  We know they're

12   insulated from that.  The question is -- the last

13   remaining question is this notion of inherent

14   coercion.  And in this case -- and -- and -- and --

15                   THE COURT:  And the conundrum there

16   has to be intellectually -- what people are going to

17   say is "I know I can freely choose no without any

18   consequence" except the three -- when did the deal

19   close in relationship to the vote?

20                   MR. ALLINGHAM:  Very quickly.

21                   THE COURT:  Yeah.  I mean, I'm

22   assuming, from experience, there's, like, a team that

23   makes sure things close so the business plan doesn't

24   change or something.

143

1                    Is ... that even if you assume there's
2       a two-week delay or something like that, there's
3       appraisal right here; right?
4                    MR. ALLINGHAM:  Yes.
5                    THE COURT:  Yeah.  But because it was
6       a merger vote, if I vote no, I get the transactional
7       consideration at the same time as everybody else in
8       the deal.  So the only cost to me of hanging around
9       the vote is to delay between when I could have sold --
10                   MR. ALLINGHAM:  Which is a delay --
11      which is a -- which is a choice you have in any
12      transaction.
13                   THE COURT:  That's what I'm saying.
14      So the whole thing about inherent coercion has to be
15      it's not that I'm afraid that the controller -- that I
16      actually have to be around for the controller to
17      punish me, because I can freely vote no and still be
18      gone, thinking he'll punish me if I -- if the
19      transaction goes down, right.  Or is it that if we all
20      vote -- if I know all of us vote no, the transaction
21      actually will go down and he'll be able to punish me?
22                   MR. ALLINGHAM:  And I think that is
23      the conjecture that -- that --
24                   THE COURT:  That if we all vote no,

144

1     then -- then Mr. Perelman is going to rise up and

2     engage in retributive acts, and we'll all be sorry,

3     and we'll get 14 bucks or some pathetic number down

4     the line.

5                      MR. ALLINGHAM:  Exactly.  And that --

6     that is articulated as a possible perception on the

7     part of minority shareholders.  It's a perception

8     that, frankly, makes no sense at all in this case.

9                      The two specific examples, which Your

10    Honor has now talked about, you know, stop the

11    dividend payments, MFW never paid dividends.  Okay,

12    let's do a retributive transaction at a lower price.

13    In this case the MacAndrews & Forbes Worldwide board

14    had already extracted an agreement from Mr. Perelman

15    that he would not buy above a certain level of stock,

16    below a majority, without giving notice to the board,

17    which gives the board the absolute power to do what it

18    needs to do if he's going to do some unfair act.

19    There is no reason for shareholders to perceive --

20                      THE COURT:  Well -- and I take it,

21    then -- what we're saying something about the

22    inadequacy of our law, too, if a controller, in the

23    wake of a no vote, attempts to do retributive acts,

24    what we would be saying is somehow our law has no

145

1  ability to constrain such duties -- breaches of the

2  duties of loyalty when they actually happen.

3  　　　　　　　　MR. ALLINGHAM:  That's true, Your

4  Honor, although in Citron, the Court said it would

5  take you awhile to get your remedy for that unlawful

6  act.  But my point is the board has absolute power to

7  stop that awful act that Mr. Perelman obviously isn't

8  contemplating, anyway.  Why would a minority

9  shareholder, looking at a controller, who, for the

10  first time, has said "I'm walking away from influence

11  here.  I'm walking away from influence on the vote.

12  I'm walking away from influence on the terms of the

13  transaction.  I will let the chips fall where they

14  may.  And if a deal I want to do doesn't get out of

15  the starting gate, okay"?

16  　　　　　　　　THE COURT:  Well -- and what you're

17  saying is those conditions actually create an

18  environment where if the controller then attempts to

19  do something retributive, it can shine the light on

20  himself because you promised to let the committee say

21  no.  You promised that you would abide by the

22  committee's decision, but now you've essentially, you

23  know, got a club in your hand and you're beating the

24  -- the -- the daylights out of people.

146

1             MR. ALLINGHAM:  And my point is both

2    of these provisions, no dividend and the agreement,

3    were publicly disclosed.  So were the conditions.  No

4    rational minority shareholder would say under all of

5    those circumstances "I can't think of what it might

6    be, but I'm still afraid Mr. Perelman is going to do

7    something to me if I vote no."  It's just not

8    rational.

9             Thank you, Your Honor.

10             THE COURT:  Anything from the special

11    committee?

12             MR. MUNDIYA:  No, Your Honor.

13             THE COURT:  Well, thank you, and thank

14    you particularly to our reporter.  Our students are

15    here and they're going to go somewhere else.  I would

16    free the lawyers, and maybe I will talk to the

17    students for a couple minutes, and then they can go

18    down and enjoy their lunch without the presence of my

19    bald head.  And -- but you guys do not -- you've

20    risen.  You may leave.  And so may Neith.

21             (Court adjourned at 1:10 p.m.)

22                      - - -

23

24

CHANCERY COURT REPORTERS

147

1                             <u>CERTIFICATE</u>

2

3                    I, NEITH D. ECKER, Official Court

4      Reporter for the Court of Chancery of the State of

5      Delaware, do hereby certify that the foregoing pages

6      numbered 3 through 146 contain a true and correct

7      transcription of the proceedings as stenographically

8      reported by me at the hearing in the above cause

9      before the Chancellor of the State of Delaware, on the

10     date therein indicated.

11                         IN WITNESS WHEREOF I have hereunto set

12     my hand at Wilmington, this 15th day of March 2013.

13

14

15                         /s/ Neith D. Ecker

16                         ----------------------------
                           Official Court Reporter
17                          of the Chancery Court
                             State of Delaware
18

19

20     Certificate Number:  113-PS
       Expiration:  Permanent
21

22

23

24

CHANCERY COURT REPORTERS